1

2                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF OHIO
3                         WESTERN DIVISION AT DAYTON

4    BALL METAL BEVERAGE CONTAINER
     CORP.,
5
                     Plaintiff,
6
     Vs.                              CASE NO. 3:12-cv-33
7
     CROWN PACKAGING TECHNOLOGY,
8    INC., et al.,

9                    Defendants.

10
                         TRANSCRIPT OF PROCEEDINGS
11                          MARKMAN HEARING

12   PRESIDING:  THE HONORABLE WALTER H. RICE

13   DATE:  October 22, 2013

14   APPEARANCES:

15   John D. Luken, Esq.
     Joshua A. Lorentz, Esq.
16   Rachael L. Rodman, Esq.
     Nicole M. Sigurdson, Esq.
17   On Behalf of Plaintiff

18   Dale M. Heist, Esq.
     John F. Murphy, Esq.
19   Aaron B. Rabinowitz, Esq.
     James H. Greer, Esq.
20   On Behalf of Defendant

21   Law Clerks:  Lisa M. Woodward, Esq.
                   Zachary P. Farquhar, Esq.
22
     REPORTED BY:
23   Debra Lynn Futrell, RMR, CRR

24

25

1                      C-O-N-T-E-N-T-S

2                                          Page

3    Argument by Mr. Luken              5
     Argument by Mr. Heist             62
4    Argument by Mr. Murphy           119
     Argument by Mr. Luken            130

5                             -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              Tuesday, October 22, 2013

2             IN THE CONFERENCE ROOM

3                  9:04 a.m.

4         THE COURT:  This is Ball Metal Beverage

5  Container Corporation versus Crown Packaging, et al.

6  The appearances for Ball:  James Greer, Aaron

7  Rabinowitz, Joshua Lorentz, and John Luken.  For Crown,

8  Rachael Rodman, Dale Heist, Nicole Sigurdson, and John

9  Murphy.

10         MR. LUKEN:  Some of those were crisscrossed

11  as to who's on whose side.  I ended up on Dale's side,

12  I'm pretty sure.

13         THE COURT:  Can we assume the case is

14  settled then?

15         MR. LUKEN:  That is a novel ADR technique.

16         THE COURT:  Frees up the rest of my day.  I

17  apologize.  I simply was going by what's in front of me.

18  Let's handle it in this fashion.  For Ball, John Luken

19  Joshua Lorentz, and Rachael Rodman.  For Crown, James

20  Greer, Dale Heist, Aaron Rabinowitz, and that leaves

21  John and Nicole.

22         MR. LUKEN:  Yes.  John, you are with the

23  John, are you not with Ball.  Nicole.  With Ball.

24         MR. GREER:  You have John Murphy with Crown

25  too, your Honor.
```

1          THE COURT:  I apologize, I was going by this

2 and I should have double checked it.  At any rate

3 recovering my dignity to the extent possible, we're here

4 on a claim construction matter.  I understand there are

5 no witnesses.  We're going by oral argument.  That's

6 fine.

7          I've read the briefs.  I read your

8 prehearing statement.  I'm assuming, and you can correct

9 me, that the arguments this morning will be based on the

10 areas on which you have not reached agreement.  Is that

11 a valid assumption?

12          MR. LUKEN:  Yes, your Honor.

13          MR. HEIST:  Yes, your Honor.

14          THE COURT:  I am planning to start first

15 with Ball's argument unless the two of you have agreed

16 to proceed differently.

17          MR. HEIST:  No, we actually agree to that.

18          THE COURT:  Anything you need to tell me

19 before I go in other than who represents whom?

20          MR. LUKEN:  Judge, in terms of timing, since

21 your Honor allowed half a day, we were guesstimating an

22 hour and a half each and be able to reserve 45 minutes.

23          THE COURT:  Unfortunately, I have a

24 commitment at noon.  If we do not finish by noon, I've

25 got some time this afternoon, if need be.  See you out

1    front.

2                    (Recess taken at 9:07 a.m.)

3                         IN OPEN COURT

4                         9:15 a.m.

5              THE COURT:  We have this morning case

6    C-3-12-33, Ball Metal Beverage Container Corporation

7    versus Crown Packaging Technology, Incorporated, et al.

8    The appearances are:  For Ball, John Luken, Nicole

9    Sigurdson, Joshua Lorentz, and Rachael Rodman.  For

10   Crown, James Greer, Aaron Rabinowitz, John Murphy, and

11   Dale Heist.

12             We are here for a claim construction or

13   *Markman* hearing.  Counsel have asked for an hour and 15

14   minutes each with the option of reserving some time for

15   reply or rebuttal.  It's my understanding that the

16   arguments will zero in on those claims which have not

17   been resolved between counsel.

18             Counsel for Ball may proceed.  Mr. Luken.

19             MR. LUKEN:  Thank you, judge.  Now we find

20   out whether my technology works, whether I can advance

21   the slide successfully.

22             So far so good.  As your Honor indicated,

23   we're here to focus on the claims that are at issue and

24   the disputed claim terms that are at issue.

25             Your Honor will note that in this case,

1  unlike the past case between the parties, there are

2  many, many claims.  There are 25 different asserted

3  claims in the current case.

4           On the screen, the claims that are

5  independent claims are bolded and underlined, and the

6  dependent claims are not.  If we compare this to the

7  last case, the only claims that your Honor had to

8  grapple with in the last case are the claims that are in

9  red here, claim 50 and 52 of the '875 patent and claim

10  14 of the '826.  13 is the independent claim from which

11  claim 14 depends, but claim 14 is the asserted claim.

12           Your Honor, that frames a lot of the issues

13  that you are going to have to deal with in *Markman*.

14  Crown in its briefing has mentioned repeatedly that

15  there are a lot of claim terms here as if that is

16  something of our choosing.

17           In fact, the patents have the unfortunate

18  tendency to describe exactly the same structure or the

19  same process using slightly different words in different

20  claims so that in the first case, your Honor, may have

21  made it quite clear, for example, that a can end wall is

22  the part of the can end that runs from the cover hook at

23  the top to the annular reinforcing bead at the bottom

24  and that it's a single surface.  Your Honor only had to

25  deal with that basically in two places that were

1    relatively similar.  Claim 50 in one patent and claim 13

2    or 14 in the other.

3              Your Honor now has to grapple with the

4    claims trying to say exactly the same thing but doing it

5    as many as three, four and five different ways.  So the

6    bedrock of what we're trying to urge your Honor to do is

7    to construe the same concept, the same part of the can

8    end the same, regardless of whether one claim calls it a

9    first point and the other one calls it a first location,

10   or whether one claim calls it a second point or the

11   other claim calls it a transition.

12             The second bedrock piece of what Ball is

13   urging, your Honor, is to stay true to your holdings in

14   the first case.  There is a significant decision your

15   Honor made that was affirmed by the federal circuit

16   concerning a disclaimer of scope by Crown as a result of

17   statements made during prosecution.

18             Your Honor found that Crown had limited its

19   invention to a can end which is seamed such that it

20   becomes substantially cylindrical during seaming, and

21   during that process, the upper portion of the can end

22   wall is bent by ten degrees or more.  That latter part

23   was dispositive in the last case.  The federal circuit

24   affirmed.

25             Crown never actually disagreed with the

1  "becoming substantially cylindrical" part of that

2  holding which both means it has to not be beforehand and

3  becomes during.

4        Your Honor will see as I go through today

5  that that's a bedrock in what we're proposing, is to

6  make sure that just because there are a lot of new

7  claims that are added that try to describe the invention

8  slightly with different language, that disclaimer

9  applies across the board to every claim in these

10  patents.

11        First, your Honor, I'm not doing the

12  technology real well here.  I'm going backwards.  That's

13  not going to help.

14        Briefly, to highlight the differences

15  between the prior art and the invention which are going

16  to drive the constructions, particularly the disclaimer.

17  So in the prior art can ends, they all have a peripheral

18  curl, that curved part at the top of the blue, which is

19  called the cover hook in the patents.

20        They have the can end wall, which your Honor

21  recognized in the last case.  It is that single surface,

22  not two walls but one wall, a single surface, that is

23  the next structure down.  It has the reinforcing bead at

24  the bottom, which your Honor last time held was a

25  generally U-shaped stiffening bead.  And the parties

1    have agreed in this case to your definition of the

2    annular reinforcing bead from last case.  So we do

3    occasionally agree on something.  Then the center panel

4    into the middle.  So it's a continuous set of

5    structures, peripheral curl hook, then the can end wall,

6    and then the reenforcing bead.

7              In the prior art as Crown said repeatedly,

8    the angle of inclination of the can end wall, which is

9    angle C on this, and is the angle of the straight part

10   that goes from the curl at the top down to the

11   reinforcing bead in the bottom is under 20 degrees.  The

12   specification here describes angle C in the prior art as

13   about 12 to 15, as typically about 12 to 15.

14             But the specification also describes it as

15   being larger than 12 to 15, referencing one prior art

16   reference, the Kysh reference.  It describes it on the

17   top as anywhere between, as that reference, going 14 to

18   16.  And in the figure on the bottom which comes from

19   the specifications discussion of a Kraske reference, it

20   describes the prior art having a can end wall of between

21   12 and 20.

22             Consistently, the specification, the file

23   history refer to the prior art as can ends in which the

24   can end wall is inclined at 20 degrees less.  And

25   consistently the specification, the file history, and

1    the claims themselves define the invention's can end

2    wall as always being 20 or more.  Usually 30 or more.

3              That is a line of demarcation between the

4    prior art and the invention that becomes critical when

5    we're talking about what it means to become

6    substantially cylindrical.  We'll talk about that a

7    little bit more this morning.

8              So again these claims all describe either a

9    can end that is seamed in a particular way, that's the

10   '826 patent, or a method of seaming that uses a can end.

11   So they're basically mirror images of each other.

12             Your Honor construed them consistently in an

13   integrated manner last time.  We would urge your Honor

14   to do it again today.

15             Now, I'm moving from the structure to the

16   seaming in the prior art.  As your Honor recalls, the

17   can, which is what we've highlighted in green here, sits

18   on a lifter plate in the seamer.  The can end which we

19   were looking at before blown up, but it's the blue thing

20   at the top, and it's rather small when it sits in the

21   seamer, is placed on top of the can, and there curls are

22   like flanges on the outside and they sort of rest right

23   on top of each other.

24             The chuck which your Honor spent a fair

25   amount of attention to in your *Markman* decision in the

1    prior case, is pushed down on the can end so that the

2    lifter plate and the chuck squeeze the can end and the

3    can together.  They are then rotated at high speed.

4            The first seaming roll shown in this

5    diagram, on figure 1 from the patents on the left, comes

6    in and begins to bend and it sort of tucks the can end

7    and the can around each other in their curved parts.

8    Then it's pulled away, and the second seaming role comes

9    in and finishes the job.  During the process, as your

10   Honor recalls, it's the upper part of the can end wall

11   that is bent inwardly by the seaming rolls.

12           In your Honor's decision in the *Markman*

13   order and in your summary judgment on non-infringement

14   that was affirmed by the federal circuit, you focused

15   exactly on how much bending, where the bending occurs.

16   So the bending here is in the upper part of the can end

17   wall.

18           This is just the prior figure, that's figure

19   2 from the patents, but it blows it up a little bit so

20   that you can see the seating of the chuck which the

21   chuck continues but the lower part of the chuck here is

22   highlighted in yellow, and it's sitting in the can end

23   wall.  You can see that before seaming starts, it's not

24   touching the can end in the upper can end wall, but it

25   is seated down below.

1             Importantly, your Honor, in the first case,

2    and this is in your first summary judgment decision on

3    invalidity, although the written-description holding

4    there was reversed two to one by the federal circuit,

5    your Honor correctly recognized in that decision that in

6    the invention the drive is on the can end wall.  Whereas

7    in the prior art, the drive is in the annular

8    reinforcing bead that's at the very bottom where it has

9    the D where that yellow chuck is pressing down.  So when

10   we were looking before during seaming, the prior art

11   presses the chuck down in the reinforcing bead.  Whereas

12   in the invention that is not the case.

13            So, when we're finished, and this is figure

14   3 from the patent, those flanges, those outer curved

15   parts of both the can end and the can have been rolled

16   together and you have a typical double seam of five

17   layers, three of which come from the can -- the can end,

18   two of which from the can itself.  So that's a finished

19   double seam.

20            The invention gets to a finished double

21   seam.  The finished double seam looks the same.  It's

22   how you get there that is critically different.  Let's

23   talk about how we get there.  This is the invention of

24   Crown that your Honor last time had to convert into

25   claim constructions to be true to the file history and

1   the specification and the patent that your Honor is

2   faced with doing again.

3           First of all, unlike what we were looking at

4   before, here again, this is figure 4 from the patent,

5   and we've highlighted angle C which is throughout the

6   patent, that's the angle of the can end wall.  In the

7   prior art, that was always between 12 and 20.  Always

8   less than 20.  Typically 12 to 15 but under 20 in the

9   prior art.  It's exactly the opposite in the invention.

10   Angle C is between 20 and 60.  Preferably higher.  So

11   that's a major line of demarcation between what the

12   patent can cover and what the prior art could cover.

13           Crown's invention, according to Crown, uses

14   on the chuck a different kind of chuck.  They talk about

15   the radically different method of seaming, your Honor

16   will recall from the file history throughout from the

17   first case.  Their chuck is different in that --

18   remember the chuck we were looking at before in the

19   prior art had a single generally sloping surface.

20   Crown's invention has two walls of the chuck.  It has

21   that upper wall which is numbered 33 here, which is the

22   part against which the upper can end wall is pushed in

23   by the seaming rolls.  And 32 on the bottom is the lower

24   can end wall.

25           You'll recall your Honor in the first case

 1   held that these two walls have to be distinct and
 2   discernibly different side surfaces.  Because as your
 3   Honor correctly found, the chuck has two walls in the
 4   invention.  Whereas the can end only has one.  The can
 5   end is a single surface.  The chuck has two.
 6              What's critical is that the lower wall of
 7   the chuck, 32 -- the bottom of the two distinct and
 8   discernibly different side surfaces is the frustoconical
 9   drive surface that your Honor recognized in the first
10   summary judgment decision of invalidity.  That's where
11   the drive occurs in the invention.  The invention takes
12   a much bigger can end wall and it can't just press it in
13   gently by ten degrees or less.  It has to crease it at
14   that juncture that you recognized between the two chuck
15   walls and bend that can end up and around and it drives,
16   not down in the bottom of the countersink, it drives
17   right on 32, the frustoconical drive surface.
18              This is the language that your Honor
19   referenced in that decision, that in contrast to figure
20   2, the prior art, the chuck of the invention is designed
21   to drive initially on the relatively large chuck wall
22   without entering deeply into the anti-peaking bead or
23   the anti-reinforcing bead.  So it doesn't drive in the
24   bottom like the prior art.  It drives on the side.  It
25   drives on the can end wall itself.

1    This figure, your Honor, points, you can see

2    where the juncture of the two chuck walls, which is a

3    claim term that the parties have agreed upon here, is

4    where that upper can end wall is deformed during

5    seaming.  So you go from over 20, usually 45, and you

6    have to bring it all the way up to practically vertical.

7    You do that by driving on the lower chuck and bending it

8    around the juncture of the two chuck walls.

9    As your Honor pointed out in the rulings in

10    the first case, during prosecution -- and here we're

11    referring to Mr. Higham's declaration, but this is

12    repeated throughout prosecution -- Crown repeatedly said

13    when challenged by the examiners, and the examiner said,

14    well, you're claiming a can end that just has a big

15    angle.  I can see that in the prior art or it would be

16    obvious from the prior art.

17    Crown repeatedly said no.  What

18    distinguishes us from the prior art is our method of

19    seaming because we have this juncture.  We bend

20    significantly with this two-wall chuck.  We bend

21    substantially more than the prior art.  But we still end

22    up with a double seam that looks the same as in the

23    prior art.  We get there dramatically differently.

24    In fact, Crown specifically said that you

25    would not think of doing the angle of Kysh -- that's the

1    one I showed you earlier that was 12 to 20 degrees.

2    Crown says no, you have to bend by dramatically more

3    than that.  This is the particular part -- so that the

4    metal was bent through an angle of no more than about

5    ten degrees.  That's the particular part of Mr. Higham's

6    declaration that became dispositive in the first case.

7    Because your Honor said the disclaimer is you have to

8    become substantially cylindrical -- that's in the

9    *Markman* ruling -- and you have to bend by no more than

10   about ten degrees.  It was undisputed in that case --

11   well, once your Honor clarified how you measure bending,

12   it was undisputed in that case, that that requirement

13   was not met.

14              This is your summary judgment order that I

15   was speaking about a second ago where you referenced Mr.

16   Higham's declaration and you hold that it is undisputed

17   that the end at issue in that case did not bend by more

18   than ten.  Therefore, non-infringement of all of the

19   three or four claims that were at issue in that case.

20              So that's basically a once over, fairly

21   quickly.  The briefs go into more detail.  Frankly, your

22   Honor's *Markman* opinion and summary judgment decision in

23   the first case also gets into some of the same detail as

24   to the critical differences between the prior art and

25   the invention that are going to drive your Honor's

1    construction of the claim terms here.

2            Quickly going over the principles that have

3    to guide you in your claim construction -- and you do

4    hit many of these in your *Markman* decision in the first

5    case.

6            First, the meaning of term is one that would

7    be the meaning that it would have to a person of

8    ordinary skill in the art after reviewing the intrinsic

9    record at the time of the invention.

10           Your Honor, throughout the briefing, Crown

11   takes the position that "ordinary meaning" is something

12   that your Honor can just punt on and hand to the jury to

13   figure out.  So there are a lot of claim terms that are

14   worded differently from one claim to another.  Crown

15   proposes just leaving them as is and let the jury sort

16   out where it is.  Well, it's not ordinary meaning to a

17   jury that's involved here.  *Markman*, this is a question

18   of law for the Court.  There's no witness here today.

19   There's no declarations of record telling you that any

20   of these terms have a particular meaning to one skilled

21   in the art after that person is familiar with the prior

22   art and the intrinsic record, the file history.

23           So "ordinary meaning" doesn't mean I can

24   find it in a dictionary.  Let's just throw it to the

25   jury.  They'll sort it out.  That's asking for mass

1    confusion.  That's asking for both sides to turn their

2    experts loose in an uncontrollably aggressive manner.

3    That's asking for things to stray from the proper

4    construction.  So we're asking for clarity.

5           The second place where I think we and Crown

6    are disagreeing in the briefs, and your Honor has

7    recognized this in the first case as well, is from the

8    second quote.  *Phillips* itself, the en banc decision,

9    concerning claim construction recognizes that the

10   specification is always highly relevant.  It's usually

11   dispositive and it is the single best guide to the

12   meaning of the claim term.  That's particularly the case

13   where here the record of what Crown discloses in the

14   patent and what it said during prosecution is so

15   singularly focused on a single set of attributes so that

16   the specification really drives the claim construction.

17          However, as your Honor recognized that the

18   prosecution history can limit.  If the invention is

19   limited by statements such as Mr. Higham's declaration,

20   it's binding and it's not just binding on what was in

21   the first case.  It's binding on all of the claims that

22   flow from that invention so that you can have a

23   disclaimer of claim scope.

24          Critically, because the specification

25   describes and enables the invention, you cannot have

1   claims that are of a broader scope than the invention

2   that's set forth in the specification.  This gets into

3   the issue that your Honor dealt with in the invalidity

4   summary judgment motion which is still here, which is

5   where there's driving.  We're going to come back to that

6   in a second.

7            Thus, it is appropriate to rely heavily on

8   the written description for the guidance as to the

9   meaning of the claims.  In other words, you can't claim

10  what you didn't invent.  You can't claim what isn't

11  disclosed as part of your invention in the

12  specification.

13           With that as background, let's now turn to

14  the disputed claims.  What we've done here, your Honor,

15  and I'll keep coming back to this as I go through each

16  group of claims to focus on which particular one of

17  these we're talking about, but they do fall into

18  basically a handful of categories.

19           As you can see, there's a couple as to the

20  chuck, the first chuck wall and the second chuck wall.

21  There's the peripheral cover hook which is at the top as

22  we looked at before.  That's the structure at the top of

23  the end.  We've all agreed on the annular reinforcing

24  bead.  So there's nothing pointing at the bottom end

25  because that term's not disputed.  It's agreed upon.

1    The can end wall is what's in the middle.

2              There is disagreement there largely because

3    your Honor in your first decision in the first case held

4    that that can end wall has to be a single surface as

5    opposed to the two walls of the chuck.  Crown is trying

6    to take that out, at least of any claim that you did not

7    construe in the first case because it wasn't asserted in

8    the first case.

9              Over on the right, you can see we point at

10   the upper portion of the can end wall and the lower

11   portion of the can end wall.  Those are critical for

12   clarification because the upper part of the can end wall

13   is where the disclaimer was.  That's the part that has

14   to be not substantially cylindrical before seaming,

15   becomes substantially cylindrical during seaming and

16   bend by more than ten degrees.  That's in your Honor's

17   original case decision.

18             We got the point, because your Honor will

19   recall, although we did not get this far, your Honor did

20   not have to decide these points.  The crux of eventually

21   at a trial, if it got that far, of infringement here is

22   whether certain angles are above or below a threshold

23   amount.  Usually 30, sometimes 20 degrees.  And to

24   figure those out, the trier of fact has to place a point

25   somewhere on the can end wall and another point

1   somewhere else and connect the dots and measure the

2   angle.  We're all using -- learning how to use AutoCAD

3   in this case so that we can do that.  But what's

4   critical is where you put those two dots.  Because the

5   first dot -- you'll remember in the first case, your

6   Honor, in the summary judgment briefing when your Honor

7   had to determine the amount of bending of the upper can

8   end wall, Mr. Higham tried to move the upper point out

9   into the cover hook.  He tried to pick up some of the

10  curved part in the cover hook.

11          Your Honor recognized that that's not how

12  they did it when they made their disclaimer before the

13  patent office.  So your Honor said no, it needs to be

14  here.  Some of what Crown is frankly complaining about

15  in the briefing is that we're asking your Honor to

16  clarify some points that were in the last decision with

17  a little more substance, a little more clarity in large

18  part because of the proliferation of claims here to make

19  sure the jury doesn't think that the first point is one

20  thing here and a different thing there when it's

21  supposed to be the same thing.

22          Unfortunately, there's actually one pair of

23  claims where they have to mean something different even

24  though they use the same word.  So that's why we're

25  zeroing in a little bit more on the can end wall and on

1    the points.  So while there are a number of issues your

2    Honor has to decide, they collapse into a manageable

3    group of issues which frankly track very closely to what

4    you had to do in the first case.

5             So, your Honor, there are -- as I said,

6    there are quite a few -- well, it's at least plural, the

7    number of things that we've agreed on.  The rotatable

8    chuck that comes straight out of your first decision.

9    The annular reinforcing bead that comes out of your

10   first decision.  The seaming panel is the curved

11   innermost portion of the cover hook.  We've agreed on

12   that.  The reason that comes into play is that some of

13   the claims talk about the seaming panel as being the

14   thing that's above the can end wall.  Others talk about

15   the cover hook.  Well, the seaming panel is the portion

16   of the cover hook that abuts the can end wall.  So for

17   purposes of this case, the seaming panel and the cover

18   hook are, for all practical purposes, going to be the

19   same thing.  The cover hook actually has some more

20   structure that's not relevant to the case.  Because some

21   claims talk seaming panel and some claims talk cover

22   hook, they both have to be something that's addressed.

23   We agreed on the seaming panel.

24            The juncture therebetween, your Honor

25   recalls, that was a critical thing in the first case.

1    Your Honor didn't have to reach that in summary
2    judgment, but your Honor was clear that there's two
3    walls on the chuck and where they meet is a juncture
4    which is a definable edge which is a point in
5    cross-section.  That's because they need that edge to
6    seam.
7            Deforming during seaming, so as to be bent
8    upwardly around the juncture of the chuck walls --
9    that's from claim 14 from the last case -- and bending,
10   et cetera, et cetera, from claim 50 from the last case.
11   We have agreed there that it's bending upwardly around
12   the juncture with a portion of the can end wall being
13   bent by more than ten degrees.  On at least the claims
14   that were here from the last case, Crown has agreed the
15   disclaimer applies.  Crown is trying to avoid the
16   effects of the disclaimer everywhere else.
17           So the first group of claims that I'll
18   address -- and I'm going to move through some of these
19   more quickly than others because the briefs, I think,
20   may cover them more completely than others.  And the
21   points of disagreement may be clarified in the briefs,
22   but in any event the first one is the cover hook.  The
23   most logical place to start because it's up at the top
24   of the entire structure.  It's the outside.  It's that
25   curved thing that I showed you before.

1           This shows up in most of the claims.  All of

2    the independent claims.  Therefore, out of the 25 claims

3    that we have at issue here, it's in quite a few.

4           The parties have proposed different

5    constructions primarily because we have more

6    clarification.  Again so that the jury doesn't get

7    confused and try to draw that critical point that you

8    have to measure for some of the claims where the cover

9    hook stops and the can end wall starts, that's a point

10   that you need so that you can draw two dots, connect the

11   dots and measure the angle of the line between them, so

12   the jury and the experts need to know exactly where it

13   is so we've provided adequate details so that the jury

14   can do that.

15          How so?  You note that we've said the

16   outermost curved portion of the can end wall that's

17   placed on the can body flange and it's formed into

18   double seam.  And that's describing exactly what we

19   looked at a second ago when we went through the

20   invention.  As I pointed out, the cover hook is the

21   thing on the outside.  In claim 1 of the '826 patent

22   that upper point of the border between the cover hook

23   and the can end wall is where you have to put your first

24   point that you're going to measure an angle for.  It's

25   critical that the jury in effect know where the border

1    is.

2         Again, it's not sufficient just to say,

3    well, Indiana's west of Ohio and Ohio is east of

4    Indiana.  You've got to know where the border is if

5    you're going to figure out whether somebody is in one

6    state or another.  It's the same kind of thing we're

7    dealing with here.

8         We've referred to, in our proposed

9    construction, the cover hook is the outermost curved

10   portion of the can end.  This is right.  Figure 5 shows

11   you that's exactly what it is.  It's the outermost

12   portion of the can end and it's curved.

13        In the specification, the spec makes it --

14   the patent makes it abundantly clear that you place the

15   cover hook on the body of the can, on the flange of the

16   body of the can and they are rolled together during

17   seaming.  When we say it's placed on the can body

18   flange, that is not an important limitation.  That's the

19   invention.  That's how this thing works.  You can see it

20   right here.  The cover hook during seaming, as it's

21   seamed, is the red part that's getting rolled in and the

22   green is the can end itself.

23        This is -- before I showed you during

24   seaming one sitting on the other.  This is from figure 7

25   of the patents which is when seaming is pretty far

1    along.  On the left side, I believe that's after the

2    first roll is finished.  On the right side, you can see

3    the classic double hook -- or double seam on the

4    finished seam formed by the second seaming roll.  So

5    this is what happens.  It is formed into a double seam.

6    So our construction is describing exactly what goes on

7    in the invention.

8              Crown takes issue with some of the language

9    we have in here and says it's surplus and you don't need

10   it and it's wrong.  The two parts they really disagree

11   with most are whether the cover hook is the curved

12   portion of the can end and whether it's formed into a

13   double seam.  Well, it is.  The best proof of that is,

14   remember during the last case Crown pointed out that it

15   wasn't just suing us here -- or Ball here, it was suing

16   *Rexam* in Delaware.  That case proceeded to some

17   decisions by the district court and made a trip up to

18   the federal circuit as well.

19             In that case you'll recall shortly before

20   your Honor ruled on *Markman*, Crown submitted the entire

21   *Markman* decision from the Delaware case and urged your

22   Honor to adopt it verbatim because they were bound by

23   it.  Your Honor pointed out that that doesn't

24   necessarily mean that Ball is bound by it.

25             But on this particular point, the fact that

1    the cover hook is curved -- is a curved portion of the

2    can end came right out of that decision and right out of

3    Crown's proposed construction and that it's formed into

4    a double seam is also right out of Crown's construction

5    in the other case.

6              Your Honor, we submit Crown should not be

7    heard here to say that "the curved portion of the can

8    end" or "formed into a double seam" are either incorrect

9    or inappropriate for inclusion in a claim order because

10   that's where they came from, their proposed construction

11   for the exact same claim term in the other case.

12             So Crown's construction is insufficient

13   because it's not precise enough.  It, once again, just

14   says an outer portion.  So you can't tell where that

15   portion of the end, the cover hook stops and the can end

16   wall starts.  We have to be clear enough.

17             Your Honor's decision in the first case

18   describing the can end wall as a single surface and what

19   Crown asked for in the other case and got, which is the

20   cover hook is the curved thing, the border between the

21   curved outer portion and the single surface that's a

22   wall, that does the job.  So this enables the jury to do

23   what it has -- the trier of fact to do what it has to

24   do.

25             The next group of terms are the ones that

1    deal with the can end.  The can end wall.  And so

2    everything that I showed you earlier, I'm going to zoom

3    in now and pay attention to the can end wall term.  This

4    begins where the terms are not always consistent.  So

5    sometimes it calls this the wall extending inwardly and

6    downwardly.  Sometimes it calls it a circumferentially

7    extending wall.  Sometimes it calls it a

8    circumferentially extending wall extending from the

9    seaming panel of the reinforcing bead.

10              There is absolutely no dispute in the

11   briefs.  Your Honor has four briefs before you.  No one

12   has suggested that the part of the end that it's

13   describing is different.  The can end wall is the can

14   end wall in the invention.  The cover hook is the cover

15   hook.  The reinforcing bead is the reinforcing bead.  So

16   these claims need to be construed consistently so that

17   the jury doesn't get confused by one or the other.  And

18   in light of that, we have tried to do that.  So you'll

19   see the three terms on the left and in the middle is our

20   proposed construction.  In the right, Crown is proposing

21   three different versions for these three different terms

22   that mean the same thing.

23              What you'll notice is that the single

24   surface for the can end wall that your Honor found had

25   to be the case in the first case, in the first

1    litigation, in your first decision, is in ours.  It

2    has -- however you're going to define the can end wall,

3    even if you're going to accept Crown's invitation to do

4    it here three different times instead of once

5    consistently, the single surface restriction that your

6    Honor found last time belongs in there.

7              And the fact that Crown pulled out yet more

8    claims than they asserted in the prior case doesn't mean

9    they get a pass and that that single surface is

10   eliminated.  Their chuck still has two walls.  Their can

11   end wall is a single wall.  We've also added it extends

12   from the cover hook to the annular reinforcing bead.  If

13   it belongs in one of these, it belongs in all of them so

14   that the jury can tell that these are describing the

15   same thing.

16             So, your Honor, in your decision in the

17   first case dealing with -- and we have fewer claims

18   here, but dealing with this structure, specifically

19   said, it's a single surface encircling the center of the

20   can from the seaming panel to the reinforcing bead.

21   Remember the seaming panel is part of the cover hook

22   that's right -- it's the innermost part of the cover

23   hook.  So we've put the word "cover hook" in instead of

24   "seaming panel" so it's consistent with the asserted

25   claims here.  But that doesn't change the meaning.

1          It's still what goes between the cover

2     hook/seaming panel all the way through the reinforcing

3     bead.  Your Honor recognized that.  That is exactly what

4     the specification shows.

5          You can see in figure 6 on the right side is

6     that single surface, straight can end wall.  It's the

7     single surface that your Honor found in the red.  On the

8     left side you can see where they're beginning to seam

9     with the first seaming roll, and it's starting to get

10    bent upwardly around the juncture of the two chuck

11    walls.  But it's that red single surface.

12         Equally importantly, the specification

13    always describes the lower part as being the

14    frustoconical drive surface.  It's what does the driving

15    during seaming.

16         In the file history, Crown was consistent.

17    The wall of the can is engaged by the chuck so we're not

18    driving in the reinforcing bead like in the prior art.

19    We're driving on the wall.  The deformation of the upper

20    portion of the can end wall -- meaning how do I get from

21    this big, greater than 20, preferably 4 to 60, usually

22    45 can end wall angle, how do I get it up into a double

23    seam.  I use it using the juncture between the chucks.

24    So that's what we're talking about with this can end

25    wall.

1            We talk about it being part of our
2    construction is the can end wall is engaged by the chuck
3    during seaming.  Your Honor in the invalidity summary
4    judgment decision in the first case specifically
5    recognized the only embodiment support disclosed by the
6    written description here is that the chuck drives on the
7    can end wall and doesn't enter deeply into the
8    reinforcing bead.  The drive of the invention is
9    unequivocally on the can end wall.
10            Crown points out in its brief that your
11   Honor's decision on the -- your Honor's decision that
12   there was a 112 violation, a written description
13   violation, was reversed two to one by the circuit.  But
14   remember what your Honor decided was that the claim to
15   be valid needed a negative limitation saying don't drive
16   in the reinforcing bead.  Thou shalt not drive in the
17   reinforcing bead.  This was really drilled in, in oral
18   argument when one of the judges asked Mr. Heist:  So you
19   don't have -- don't you have to drive outside the bead?
20            Mr. Heist responded yeah, you do, meaning
21   our invention drives on the wall.  But Mr. Heist said
22   you can also drive inside the bead.  That was the
23   holding in that case.  Your Honor found that if we drive
24   in the reinforcing bead we get a Get-Out-Of-Jail-Free
25   card on the written description requirement.  Found --

1    actually that's a really horrible way of saying it.

2              Your Honor found that the claim can't be

3    valid if it permits driving in the reinforcing bead.

4    Your Honor imposed a negative limitation that should

5    have been there and wasn't.  The federal circuit said

6    they do not need to prohibit driving in the reinforcing

7    bead.

8              But as Mr. Heist is admitting right here and

9    as your Honor correctly recognized what this invention

10   is, that doesn't change the fact that you do have to

11   drive on the wall.  So the can end wall is engaged by

12   the chuck during seaming.  That is a central component,

13   an inescapable component of the invention here.

14             Even though the negative limitation that we

15   urged and your Honor accepted went down at the federal

16   circuit two to one, so thou cannot drive in the

17   reinforcing bead, the absence of that is not a written

18   description violation per the federal circuit.  Thou

19   must drive with the chuck on the can end wall, is still

20   the proper construction here.

21             Mr. Heist has succeeded in convincing the

22   federal circuit that you can drive both places but

23   you've got to drive on the can end wall.  That's what we

24   put right into the construction of the can end wall

25   because the negative limitation has been reversed so

1    let's make -- it belongs in the invention, so let's

2    describe the claims that way.  That's where it belongs

3    is in the can end wall.

4          Crown has also suggested that referencing

5    the can end wall as going all the way to the annular

6    reinforcing bead is inappropriate because some claims

7    don't have a reinforcing bead.  Well, all of the claims

8    that are asserted here do have a reinforcing bead.

9          And in the *Rexam* case -- as we pointed out

10   in the briefing in the first case, in the *Rexam* case,

11   the district court in Delaware held that any claim that

12   doesn't have a reinforcing bead is invalid under the

13   written description requirement because this invention

14   requires one.  The fact that there are other claims that

15   are invalid that don't have a reinforcing bead does

16   nothing to change the fact that this can end wall runs

17   all the way to the annular reinforcing bead.

18         So, we've said it's a single surface from

19   the cover hook to the reinforcing bead which engages.

20   The parties have already agreed that the seaming panel

21   is the curved innermost portion of the cover hook.

22   Claim 1 doesn't require a seaming panel but it requires

23   a cover hook.  That's why we talk about the cover hook,

24   as I said before.

25         Crown's proposed constructions take what is

1    supposed to be the same part of the can end and describe

2    it in different ways.  They leave some of the components

3    out of some, put it in others.  That's inappropriate.

4    *Edwards Liesciences* recognizes that.  Most critically,

5    it fails to incorporate a single surface.

6              Crown also fails to incorporate its

7    arguments during prosecution about being engaged by a

8    chuck during seaming, as your Honor reflected in the

9    summary judgment decision on invalidity, and it acts as

10   though the reinforcing bead isn't there when it clearly

11   must be.  So we would submit on this one as well our

12   construction is consistent with your Honor's previous

13   ruling and with the file history and the specification.

14             The "first point" and "first location"

15   terms.  This one is a little more complicated, judge,

16   because in the last case every time they talked about

17   the first point, they were talking about a single place.

18   All the claims in the last case.

19             Here, as you can see, we pointed to two

20   different points in red here.  Claim 1 of the '826

21   patent, one of the newly asserted claims, wasn't in the

22   case last time.  That one talks about a first point

23   that's at the top end of the can end wall.  It's the

24   border between the can end wall and the cover hook.

25             All the other claims, the first point or the

1    first location is down where it gets bent upwardly

2    around the juncture of the two chuck walls.  That is

3    straight out of your decision in the last case.  We're

4    asking your Honor -- in the last case your Honor didn't

5    construe, technically, the first point, the lower of the

6    two that I've got here because that's the first point

7    that was in the last case.  But your Honor basically

8    said:  I don't have to construe it because everybody can

9    tell that it's where the can end wall is bent upwardly

10   around the juncture of the two chucks.

11           Now, we've got, unfortunately, a claim that

12   uses the first point in a different way.  So we're

13   asking your Honor for the claims that are like the last

14   case and are talking about the first point where it

15   bends, just make it part of the construction.

16           Last time you said:  I don't have to do it

17   because everybody knows that's it.  This time we have a

18   different first point somewhere else.  So for that claim

19   we need to be specific and for the original claims we

20   need to be specific.

21           Now, I'm focusing on the ones that were in

22   the last -- okay, I'm sorry.  So the first point in '826

23   claim 1 is the upper of those points I was showing you.

24   Then the first point and first location in the other

25   claims is the other one.  Then this zeros in again and

1    shows you the two locations that I was just showing you
2    a second ago.
3                So let's zoom in on -- this is the first
4    point, first location from the original case.  This is
5    everything except claim 1 of the '826.  So it's the
6    bottom of those two points.
7                We propose to clarify.  Your Honor didn't
8    put this in your technical construction, but it was in
9    the opinion.  It's the point on the can end wall where
10   the juncture of the two chuck walls engages the can end
11   wall and bends it upwardly.  Whereas Crown has basically
12   said it's a first point or a first location.
13               In the last case, that might have worked
14   because everybody knew what we were talking about.  In
15   this case just telling the jury a first point or a first
16   location when we've got that other claim hanging out
17   there that's pointing at a different part, it needs to
18   be clarified.
19               This is the language I was talking about
20   from your first *Markman* order where you said you didn't
21   have to construe it because it's apparent that that's
22   where the can end wall is bent upwardly at the juncture
23   of the two chuck walls.  So we're asking to take that
24   thing that was apparent in the first case and actually
25   make it part of your claim construction.  This is

1    consistent with what Crown said during prosecution.  The

2    wall's engaged by a chuck.  The upper portion of the

3    wall, the juncture formed by the two walls of the chuck

4    bend the can end wall.  So what your Honor put, as I

5    just showed you a second ago, in your decision is

6    exactly what Crown told the patent office, and it's what

7    the specification says.

8           So that group of claims, the first point

9    everywhere except claim 1, all we're asking you to do is

10   to make part of an actual construction what you

11   recognized in your decision last time.

12          Claim 1 of the '826, remember it's pointing

13   at the higher level.  It uses the same word "first

14   point," but it's not talking about some point in the

15   middle of the can end where it gets bent by the chuck.

16   It's talking about the top of the can end where it

17   borders the cover hook.  So you're moving from the

18   single surface into the curved cover hook.  Here this is

19   how it's used and it's used to pick a point, pick a

20   second point, connect the dots, and measure an angle.

21   It's critical that the jury or the expert or the trier

22   of fact knows which point we're talking about and how

23   it's different from the way it's used in all the other

24   claims.

25          On this one, we define it fairly

1    straightforwardly.  It's the innermost point on the end
2    at which the cover hook terminates.  It's the border
3    between the cover hook and the can end wall.  It's the
4    top of the can end wall.  It's all saying exactly the
5    same thing.  Whereas Crown just says it's a point.  As
6    in, "jury, go ahead and get confused," especially
7    considering we've got that other language there.
8            Here we're showing it very specific.  The
9    green is the cover hook.  The blue is the can end.  This
10   is where they border.  So it's the innermost point.
11   Come in from the green.  It's where the cover hook
12   terminates.  So the jury would use your Honor's
13   construction of cover hook, use your Honor's
14   construction of end, and it can plot that point
15   adequately.
16           Crown's constructions, in contrast, provide
17   not sufficient specificity and accuracy.  They treat all
18   a point, a point, a point.  Your Honor will remember in
19   the last case Mr. Higham tried to plot the upper can end
20   wall as including part of the curve that's in the cover
21   hook.  Your Honor held him to it; said no, it's the
22   straight part.  It's not where you're going.  Crown's
23   construction invites the jury to ignore all of that and
24   just basically take over your role as the decider, to
25   use an unfortunate term, of claim construction matters.

1       So now I'm moving in, so we've covered the

2   first point, which is the thing that defines the top of

3   the angle that we're measuring.  Now, I'm going to move

4   down into the second point.  What defines the bottom.

5       Here you can see it, and it's fairly

6   consistent throughout.  There are no claims to throw a

7   monkey wrench into it here and make a second point

8   different in one claim than it is in another.

9       The problem here is that between all these

10  25 claims, sometimes it's a second point, sometimes it's

11  a second location, sometimes it's a transition, but it's

12  always talking about the same thing.  It's that point

13  where the can end wall, which is that single surface

14  that comes down, goes into the U.  That's the

15  reinforcing bead.  Every embodiment, everything the

16  patent teaches us is where that kink is that we're

17  pointing at.

18      If you look at page 8 and 9 of Crown's

19  opening brief in this very *Markman* process and you look

20  under the section called Crown's Invention, you're going

21  to see that they point the second point and the

22  transition to exactly that kink.  So what we're trying

23  to do here, your Honor, your Honor needs to be able to

24  tell the jury where that kink is, find that spot where

25  it changes shape.  As I said, depending on which claim

1    you're in, the claims describe exactly the same thing

2    with a multiplicity of ways.

3              Your Honor, we submit that using a single

4    consistent construction to describe the same thing is

5    the most effective way to make sure that the jury and

6    the trier of fact know what they're doing and doesn't

7    invite confusion, motions, et cetera, et cetera.

8    Therefore, for these various points, we've said it's the

9    point in the can end which is angularly offset.  That's

10   the kink.  I'm going to come back to where we got that

11   language from.

12             Crown, in two of the five, uses the language

13   in your first case, it's a point that marks the lower

14   end of the can end wall.  It's a place where one thing

15   changes to another.

16             On this one, your Honor, I confess we are

17   asking you to be -- to clarify beyond what you did in

18   the last case.  There are a number of terms here that

19   all have to mean the same thing.  We're asking your

20   Honor to avoid the problems that surfaced in the last

21   case by staying true to what you're describing but use

22   more words.

23             So it's that point right there where the

24   part above it is the can end wall, that single side

25   surface.  The part below it we've all agreed is a

1    U-shaped reinforcing bead.  So we're trying to describe

2    the border.  This is a little hard to see.

3            In the first case, your Honor, this was in

4    the summary judgment briefing on validity, I asked Mr.

5    Higham, Crown's expert, to tell me where this second

6    point, second location transition was.  Tell me where

7    the top of the reinforcing bead is and the bottom of the

8    can end wall is.  It wasn't even on the accused device.

9    It was on the invention.

10           Figure 4 of the patent.  He drew three

11   different reinforcing beads.  In effect, it's kind of

12   hard to see, your Honor, but right on the bottom of the

13   can end wall on the very top, he split the can end wall.

14   That straight line coming down, part of it he put in the

15   reinforcing bead.  Part of it he put in the can end

16   wall.  That's exactly the inconsistency and the

17   potential for, frankly, mischief that is there unless

18   the Court takes it a step beyond what you did in the

19   last case.

20           In the last case you basically said that

21   this point is where the can end wall stops and the

22   reinforcing bead stops -- or starts.  It's the border.

23   Now we're asking you to give the jury some, if you will,

24   geometry, some way to figure out where that change of

25   shape is because you're undeniably -- under your Court's

1   original decision in the prior case, you're going from

2   one surface has a single surface.  It's not bending back

3   and forth all the way all over the place.  The next

4   structure, the reinforcing bead, is a U.  You ought to

5   be able to tell when you've moved from a relatively

6   straight thing into a U-shaped thing.  That's what we're

7   asking you to do.

8           So the language that we picked and -- is

9   from the Crown patent, a continuation patent, the '041

10  patent that has been prosecuted and issued since your

11  *Markman* decision in the first case.  This is the patent.

12          In that prosecution the patent office

13  basically challenged Crown and said:  Well, we've got a

14  lot of prior art that we think reads on what you're

15  doing.  And Crown specifically amended and said no, our

16  invention is that the outer wall, this U in the

17  reinforcing bead is angularly offset from the chuck

18  wall, which is to say the can end wall.  We've got an

19  angular offset.

20          Your Honor, that exactly describes what's

21  going on here.  I recognize this is from a later patent,

22  but what we're asking your Honor to do is to give that

23  clarity.  How does a jury know where that border is?

24  The border happens when the shape changes.  An angular

25  offset is precisely what's going on in this patent.

1    That's why we went to that patent.

2            Similarly, in this patent -- Crown says in

3    the reply brief:  Well, that's going to be really hard

4    to figure out.  How can you tell what an angular offset

5    is?  First of all, you can look at figures 4 through 7

6    because it's quite clear where that angular offset is.

7    If you notice, your Honor, the can end wall is always 20

8    to 60 degrees that I was showing you and talking about

9    earlier.  This is in the specification itself.

10            The other thing that's on the other side of

11   this border is the reinforcing bead.  Crown's

12   specification says that varies between minus 15 to plus

13   15 degrees.  You can have a variance from 60 to 10, 60

14   to 10, 60 to minus 15.  The closest these can get is a

15   20-degree can end wall and a 15-degree chuck wall.

16            So even if you've got a U-shaped thing at 15

17   degrees and you've got 20 degrees coming down, there's a

18   kink.  There's an angular offset.  That enables the jury

19   to find that point which it unequivocally has to in

20   order to connect the dots and measure an angle so the

21   jury can do what it's supposed to be doing without --

22   the problem we had with Crown's expert saying, well, I

23   can find four or five or six or an infinite number of

24   reinforcing beads.  There's only one angle that has to

25   be measured.  So we can't have an infinite number of

1    borders that is going to be the bottom anchor for that

2    angle.

3              Right there again if I flip back to figure

4    4, all we're trying to do is describe that kink.  An

5    angular offset is how Crown described it in a subsequent

6    patent that has the same specification and the same

7    invention.  So if your Honor were inclined to use a

8    thesaurus and come up with a different word for angular

9    offset like a kink or something like that, but it's the

10   change in shape.  An angular offset is the appropriate

11   way to do that.

12             Crown, on the other hand, its constructions

13   are all over the place.  They have five different

14   constructions for the same thing.  Most of them don't

15   include the important parts that come right out of the

16   specification and right out of what you said in the

17   first case.  That's the "second point," "second

18   location," terms that are down at the bottom.

19             It also skips -- it's perfectly appropriate

20   under *Microsoft* and *Verizon* to be advised in this case

21   by what Crown did in a subsequent patent that flows from

22   the exact same application.

23             Now, your Honor, I'm going to revisit the

24   can end wall terms quickly.  We're going to look --

25   because now it's important, as I said before, to be

1    clear about what's different between the upper and the

2    lower portion of the can end wall.  So I'm focusing on

3    the upper portion.  That's the part that had to be bent

4    by more than ten degrees.  That was the decision and

5    that was the driver in your first summary judgment

6    decision.

7            Again, we've got the problem that,

8    describing the very same thing, the claims don't always

9    use the same words.  The way to make this clear to the

10   jury is to use the same construction for each rather

11   than a bunch of vague constructions that the jury could

12   think these are different things.  So that's what we've

13   proposed.

14           Your Honor's summary judgment decision

15   noted that this upper portion of the can end wall

16   becomes substantially cylindrical during seaming.  Your

17   Honor, that's critical, not only does it have to end up

18   being substantially cylindrical, but it has to become

19   substantially cylindrical during seaming which means it

20   wasn't substantially cylindrical before seaming.

21           That's where we come -- that's why we add to

22   this construction that the can end wall before seaming

23   is not substantially cylindrical; that it has an angle

24   of at least 20 degrees.  I'm harkening back here when we

25   were going through the invention and the prior art, your

1    Honor will recall, that that can end wall, and
2    particularly the upper can end wall, is always described
3    as 20 degrees or below in the prior art and always
4    described as 20 degrees or above in the invention.  So
5    if you're not at least 20 degrees before seaming, you're
6    in the prior art, you're not in the invention.  So this
7    "becomes substantially cylindrical" language that your
8    Honor used in the *Markman* decision and in the summary
9    judgment infringement decision, this 20 degrees simply
10   enforces that.  It clarifies that again so the jury
11   knows what it means to become substantially cylindrical.
12   I'm at a risk of running late on time.
13             Your Honor, during the appeal when you were
14   affirmed on the summary judgment of non-infringement
15   decision, Crown disagreed strongly with the ten-degree
16   requirement, the bending of more than ten degrees that
17   you read into.  The federal circuit affirmed on that.
18             What Crown never disagreed with before your
19   Honor or on the federal circuit was the "to become
20   substantially cylindrical."  Crown admitted -- in fact,
21   Crown said we didn't go as far as ten degrees.  We just
22   said it has to become substantially cylindrical.  So
23   becoming substantially cylindrical, there's no doubt
24   about that.  It was in your decisions twice, and Crown
25   on appeal when it unsuccessfully tried to get the

1    ten-degree part of the disclaimer reversed, Crown kept

2    and didn't even challenge the "become substantially

3    cylindrical." Here "to become substantially

4    cylindrical," you have to be not substantially

5    cylindrical to start with and that line is 20 degrees

6    because that's the line between what they describe as

7    the prior art and what they describe as the invention.

8          I'm just showing you here that angle C is

9    not substantially cylindrical because it's between 20

10    and 60 in the invention right out of the specification.

11          As an aside, your Honor, the specification

12    is almost identical. All the way through our briefs and

13    all the way through this presentation, we're always

14    citing the '875. For some reason, even though the words

15    are almost always exactly the same and the figures are,

16    the lines get off a little bit. When you're reviewing

17    any of this, we're always citing the '875. If it looks

18    like what we said isn't there because you're looking at

19    '826, it's probably right next to it.

20          The other issue Crown has is that our

21    construction of the upper can end wall talked about a

22    straight upper portion of the upper can end wall. Your

23    Honor recalls that during the non-infringement briefing

24    on the issue that you decided, not the ones that were

25    moot because you didn't need to reach them, Mr. Higham,

1   you'll recall, we measured -- our expert measured the

2   bending of the upper can end wall as being the straight

3   part because that's exactly what Crown did when it was

4   describing how much the upper can end wall bent during

5   prosecution.  That was their disclaimer.

6            Remember Mr. Higham was faced with 13.  He

7   needed that number to be higher.  He made it 23 because

8   he moved the point from the top of the point of the

9   straight upper can end wall and he went up that curve

10  into the cover hook.  He moved it all the way over here

11  and that took his angle, surprisingly, 13 to 23.  Your

12  Honor had none of that.

13           That's exactly what we're fighting over

14  here.  We're fighting over whether the upper can end

15  wall is what your Honor said it was in the first case or

16  whether Crown can continue to include part of that

17  curved thing next to it.

18           What we're proposing here is not only

19  straight out of that summary judgment decision, but it's

20  entirely consistent with your *Markman* decision where you

21  said the can end wall is like a single surface like one

22  shape.  The cover hook, remember, is the curved thing

23  next to it.  So that's how the jury tells the

24  difference.

25           Crown's proposal leads to inconsistent

1    measurement decisions which your Honor had none of in

2    the first case and we submit you don't want to invite in

3    the second case.  Crown's proposal does not always

4    incorporate the disclaimer that your Honor found in the

5    first case and has been affirmed.

6              Flip now to the lower portion of the can end

7    wall.  That's the part that we've highlighted in red

8    here.  This shows up in a couple of different places.

9    It's the second portion, it's second wall portion, but

10   we're talking about the same thing.  So again, we need

11   to use one definition.  Here Crown actually only uses

12   one.  But again, it's too vague.  It simply says a

13   second part.  It invites the jury to go all over the

14   place.  What the specification clearly says, what they

15   said throughout prosecution, what's consistent with your

16   invalidity summary judgment decision, this is the lower

17   part.  This is what's engaged by the lower wall of the

18   chuck, the frustoconical drive surface.

19             Here I'm showing you again figure 6 with

20   particular attention to this part of the can end wall,

21   the lower part of the can end wall.  Your construction

22   should reflect that it's engaged by the frustoconical

23   drive surface during seaming.  That's, 32 is that lower

24   wall on the chuck.  In red is the lower part of the can

25   end wall.  So driving has to go there.

1          Again on appeal Mr. Heist convinced the
2   federal circuit that you can also drive down in the
3   reinforcing bead so that negative limitation I know that
4   basis for invalidity, we can't get back.  But the fact
5   is, the invention drives on the can end wall on the
6   lower part of the can end wall and, your Honor, that
7   needs to stay and be clear.  That's what Mr. Higham told
8   the patent office that the way you can make this large
9   angle work is you reform by driving down here and
10  bending up here.  So you take that single surface can
11  end and you do this with it because you got a two-wall
12  chuck.  But you're driving down here.  When I said do
13  this, you're driving here.  That needs to be in the
14  construction of the lower part of the can end wall.
15  Also your Honor recognized that the only embodiment
16  supported or disclosed by the written description is the
17  chuck drives on the can end wall.  That flows directly
18  from your decision and from the patent.
19          Crown, on the other hand, shortcuts this by
20  being sufficiently vague that it's going to create
21  problems because again the lower can end wall and the
22  reinforcing bead you need to know where those border so
23  that you can draw the point.  Then you can connect the
24  dots and you can measure the angle.  Once again, your
25  Honor, because of the proliferation of claims and other

1      reasons in this case, we're just asking you to clarify

2      what you said in the first case but in a manner that is

3      consistent -- entirely consistent and flows from all of

4      your decisions in the first case.

5              Your Honor, I'm down to two groups of terms.

6      The chuck has a first wall and a second wall.  Again

7      you're familiar with this.  Those are the two walls of

8      the chuck that you decided in the first case need to be

9      distinct and discernibly different surfaces.  The

10     language -- some of the claims talk about a first and

11     second wall.  Then some of them call out the first wall.

12     Some of them call out the second wall.

13             So, your Honor, we've submitted that they,

14     first, all need to be distinct and discernibly

15     different.  Your Honor recognized that the one chuck

16     wall and the other chuck wall are distinct, discrete and

17     discernibly different so we put that in all of the

18     definitions here.  Crown has taken that out.  So Crown

19     has eliminated that consistently that the can end wall

20     is a single surface.  One wall before seaming.  The

21     chuck is two walls, discrete and discernibly different

22     surfaces from your first decision.  We're asking you to

23     keep it and to make it clear where we've got additional

24     claim terms that only talk about part of the wall, okay,

25     incorporate it into your description of those claim

1    terms.  So that's what we're doing here.

2              So you said in your first *Markman* decision

3    that you would inform the jury that the first and second

4    walls of the chuck means discrete -- distinct, discrete

5    and discernibly different side surfaces.  That remains

6    critical.  Crown offers no reason to go back on that.

7    Your Honor should keep it.

8              That's the upper wall, the first one.  Your

9    Honor since the claims are sometimes using both together

10   and sometimes use them separately, when it uses them

11   separately, let's make it clear, we submit, your Honor,

12   to the jury which one we're talking about.

13             The first wall, 33, is described as

14   substantially cylindrical.  It has to be substantially

15   cylindrical during seaming.  That's what you press the

16   can and the end together against to get the double seam.

17   The double seam has to be substantially cylindrical

18   because that's how a pop can looks.  That's how a beer

19   can looks.  That's what the specification describes.

20   It's up and down when you're finished.

21             The top part, 33, which is your first wall,

22   is a substantially cylindrical surface that comes

23   straight out of the specification.  That's how this

24   works.

25             The second wall is a frustoconical drive

1    surface.  We talked about that earlier when we were

2    talking about the can end wall.  Your first summary

3    judgment opinion, again bedrock interpretation in this

4    case, is that this invention requires that the chuck

5    drives on the can end wall.  Here's where it happens.

6    The lower of the two walls of the chuck is the

7    frustoconical drive surface.  That's what has to drive.

8    Regardless of what also happens in the reinforcing bead,

9    it has to drive there.  So that belongs in the

10   construction of the lower wall of the chuck.

11            Thus, we pull this together and our

12   construction integrates those concepts which is

13   completely consistent with what they told the patent

14   office when they were saying we should get a patent,

15   even though you've got prior art can ends that seem to

16   do what we're doing because we seam in this radically

17   different way.  We have a top wall that's substantially

18   cylindrical on our chuck.  We have a different wall.

19   That is where we do the driving.  That's in the

20   specification that's throughout the file history.  They

21   should be held to it.

22            So we submit that the first

23   circumferentially extending wall has to be discrete,

24   discernibly different.  That's from your first decision.

25   The second one has to be the frustoconical drive

1    surface.   That flows from your invalidity decision.

2              Crown, on the other hand, fails to include

3    your construction from the last case about two walls on

4    the chuck, distinct and discernibly different.   That's

5    inappropriate.   And they run from the file history.

6              Also -- well, this is really similar in that

7    when the same language is used in multiple places, it

8    should be construed consistently.

9              Lastly, your Honor, are the terms about

10   bending and deforming.   This is what your Honor went

11   into in several decisions with respect to disclaimer,

12   with respect to the file history, that the radically

13   different thing about this invention is supposedly how

14   it seams, how it bends the can end upwardly around the

15   juncture of two walls so that it bends by at least ten

16   degrees and so that it becomes substantially

17   cylindrical.

18             Now, some of these claims use the phrase

19   "adapted to be joined."   Others use longer phrases but

20   were describing the same thing.

21             In the prior case, your Honor held that it

22   had to become substantially cylindrical and it had to be

23   bent by more than ten degrees.   Since your Honor found

24   no question of fact that it didn't bend by more than ten

25   degrees during seaming, we were granted summary judgment

1    and that was affirmed.  As I said before, Crown did not

2    challenge the substantially cylindrical part of your

3    Honor's *Markman* ruling as to the disclaimer.  So that is

4    still viable.  It still belongs in the claim

5    construction in this case.

6              So we've got the claims that you construed

7    last time in the first case where you basically captured

8    that it becomes substantially cylindrical and the first

9    wall portion's bent by more than ten.  That flows right

10   into the agreed-upon constructions.  On these two we did

11   agree and everything we're arguing for on the other

12   terms is here.  It becomes substantially cylindrical and

13   it's bent by more than ten.  However, when we get into

14   the claims that are new in this case, we want to

15   incorporate the same things.  It has to become

16   substantially cylindrical which means it wasn't

17   beforehand so it's 20 degrees or more.  It has to end up

18   being substantially cylindrical.  So it's become

19   substantially cylindrical and it has to bend by at least

20   ten degrees.  Right out of Mr. Higham's declaration.

21   Right out of your decisions.  Crown however picks and

22   chooses pieces of these.

23              I'll note that claim 32 is the end of the

24   claim 45, the one on the bottom, the one they're

25   asserting against us.  That goes even farther than the

1    disclaimer that says you've got to bend by at least 16.

2    So neither of us have put the ten in there because it

3    would be redundant.  You've got to bend by at least ten

4    and you've got to bend by at least 16.  We both

5    shortened it.  The disclaimer is still in there.  It's

6    just sort of superseded because the claim requires even

7    more bending.

8            Claim 1 says "adapted to be joined."

9    "Adapted to be joined" in our construction, I'm just

10   drilling down, it has to become substantially

11   cylindrical and be bent by more than ten degrees right

12   out of your decision in the first case supported by the

13   prosecution history.  All we're doing here is holding

14   them to what they said in prosecution and what your

15   Honor already found they disclaimed.

16           Then here we've got the citations to the

17   office action reply and Mr. Higham's declaration that

18   underlie your decisions in the first case that during

19   bending, during seaming, adapted to be seamed, during

20   seaming, all of these inventions require both becoming

21   substantially cylindrical and bending by more than ten

22   degrees.

23           There you are specifically saying that it

24   becomes substantially cylindrical, not that it just ends

25   up but it becomes substantially cylindrical.

1              Specifically, as we showed you before, the

2    ten degrees portion of the disclaimer specifically

3    called out and affirmed.

4              Thus, ours -- and I've put three bullet

5    points on the right side.  This is the bedrock

6    description of the invention and their disclaimer.

7              First, the upper portion of the can end wall

8    is bent by more than ten degrees during seaming.

9    Secondly, that the upper portion of the can end wall

10   becomes substantially cylindrical during seaming.  And

11   the third is really a corollary of part two which is if

12   you're becoming substantially cylindrical during

13   seaming, then you weren't substantially cylindrical

14   before, how does one draw the line?  It's because the

15   invention is consistently 20 degrees or less -- I'm

16   sorry.  The prior art is 20 degrees or less.  The

17   invention's 20 degrees or more.  So that needs to be in

18   these claims.

19             Another description, basically what I've

20   said before.  We are incorporating this into the

21   description of the upper portion of the can end wall.

22             Crown's proposed constructions, because

23   they're inconsistent and piecemeal, they try to avoid

24   your Honor's holding about ten degrees of bending and

25   becoming substantially cylindrical.  Crown has admitted

1    that there's a disclaimer as to the claims that were in

2    the first case but they deny it elsewhere but it's the

3    same invention.  It is the same invention.  I don't

4    think I put it up here, your Honor, but there's one last

5    point before my conclusion.

6              Crown particularly draws attention to claim

7    1 of the '826.  Although they say the same thing about

8    claims 13 and 14.  Remember the '826 patent describes a

9    can end that's adapted to be seamed in a certain way.

10   And the '875 describes seaming of a can end that's made

11   a certain way.  Your Honor, in the first case, treated

12   them as basically mirror images of each other, so did

13   the parties.  You've got to remember in the summary

14   judgment briefing, we didn't make separate arguments for

15   the '826 and the '875.  We picked the same language and

16   we applied them both at the same time and the experts

17   did that.

18             Your Honor, that has become -- because when

19   Crown was arguing with the patent examiner and trying to

20   convince him and the examiner was challenging them,

21   Crown was not saying it's this particular claim.  Mr.

22   Higham's declaration was as to everything.

23             In particular, the Higham declaration and

24   the brief that went to the patent office along with the

25   Higham declaration that your Honor called out

1  specifically, that one was in the '826 which was the

2  second of the two patents.  Your Honor was entirely

3  proper to also read that back against the '875 under the

4  *Microsoft* case that your Honor cited.  The federal

5  circuit agreed with that.

6          But the specific declaration, claim 1 that

7  we're now accused of infringing and several of its

8  dependent claims, one through 12 was before the patent

9  examiner.  Crown came back and added 13 and 14 and

10  submitted the Higham declaration in its brief, both for

11  one through 12, the ones the examiner had challenged,

12  and for 13 and 14, the one we were accused and your

13  Honor dealt with in the last case.  That Higham

14  declaration, the disclaimer that you found, the "become

15  substantially cylindrical and bend at least ten

16  degrees," that isn't just claim 14 from the last case.

17  That is the entire invention.  Clearly, the entirety of

18  the claims that are in the '826 patent because that's

19  what Crown offered it for.

20          So finally, your Honor, the best part of my

21  presentation is the part that says "in conclusion," we

22  embrace the Court's findings in your *Markman* order and

23  your summary judgment decisions.  Where we're varying

24  from what you did before, we are not asking you to go

25  backwards or to change.  We are asking you to clarify

1    and stay consistent with everything that drove all three

2    of your decisions in that case so that now that we have

3    25 claims and we have even more claims using different

4    words to try to describe the same thing, the jury and

5    the experts don't get lost, don't get confused, and

6    don't put pieces or points where they don't belong so

7    that you are sufficiently clear that the case is

8    manageable and the decisions will be correct going

9    forward.

10              Crown, on the other hand, goes back to

11   square one and reproposes constructions that you've

12   already rejected, like the can end wall being a single

13   surface, like the chuck having two distinct and

14   discernibly different side surfaces and like the

15   disclaimer that they want to read out of anything that

16   wasn't in the first case.  They introduced even more

17   ambiguity which allows arbitrary, improper and

18   self-serving measuring methods.  And yes, I am talking

19   about what Mr. Higham tried to do on the summary

20   judgment last time and your Honor correctly rejected.

21   There's going to be more of that if these claims aren't

22   construed with enough clarity.  They tried to circumvent

23   your holdings in the last case particularly with respect

24   to this disclaimer.

25              I appreciate your Honor's time and

1    attention.  I hopefully will have very few comments in

2    rebuttal, but I'd like to reserve a few minutes for

3    that.

4              THE COURT:  Certainly.  Is that something

5    you need to bring to my attention?

6              MR. LUKEN:  They were reminding me that I am

7    supposed to reserve time for rebuttal which remarkably I

8    remembered on my own.

9              THE COURT:  Thank you, Mr. Luken.  Give me

10   one moment.

11             Let's handle it in this fashion.  You had

12   asked for an hour and 15 minutes and the opportunity to

13   reserve some of that time for rebuttal.  You've used an

14   hour and 13 minutes.  Why don't I give each side a total

15   of an hour and a half which will give you 15 minutes.

16             Mr. Heist, you can divide your time in any

17   fashion that you wish.

18             We will be in recess for no more than 15

19   minutes.  Cindy, I'd like you to line everybody up at

20   about the 13-minute mark and we'll come back into court

21   and we will hear from Crown.  We are in recess.

22             (Recessed at 10:33 a.m.)

23                       IN OPEN COURT

24                       10:49 a.m.

25             THE COURT:  Mr. Heist, I assume you will be

1    arguing for Crown.

2              MR. HEIST:  Yes, your Honor, although there

3    are a few terms my partner, Mr. Murphy, will argue.

4              THE COURT:  That will be fine.  I hate to

5    put either of you under this kind of pressure.  I

6    apologize in advance, but I must recess no later than 10

7    minutes of 12.  So come to a convenient point to pause

8    around and about that time.  We'll pick up then at 1:30.

9    All right.  Mr. Heist.

10             MR. HEIST:  Thank you, your Honor.  Mr.

11   Luken started out with what he called bedrock issues.

12   He said it's bedrock that all the claims should be

13   construed the same.  We will show you case law that

14   shows that different language in different claims is

15   presumed to create different scope.

16             Mr. Luken said it's bedrock that we will

17   stay true to your prior decision.  We will show you how

18   Ball's construction deviates and changes your --

19   deviates from and changes your prior construction.

20             He says it's bedrock that the specification

21   drives the construction of these claims.  But we will

22   show you that the words of the claims of which we saw

23   very little is what drives the construction.

24             And he said it's bedrock that the chuck

25   drives on the wall in this patent.  But we will show you

1    from your prior decision where they argued that the

2    rotatable chuck must drive on the wall and where your

3    Honor rejected that proposal.  I hope to show you that

4    what Ball claims to be bedrock is actually quick sand.

5              Now, I think it's worth pausing for a minute

6    to look at how we've come here after the prior case and

7    how we've arrived back in your courtroom again.  I think

8    I'd like to spend a few minutes on a procedural

9    background.

10             Now, before Crown's invention, the standard

11   end was called the B-64.  Mr. Luken spoke about that.

12   It had an angle of about 14 degrees, as shown in the

13   drawing that is up on the screen.  It was seamed against

14   a chuck that had a wall angle of around four degrees.

15   So it was bent upwardly during seaming about ten degrees

16   which that reality formed the basis of the disclaimer

17   that was found in the last case and that ultimately

18   resulted in the disposition of that case.  That end was

19   known.  Billions of them were made.  Both parties

20   manufactured them.

21             Crown came out with a SuperEnd.  It had an

22   angle in the commercial embodiment of 45 degrees.  It

23   was seamed as shown in the patent by being bent upwardly

24   during the seaming process against a substantially

25   cylindrical surface, 33, that's shown in figure 6 of the

1  patent, and the patent specification at column 4, line

2  32 says that the surface, substantially cylindrical

3  surface, 33, of the chuck may be inclined at an angle

4  between plus four degrees to minus four degrees.

5       As a consequence of that geometry and that

6  seaming method, the SuperEnd made a tremendous metal

7  savings.  Here we have the profile of SuperEnd shown in

8  green overlaid upon the profile of a B-64 end.  As a

9  consequence, if you were to take those two lines and

10  think of them as string and you were to pull on the

11  green string and you were to pull on the pink string,

12  you would find that the green string is shorter by a

13  good bit.  And as a consequence of the seaming process

14  when the end is put on the can, the can knits in some to

15  meet the seam.  When it does, the opening of the can

16  gets a little bit smaller.  As a consequence of those

17  things, the blank of metal from which the end is made is

18  much smaller.  The diameter of the B-64 end is shown on

19  this drawing.  That's not the diameter of the end.

20  That's the diameter of the metal blank that's stamped

21  out and used to form to make the end.

22       With SuperEnd, with the invention, less

23  material is required and because of the geometry of the

24  end, the SuperEnd can be made of thinner material as

25  well.  So the consequences of the smaller blank and the

thinner metal results in metal savings of approximately
one dollar per every thousand ends.  One hundred billion
ends are used in the United States every year.  So a
dollar per thousand represents a
hundred-million-dollar-a-year annual savings.

Since this invention was introduced, Crown
and its licensees around the world have sold more than
400 billion patented ends.

So, what appears to be a simple mechanical
invention with no moving parts has a significant
economic effect because of the metal savings.

Let's look at the timeline of how we got
here.

In March of 1996, Crown filed its U.S.
patent application.  It had earlier filed in the United
Kingdom where its research labs are located.

In January of 1999, Ball learned that
SuperEnd was, quote, "designed to reduce metal usage
without reducing overall diameter," that means of the
can, "and that the savings were due to the use of a
tapered chuck wall."

In March of 2000, they learned that their
customer, Anheuser Busch, had been evaluating SuperEnd
and they met with Anheuser Busch to -- this is right out
of their documents -- to diffuse any possible juggernaut

1    towards SuperEnd. They didn't want their customer to go

2    to SuperEnd. So they came to Crown in July of 2000 to

3    discuss a license. But the parties did not agree on

4    terms.

5            In June of 2001, Ball and its customer

6    Anheuser Busch formed a joint development pact, the

7    result of which was the development of a light-weight

8    end called the LOF+, Lid Of The Future Plus. It was

9    designed specifically to compete with Crown's SuperEnd.

10           In October of 2001, Ball's lawyers got a

11   copy of Crown's '634 patent which has the identical

12   specification but different claims than the patents that

13   we're litigating here.

14           In October of 2002 Ball decided that it

15   would advance a third parties' development called

16   Container Development Labs. Their end was called the

17   CDL end. Ball decided that they would work on the CDL

18   end while Anheuser Busch, its joint development partner,

19   challenged its '634 patent in court.

20           Here are the profiles between the LOF+ and

21   the original CDL+ end. Anheuser Busch decided they

22   would challenge Crown's patent with regard to the

23   product on the left while Ball developed the product on

24   the right. The idea was if Anheuser Busch was

25   successful maybe they would sell the LOF+, but if they

1    were unsuccessful in court the parties would move

2    forward with the original CDL plus.

3            In March of 2003, Ball came in to Crown

4    again to discuss a license.  Again, the parties could

5    not reach agreement.  Ten days later, Anheuser Busch

6    sued Crown and asked for a declaration that the LOF+

7    didn't infringe Crown's patent.

8            In November of 2003, the Eastern District of

9    Wisconsin Judge Shabaz ruled that the LOF+ did not

10   infringe Crown's patent.  But in December of 2004, the

11   federal circuit reversed that decision.  Shortly

12   thereafter, Ball invested more than a hundred million

13   dollars in new high-speed machines to make the original

14   CDL+ ends.  The reason they did it is customers

15   demanded -- this is right from their document -- cost

16   savings from all end makers as a result of the reduced

17   metal usage Crown SuperEnd.  Their investment in the

18   CDL+ was driven by Crown's SuperEnd and the competitive

19   pressures that it reduced.

20           In February of 2005, the first of the two

21   patents that we had litigated here, the '875 patent was

22   issued.

23           Ball's engineers saw the patent right away.

24   They said we need to do some homework.

25           In August of 2005, Anheuser Busch, their

1  joint development partner, agreed to pay royalties to

2  Crown to settle their dispute.  They agreed to pay not

3  only on the LOF+ that had been jointly developed with

4  Ball, but they also agreed to pay on the original CDL+

5  ends if they were purchased from Ball.  Thereafter, they

6  began to pay royalties.  When their joint development

7  partner took a license, Ball anticipated litigation.

8  Then entered into -- four days later, they entered into

9  a joint defense agreement with Container Development

10  Labs.  Their premonition that there could be litigation

11  was right on the money because the next day Crown filed

12  suit in this court for infringement of the '875 patent

13  alleging that the original CDL+ infringed that patent.

14          Two weeks later, Crown's '826 patent, the

15  second patent involved in this case, was granted and

16  Crown immediately amended the complaint to add it.

17          In 2006, this high-speed machinery came to

18  Ball and it had a lot of problems.  They were having

19  difficulty getting their product manufactured on the new

20  machinery.

21          In April of 2008, this Court's *Markman*

22  ruling came down and, among other things, required that

23  during the seaming operation that deformation be more

24  than ten degrees.  Crown had argued that there was no

25  disclaimer.  The Court disagreed with us and your ruling

1    governed the case going forward.

2          A month later, Ball moved for summary

3    judgment of invalidity on the grounds of claim

4    indefiniteness, inadequate written description,

5    anticipation, and obviousness.  They also moved for

6    summary judgment of non-infringement on the ground that

7    the original CDL+ was not bent more than ten degrees

8    during seaming, as your Honor's ruling required.

9          As soon as -- that motion was then

10   ultimately granted in September 2009 when the Court

11   ruled that the claims were invalid on the grounds of

12   anticipation and inadequate written description.

13         Immediately after the Court's ruling, I

14   think it was just a few days, Ball changed the geometry

15   of the CDL+ end that we had litigated, and they came out

16   with what they now call the new CDL+ end, but they

17   didn't tell us and they didn't tell the Court about the

18   change in their process.

19         The original CDL+ end, their expert

20   testified, had an angle before seaming of 13 degrees, as

21   shown on the left in slide 21.  We submit that the new

22   CDL+ end has an angle of 17 degrees before seaming.  So

23   while the old original CDL+ was subject to your Honor's

24   eventual ruling of non-infringement, the new CDL+ did

25   not operate within the safe harbor that was created by

1    the litigation between the parties in the prior case.

2             Crown appealed the invalidity ruling to the

3    federal circuit in October 2009 and it appealed the

4    written description and anticipation rulings.  But the

5    Court ruled that the claims were not indefinite and Ball

6    never cross-appealed from that.

7             In April of 2011, the federal circuit

8    reversed the invalidity rulings.  In the summer of 2011,

9    the Court took up that portion of Ball's motion for

10   summary judgment of non-infringement.

11            In November of 2011, Crown through its own

12   initiative found some CDL ends in the market and, when

13   we evaluated them, we came to the conclusion that the

14   product had changed.  And we came to the Court and we

15   said:  Look, we've litigated this original CDL+ end but

16   it appears to us that the product has been modified.

17   And Ball's counsel came in and said, well, you're right,

18   we made a manufacturing change which unknown to us ended

19   up making a slight tweak in the shape of the CDL+.

20            Now, the original CDL+, as your Honor

21   ultimately ruled, was deformed less than ten degrees

22   during seaming.  The new CDL+, we submit, is deformed

23   more than ten degrees during seaming.  So what Ball

24   characterized as a slight tweak is the movement of the

25   product from the safe haven created by the prior lawsuit

1  into harm's way with Crown's patents.

2          In January of 2012, the Court entered

3  judgment that the original CDL+ did not infringe because

4  of the ten-degree deformation limitation.

5          The next day Ball filed this case and asked

6  for a declaration that the new CDL+ did not infringe.

7          In August of 2012 Ball's engineers tried but

8  failed to make the CDL+ end with deformation that was

9  less than ten degrees.  So they were having some

10  difficulty going back to the safe harbor.  That's why

11  we're here.  That's why, unfortunately for everyone,

12  this case is still moving forward.

13          Crown has two patents.  The '826 covers a

14  can end.  If the can end were sitting on this table, the

15  claims of that patent have to cover the end as it sits

16  here on the table.  It's a product patent that covers

17  the thing.

18          The '875 patent, a method of seaming patent,

19  it covers the steps of seaming an end to a can body.  So

20  it covers the process of seaming.  So the end is defined

21  by what it is and the process is defined by how the

22  steps of the method are applied in the seaming process.

23  They are two separate patents.  The patent office said

24  they were two separate inventions.  And the two patents

25  therefore fall into two separate, what patent lawyers

1    would call statutory classes.

2            This is an article on the left, the '826

3    patent, and a method on the right.  It has consequences.

4    The claim language of these patents and the difference

5    in claim language has consequences that cannot be

6    ignored.

7            We have a lot of claims at issue.  I promise

8    your Honor that between now and the time of trial or

9    even summary judgment we are going to cut some of these

10   claims out of this case.  We're still in discovery.  In

11   fact we had the first deposition last week and so we're

12   still trying to decide which claims we're going to

13   assert.  The task of deciding what these claims mean is

14   not great as Mr. Luken would suggest.

15           The reason why is we asserted claim 14 of

16   the '826 patent and claim 50 in the last case and many

17   of the terms that are at issue in all of these claims

18   were resolved in that decision.  We're also asserting in

19   this case, claim 1, an independent claim of the '826

20   patent, and some dependent claims, but all of the terms

21   in dispute are in the independent claim.  So all those

22   dependent claims don't add any burden on the Court or

23   the parties to figure out what the patent means because

24   there are no additional terms in the dependent claims

25   that give rise to a construction issue.

1          We're asserting claim 14 of the '875 patent

2    in this case.  It wasn't asserted in the last case.

3    Again, all the claim construction issues can be resolved

4    by that claim without considering the dependent claims.

5    We're sorting dependent claim 45 which depends from

6    independent claim 32.  Again, all of the claim

7    construction issues are in the independent claim.

8          Similarly, we're asserting dependent claims

9    from claim 50.  In the last case we had just the

10   independent claim.  Now, we've added a number of

11   dependent claims.  But again there are no issues raised

12   by the language of the dependent claims.  Everything's

13   in the independent claim.  So it's not as burdensome as

14   it might appear.  That said, there are still more claims

15   than we will probably ultimately litigate or take to

16   trial.

17         So, there are 23 claim terms.  We've listed

18   them here and numbered them using the order that they

19   appear in Ball's brief, 1 through 23.  Of those 23

20   terms, eight were already construed by the Court in the

21   last case.

22         The *Markman* process in the last case was

23   not -- it wasn't quick, it wasn't simple.  It was

24   complicated.  It took 22 months, a hundred pages of

25   prehearing brief, a six-hour hearing, 77 pages of

1   post-hearing briefs, and a 53-page opinion.  The Court

2   and the parties spent a great deal of time.

3            We're not proposing anything in this case

4   regarding the construction that your Honor entered in

5   the last case except there are a couple of issues that

6   we argued before and we continue to urge here and we'll

7   see them in a moment.  But by and large, we are

8   accepting the claim construction that your Honor entered

9   in the last case with a few exceptions that I'll point

10  to.

11           There are 11 terms in this list of 23 that

12  are simply plain English terms.  And when you read the

13  claim, the definition of those terms is found in the

14  claim itself.  It's common in writing patent claims to

15  refer to a first widget, a second widget, a third

16  widget.  Those terms are used, first, second, third, by

17  a drafter to draw a distinction between elements in the

18  claim.  They're not really structural elements.  It's a

19  way to make the claim read as English in a way that is

20  precise.

21           First point, first location, second point,

22  second location.

23           All of those terms are defined in the claims

24  themselves as we'll see in a moment.  So our view is the

25  Court doesn't really need to construe those 11 terms I

1    should say beyond what is in the claim itself.  The jury

2    can determine the meaning of those terms from the

3    content.  We'll see that in a moment.

4          That leaves four terms that were not

5    construed before, are not plain English, that we think

6    the Court should focus on.  That's terms 1, 21, 22, and

7    23.  That said, we're going to go through all 23 terms

8    and explain to you why we think our construction is

9    correct and where we disagree with Ball.  Why we think

10    their construction is incorrect.

11          Ball and Crown are like two ships passing in

12    the night with regard to where you start.  And where you

13    start determines where you finish.  Ball starts from the

14    drawings in Crown's patent.  We didn't see the claim

15    language by and large.  We saw the drawings from the

16    patent.  Their view is, what a patent is all about is

17    you have a drawing, it's got all these features.  Then

18    we have to take the claims and we have to breathe all

19    this language into the claim so that the claim looks

20    just like the picture.  The case law says otherwise.

21          Claim construction begins with the words of

22    the claim.  This is from *Phillips* en banc.  We look to

23    the words of the claims themselves to define the scope

24    of the patented invention.  The written description part

25    of the specification itself does not delimit the right

1    to exclude.  That is the function and purpose of claims.

2              Now, this case *Thorner versus Sony*, 669

3    F.3d, 1362, Fed.Cir. 2012 I don't think is in our brief,

4    but it's a very important case because it says there are

5    only two exceptions that are noted as to when the

6    language of the claims doesn't control.  Those are when

7    a patentee sets out a definition in his specification in

8    the language of the case where the patentee acts as his

9    own lexicographer.  When I use the term "framus

10   injector" in my patent, I mean X.  Now we know what a

11   framus injector is because the patentee defined the

12   term.

13             The second time when the language of the

14   claim doesn't govern is when there is a disavow.  Your

15   Honor has a found disavow in this case with regard to

16   the ten-degree bending which we accept.  I didn't hear

17   Ball say that there was any other disclaimer but for

18   that one.  I didn't hear Ball say that there was any

19   definition of any term in the claim found in the

20   specification that they were asking your Honor to adopt.

21             So this case, therefore, is not governed by

22   the exceptions of lexicography and disavow.  It's

23   governed by the basic black letter principle in *Phillips*

24   that claim construction begins with the meaning of the

25   words in the claim.  Now that said it's perfectly

1    appropriate and even required to read the specification

2    of the patent to understand the context and the nature

3    of the invention.  What is error, however, is what Ball

4    is urging which is to breathe the specification

5    wholesale into the claims.

6                Here's some four principles of law that are

7    appropriate to this case.  *Rexnord versus Laitram.*  It

8    is improper to read limitations from the specification

9    into the claims.  *InterDigital versus ITC.*  It is

10   improper to read limitations from the dependent claims

11   into independent claims.  Here's a case, *Karlin versus*

12   *Surgical Dynamics,* 177 F.3d 968.  It's improper to treat

13   different claim terms as having the same meaning.  We

14   cited *Modine* in our brief for the same principle, the

15   *Modine* case.  The language of the federal circuit.

16   Different words or phrases used in separate claims are

17   presumed to indicate that the claims have different

18   meanings and scope.

19                Ball's bedrock principle that everything has

20   to be construed the same is to blur the distinction

21   between the language that the drafters used in creating

22   the claims of these two patents.  *Virginia Panel.*  It is

23   improper to add modifiers to descriptive terms standing

24   alone.  The District Court was reversed for taking the

25   unmodified term "reciprocating" and limiting it to

1    linear reciprocation because it wasn't in the claim

2    language itself.

3            Ball's positions invite error.  I'm going to

4    read from *MBO Labs versus Becton Dickinson.*  Patent

5    coverage is not necessarily limited to inventions that

6    look like the ones in the figures.  To hold otherwise

7    would be to import limitations onto the claim from the

8    specification which is fraught with danger.

9            Then *SRI* which is in our brief.  If

10   everything in the specification were required to be read

11   into the claims, there would be no need for claims.  In

12   Ball's world, we would put the claim language first and

13   the picture at the end.  We would compare the picture,

14   figure or whatever from the patent with the accused

15   product and we decide whether there's infringement.  If

16   they look different, they would say there's no

17   infringement.  That's not the rule.  That's not the

18   test.  It's backwards.

19           Let's start with the "Wall" group of claims.

20   There are two spots in the claims where the word "wall"

21   appears.  In one case we're talking about a can end

22   wall.  In another case we're talking about a chuck wall.

23   The drafting of these claims could have been clearer by

24   using different terms to keep them separate.  But we're

25   talking about the wall group of terms, which in Ball's

1    brief would be terms 2, 3, and 4 if we count from the

2    beginning of their brief.  The Court construed these

3    terms before in claim 14 of the '826 patent.  The Court

4    ruled that a wall extending inwardly and downwardly

5    meant a can end wall extending inwardly and downwardly.

6    Possibly to draw the distinction from the chuck wall.

7    Then the Court went on and said that it would explain to

8    the jury that the can end wall is a single surface.

9            With regard to similar language in claim 50

10   of the '875 patent, the Court says, a circumferentially

11   extending wall extending from the seaming panel to the

12   reinforcing bead means a can end wall which is a single

13   surface encircling the center of the can end extending

14   from the seaming panel to the reinforcing bead.

15           So here we have two similar terms, one in

16   the '826 patent and one in the '875 patent but the

17   language of the claims is different, and the Court in

18   its construction gave a different and more comprehensive

19   construction to the second term than it did with regard

20   to the first in the '826 patent.  The reason, I submit,

21   that your Honor gave it a different construction is

22   because the language of the '875 patent claim 50 was

23   different and your Honor's construction took that into

24   account as was appropriate.

25           In claim 14 of the '826 patent, your Honor's

1    construction didn't say that the wall had to encircle

2    the end.

3              In claim 50 of the '875 patent, your Honor's

4    construction said that the wall must encircle the end.

5    Why?  Because the language in claim 50 included the

6    words "circumferentially extending."  So your Honor drew

7    the distinction between claim 50 and claim 14 because

8    claim 50 had a word in it that claim 14 did not.

9              In claim 50, your Honor's construction said

10   that the wall had to extend to the reinforcing bead.

11   Your Honor's construction of claim 14 did not have that

12   requirement.  And why?  Because the language of the

13   claims was different.

14             Ball would come along now and say we should

15   sweep all of the differences and language away.  It

16   doesn't matter.  But that violates the principle of the

17   *Modine* case.  The different terms used in different ways

18   have different constructions.

19             Now, Crown's construction of these terms

20   adopts the Court's construction with one exception.  We

21   didn't think in the last case and we don't think now

22   that the claim requires a single surface.

23             Now, the reason why we took issue with that

24   in the last case can be seen in slide 41 which is a

25   quote from our brief in the last case.  We said:  By

1    putting the term "single surface" into the wall, we were

2    concerned that Ball was going to say that the can end

3    wall had to be a flat uniform surface.  Thus far, they

4    haven't made that argument.  So possibly this single

5    surface issue is a mountain out of a molehill because it

6    doesn't seem to be creating an issue in the case.  But

7    the reason why we took exception to it before was

8    because in the *Anheuser Busch versus Crown* case, the

9    federal circuit in an unpublished opinion said:  Look,

10   there the District Court said that the wall had to be

11   flat and the federal circuit said no, the wall doesn't

12   have to be flat.  It can be other shapes.  It doesn't

13   have to be flat the way it's shown in the patent.  The

14   federal circuit said no basis exists for the Court to

15   import the flat limitation of the preferred embodiments

16   into the claims because other than the reference to the

17   patent's preferred embodiment Anheuser Busch can point

18   to nothing in the written description requiring the

19   invention to be narrower than the scope of the claims.

20             We were concerned that the term "single

21   surface" might be sort of a round-about way of

22   reintroducing the word "flat" into the wall which the

23   federal circuit already said didn't have to happen in a

24   related patent.

25             Again, it doesn't seem to have created an

1   issue on the infringement side in the last case.  I

2   don't think it will in this case.  But we're preserving

3   our position that the word "single surface" isn't

4   required.

5           Ball, on the other hand, says they want the

6   same construction for all three terms while extending

7   inwardly and downwardly in claim 14, circumferentially

8   extending wall in claim 32 and dependent claim 45, and

9   circumferentially extending wall from the seaming panel

10  to the reinforcing bead in claims 14 and 50 on the '875

11  patent.

12          Let's take that language that Ball would

13  like to see inserted in all three of those

14  constructions.  Let's focus first on the idea that it

15  has to be a surface, a single surface encircling the

16  center of a can end, according to them, which is engaged

17  by a chuck and which extends from the cover hook to the

18  reinforcing bead.  So let's look at where they get this

19  "engaged by a chuck."

20          First of all, a wall, if we start with the

21  plain meaning of the word "wall," a wall -- the plain

22  meaning of the word "wall" doesn't require engagement by

23  a chuck any more than the plain meaning of the back wall

24  of this courthouse means engaged with a picture frame.

25  A wall isn't defined by what it engages.  It certainly

1    doesn't have to be.

2              Now, in the *Crown versus Ball* appeal on

3    written description, Judge Whyte, sitting by

4    designation -- this was in the last appeal in the

5    federal circuit -- noted that claim 14 of the '875

6    patent, which is the one that we're construing right

7    now, was a product claim, just as I said a moment ago.

8    The claims covers the can end as it sits on a table.

9              And he says, claim 14 as a product claim

10   recites structural limitations as opposed to method

11   steps.  So to define a wall as a wall that must be

12   engaged by a chuck is to define a thing not by what it

13   is but by how it's used.  Generally speaking, that's

14   inappropriate.

15             Let's look at claim 1 of the '826 patent.

16   Claim 1 doesn't even mention a chuck.  Has nothing

17   whatever to do with a chuck.  Nothing to do with drive.

18   Nothing to do with chuck engagement.  It's referring to

19   a can end.  It doesn't have to be adapted to do

20   anything.  It's defining the thing by what it is.  So it

21   would be error to construe claim 1 of the '826 patent to

22   have anything whatever to do with a chuck.

23             Claim 13 and 14 of that same patent has

24   different language.  There it says that the wall of the

25   end must be adapted to be deformed during seaming so as

1    to be bent upwardly around the juncture of the chuck

2    walls. So that claim requires an end that's adapted to

3    be deformed but doesn't actually require it to be

4    deformed. It doesn't require the presence or absence of

5    a chuck. It certainly doesn't require engagement with a

6    chuck. The language of the claim doesn't say that.

7              Here on slide 48, I have the examiner's

8    reasons for allowance of claim 14 of the '826 patent. I

9    won't bother to read it. But the examiner says nothing

10   about the engagement with a chuck. He says that the

11   wall portion must be adapted to be deformed during

12   seaming as to be bent upwardly around the juncture of

13   the chuck walls at a first point, but he doesn't say

14   that the wall has to be driven by the chuck at that

15   first point if "engagement" and "driver" mean the same

16   thing.

17             Now, Ball's proposal to read the word

18   "engagement" into the common term "wall" in the '826

19   patent is a proposal to limit the claim to the

20   embodiment shown in the specification. Under the

21   *Phillips* case, that's error. If everything from the

22   specification were required to be read into the claims,

23   we don't need claims.

24             Let's look at the '875 patent because there

25   the claims do require chuck engagement, but not the

1    engagement Ball seeks to read into those claims.  The

2    asserted claims, 14, 32/45, that would be independent

3    claim 32 and dependent claim 45, and claim 50 of the

4    '875 patent, every single one of them require explicitly

5    bringing the chuck into engagement with the can end.

6    But the claim language says bringing the chuck into

7    engagement with the end.  It doesn't say bringing the

8    chuck into engagement with the can end wall.

9         Now, when the drafter of the '875 patent

10   wanted to show that he knew how to say it because in

11   claim 1 which is not asserted here, there's language in

12   clause C, bringing the chuck into engagement with the

13   can end so that the juncture of the chuck walls contacts

14   the inclined wall of the can end, but the asserted

15   claims merely require that the chuck engage the end,

16   unlike claim 1 which requires contact between the chuck

17   and the wall.

18        Now, this is very important.  Claim 24 and

19   42 of the '875 patent -- which depend from the claims

20   that are asserted but which are not asserted here --

21   explicitly require that there be engagement with the can

22   end wall as shown on slide 54.  So in the unasserted

23   dependent claims, there has to be engagement with the

24   wall but in the asserted independent claims, there

25   merely has to be engagement with the end so the broad

1    independent claims are broader than the dependent claims

2    that are not asserted.

3              *Phillips*.  The presence of a dependent claim

4    that adds particular limitation gives rise to a

5    presumption that the limitation in question is not

6    present in the independent claim.

7              *Nazomi versus ARM Holdings*, 403 F.3d 1364,

8    the concept of claim differentiation normally means that

9    limitations stated in dependent claims are not to be

10   read into the independent claims from which they depend.

11             Ball, on the other hand, would require

12   engagement with the wall even in claims which only

13   specifically require engagement with the end and ignore

14   the dependent claims that add those specific

15   requirements.

16             As an aside in a recent case *Deere versus*

17   *Bush* -- that's an interesting Defendant's name -- *Deere*

18   *and Company versus Bush Hog, LLC,* 703 F.3d 1349, Fed.

19   Cir. Chief Judge Rader reversed summary judgment of

20   non-infringement and said:  The District Court

21   erroneously construed the term "into engagement" with

22   "to require direct contact between two components."

23             So even if the word "engagement" were to be

24   written into claim language, an engagement with the

25   walls, here's a similar case with similar language

1    saying that doesn't necessarily even require direct

2    contact.  Every case turns on its facts, but it's

3    interesting to note that Ball is reading this limitation

4    "engagement into the wall" into every claim even those

5    in which it doesn't appear.

6              The other limitations they wish to insert

7    into the wall terms are that the wall encircle a can end

8    and that it extend to the reinforcing bead.

9              Let's look first at claim 13/14 of the '826

10   patent.  There if we look at the claim language which

11   Ball didn't really show, the language of the claim says

12   it has to be a wall extending inwardly and downwardly

13   from the cover hook.  But there's no mention of the word

14   "circumferentially."  So there's no reason to import

15   into claim 13 any requirement that the wall encircle a

16   can end.  And there's no mention of the reinforcing bead

17   in claim 13.  That doesn't appear until claim 14.  If we

18   were to take Ball's limitation, the way they would

19   construe the patent and read it into claim 13 -- and if

20   we look at slide 60, we've done that; we've removed the

21   wall language and put in its place "Ball's

22   construction."  It would say:  A single surface

23   encircling the center of the can end which is engaged by

24   the chuck during seaming extending from the cover hook

25   to the annular reinforcing bead, but in the language of

1    claim 13 there is no reinforcing bead.  The claim
2    doesn't require a reinforcing bead.
3              So their language, if we insert it into the
4    claim, would make the claim itself ungrammatical.  That
5    doesn't help the jury.  The reinforcing bead doesn't
6    appear until claim 14 and so their construction would
7    make the claim not read grammatically from top to
8    bottom, which it should if the construction is
9    appropriate.
10             So let's look at claim 32 and dependent
11   claim 45 of the '875 patent.  Again, they want the chuck
12   to encircle the can end.  There, it should because the
13   claim language says circumferentially extending, but
14   they say it has to extend to the reinforcing bead.  But
15   if we look at claim 32, there's no mention of a
16   reinforcing bead.  That doesn't appear until claim 45.
17   So again, if we were to put their construction into
18   claim 32, it becomes, again, ungrammatical because it
19   refers to the surface extending to the reinforcing bead,
20   but that doesn't appear until we get to dependent claim
21   45.
22             Let's go on to the next term group, five and
23   six in their brief, the first point and first location.
24             The same claim construction principles
25   apply.  The words of the claim define the invention, not

1  the specification. We don't have to read the entire

2  specification into the claims.

3       Improper to read limitations from the spec

4  into the claims. *Rexnord*.

5       Improper to read limitations from dependent

6  claims to independent claims. *InterDigital*.

7       Improper to treat different claim terms in

8  different claims as having the same meaning. *Karlin* and

9  *Modine*.

10       So Crown's construction of first point and

11  first location is very simple. It's a first point on

12  the can end wall, not some other place. It's on the can

13  end wall. By the way, let me just as an aside, I agree

14  with Ball. The term "first point" appears in two

15  different contexts in the '826 patent. In claim 1, the

16  term "first point" is referring to one point, and in

17  claims 14 and dependent claims, it's referring to a

18  different first point. The parties agree with that. I

19  don't think that's a point of dispute.

20       So here we're talking about, not the claim 1

21  first point but the claim 14 first point. It's an

22  unfortunate way that the claim was drafted because it

23  does add confusion. But at least the parties are in

24  agreement that we have to construe that term differently

25  from claim 1 to claim 14.

1          Now, in the *Brown versus 3M* case, the Court

2     said -- federal circuit said:  These are not technical

3     terms of art and do not require elaborate

4     interpretation.  It doesn't mean that we can ignore

5     them.  But it's not like we're trying to define

6     something that only a person skilled in the art can

7     understand.  "First point," "first location" are these

8     drafters' sign posts to help somebody be able to read

9     the claim from top to bottom.

10          *ActiveVideo Networks versus Verizon,* 694

11     F.3d 1312.  The District Court did not err in concluding

12     that these terms have plain meanings that do not require

13     additional construction.  So if the Court wishes to

14     construe these terms, it can.  It doesn't have to.  But

15     we submit that the construction and the understanding of

16     where the terms come from, come right out of the claims

17     themselves which is why our construction seems so

18     barebones.  Whereas, Ball's seems so elaborate.

19          Ball admitted in its brief the Court

20     declined to construe first point in the last case

21     because it found that the location was clear in the

22     claim itself.  It didn't require construction.

23          Now we're looking at claim 14 of the '826

24     patent and the word "first point" appears.  So the first

25     point is referring to the point where the wall portion,

1    can end wall, is adapted to be deformed during seaming

2    so as to be bent upwardly around the juncture of the

3    chuck wall.

4                So there's the definition of the first point

5    and where it is to be found right in the claim itself.

6    Which is why our construction doesn't add that language

7    because it's already found there.

8                Now, let's take a look at the '875 patent.

9    Because the term "first location" is defined differently

10   in claim 14 of the '875 patent as it is in claim 50.  In

11   claim 14, the first location is defined in the claim

12   itself as "the transition from the substantially

13   cylindrical wall portion to the second wall portion."

14   It's referring to a point which is determined after the

15   end has been seamed to the can.

16               In contrast, claim 50 says "the first

17   location is where the wall is bent around the juncture

18   of the chuck walls," and there it's referring to the

19   unseamed can end.  So while we have maybe the same

20   point, it may turn out to be the same point, but the

21   language of the claim and the way one gets to the answer

22   is a function of how the language is set out in the

23   claim itself.

24               Ball says "first point" is where the

25   juncture of the chuck walls engage the can end wall.

1    That construction they wish to impose across both

2    patents all asserted claims.

3              Let's take a look at claim 14 of the '826

4    patent.  There, the language of the claim says "a wall

5    extending inwardly and downwardly adapted to be bent

6    upwardly around the juncture of the chuck walls."

7    That's where the first point is.

8              There's nothing in that claim that requires

9    engagement with a chuck.  It might have to bend around

10   the juncture of the chuck, but it doesn't require that

11   the chuck drive the end at that first point using Mr.

12   Luken's language.  But let's look at how the claim

13   language changes, if we shift now to the '875 patent.

14             Again, Ball's construction is the same.

15   Let's take a look, however, at the actual language of

16   the claims.  Claims 14, 32 and dependent claim 45 and

17   claim 50, all explicitly require that the chuck engage

18   the can end, not the can end wall.  So if the chuck

19   engages the can end in the bead, the claim is satisfied

20   regardless of whether it engages the can end wall

21   because the claim language in the asserted claims is

22   broad.

23             Ball would say:  Well, that's beyond what's

24   disclosed in the specification, but the federal circuit

25   in *Phillips* has said:  Just because, you know, there's

1    only a single embodiment doesn't mean the claims are

2    limited to that embodiment.  The claims can be broader,

3    and often are broader, than the embodiments disclosed in

4    the specification.

5            In this particular case, chuck engagement

6    with the wall is explicitly claimed in dependent claims

7    24 and 42 of the '875 patent which refer back to the

8    asserted independent claims.  There -- in those claims,

9    there does have to be engagement between the chuck and

10   the wall and the juncture and the wall, but those claims

11   are not asserted.  It's error to read limitations from

12   the dependent claims which are not asserted into the

13   broader independent claims.

14           Similarly, claims 14 and 32 and 45 but not

15   claim 50 have a different definition of the chuck.  In

16   claims 14 and 32, the chuck merely has to have a first

17   circumferentially extending wall.  There's not any

18   reference -- there's no reference in either of those two

19   claims to the juncture of a chuck.  So Ball's

20   construction that requires that the chuck juncture

21   engage the can end wall ignores the difference in

22   language because in these two claims, unlike claim 50, a

23   chuck juncture is not a requirement of the claim itself.

24           If we can, let's go on to the peripheral

25   cover hook.  I think it's best to consider that term in

1　conjunction with first point.  I actually don't think

2　the parties are all that far apart on their

3　constructions of these two terms.  But there is some

4　mischief that I think we need to -- potential mischief

5　that we need to clear up.

6　　　　　　　Crown's construction of peripheral cover

7　hook is an outer portion of an unseamed can end

8　encircling the end.  Our construction doesn't say, but

9　possibly it should have, we should have added the

10　language "that is to be formed into a double seam."

11　That language is found in Ball's construction.  And on

12　reflection I think it should be in ours as well.

13　Because that is the, it's that outer portion of the end

14　that encircles the end and that is to be formed into the

15　double seam that the patent is referring to.

16　　　　　　　If we look at figure 4 of the patent, it

17　shows us where the peripheral cover hook is.  It's shown

18　at element 23 in figure 4.

19　　　　　　　Ball says:  Well, the peripheral cover hook

20　has to be the outermost curved portion of the can end

21　that is placed on the can body flange and is to be

22　formed into a double seam.  They note, accurately, that

23　we sought that curved construction in the *Rexam* case and

24　we were successful in getting it.  Frankly, I don't have

25　much disagreement that the peripheral cover hook is

1    curved.

2            Our exception is if we look at the drawing

3    and we look at the cover hook, if you look at the far

4    outside where the numeral 23 is shown in figure 4,

5    there's a portion that's almost vertical and is kind of

6    straight.  It looks like it's a vertical straight

7    segment.  So our concern with the idea of a curved

8    peripheral cover hook is only that the cover hook is

9    normally curved but it could have a straight segment and

10   still be a peripheral cover hook.  If what Ball is

11   seeking to say is that it can't have any flat portion,

12   then we would disagree with that.  But we don't really

13   disagree that the cover hook is curved because generally

14   speaking it is, as shown in figure 4.

15           Now, we say that the term "first point" --

16   now, this time we're talking about the different first

17   point, the one in claim 1 of the '826 patent and not the

18   one in claim 14.  Again, there's two usages of the term

19   "first point."  It's important to keep them separate

20   because they refer to different things.  We say it's a

21   first point on the can end wall.  Why is our

22   construction so barebones?  Because the patent claim

23   itself defines the first point.  It even uses the word

24   "defines."  It says:  "The location at which said wall

25   extends from said peripheral cover hook defines a first

1    point."  So our construction is merely a first point on

2    the can end wall that defines the location at which said

3    wall extends from the peripheral cover hook.  It's just

4    the language of the claim.  It's self-defining.

5            Ball says it has to be the innermost point

6    on the end at which the cover hook terminates.  In and

7    of itself, we don't even have much of an objection to

8    that.  It seems redundant.  If we take the language of

9    the claim and we put Ball's construction in there, it

10   says:  "The location at which said wall extends from

11   said peripheral cover hook defines an innermost point

12   and cross-connection on the end at which the cover hook

13   terminates."  To me that seems redundant.  I suppose it

14   doesn't do any harm.

15           The problem that we have with Ball's

16   construction is the gloss that they put on it in their

17   brief.

18           Here we put an excerpt from their brief at

19   page 24.  They say:  "Ball claims that the first point

20   is the innermost point on which -- on the end at which

21   the cover hook terminates."  So far so good.  We really

22   don't disagree with that.  But then they continue.  They

23   say that is, quote, "the point at which the can end wall

24   begins to curve away from the line that marks angle C."

25           There's where we have our disagreement with

1    Ball. So it's really in the construction of the

2    construction. It's in the gloss that we find in their

3    brief and the way they apply the construction to the

4    preferred embodiment.

5              If you look at figure 4, Ball points to the

6    first point as we show on slide 94.

7              To understand why we have this disagreement,

8    the parties agree that the peripheral cover hook

9    includes a segment known as the seaming panel. Mr.

10   Luken mentioned that. We agree that the seaming panel

11   is the curved innermost portion of the peripheral cover

12   hook. So if we look at slide 95, you can see the

13   seaming panel is a part of the peripheral cover hook.

14   Therefore, the language that we're arguing about is:

15   Where does the first point that defines the location at

16   which the wall extends from the peripheral cover hook,

17   which is really another way of saying where does the

18   wall extend from the seaming panel?

19              In slide 95, we see the wall, we see the

20   seaming panel. The question is: Where is the point

21   that demarcates one from the other?

22              In the specification at column 4, there's a

23   reference to radius r1, which is referred to in the

24   patent as the seaming panel chuck wall radius. So the

25   specification is telling us that the point where the

1    seaming panel stops and the wall begins is in the middle

2    of that arc defined by that radius r1.

3            Crown's view is the first point is right

4    there as shown in the drawing.  So Ball's first point

5    is, according to their brief, is the point at which the

6    can end begins to curve away from the line that marks

7    angle C.  We've shown on slide 97 where they would read

8    the first point.  We've shown where we would read the

9    first point.  They're slightly different.

10           Now although we're talking only about claim

11   1 of the '826 patent, it's important to note that in

12   claims 14 and 32 of the '875 patent, there's a reference

13   to the fact that the wall that we're talking about here

14   comprises a radiused portion.  And the support for that

15   language in those claims comes from figure 4 because in

16   Crown's view of the patent, there's a portion at the

17   very top of the wall which has a radius.  So there can

18   be -- so the can end wall, where it meets the seaming

19   panel, can have some curvature to it, and that's

20   consistent with what the federal circuit found in the

21   *Anheuser Busch* case because in that case they found that

22   the can end wall need not be flat.  So here we have

23   claims that refer to a can end wall with a radiused

24   portion and we have the federal circuit telling us in

25   the *Anheuser Busch* case that the wall need not be flat.

```
1              So Crown's view is the first point in claim
2    1 and only in claim 1, is referring to the middle of the
3    arc that defines the seaming panel chuck wall radius.
4    Whereas, Ball would seem to suggest that the wall must
5    be flat, must be straight, and any part of that
6    curvature must be considered to be part of the seaming
7    panel.  That's an issue with which we disagree with
8    them.
9              Your Honor, it's almost ten of.  I am about
10   two-thirds finished.  Would this be a good time to
11   break?
12             THE COURT:  I think it would be, Mr. Heist.
13   I thank you for alerting me to that.  Give me just one
14   moment, gentlemen, if you would.
15             Why don't we be in recess then until 1:30.
16   Mr. Heist, you're at the 58-minute mark.  You seem to be
17   on schedule.  Again, each side has an hour and 30
18   minutes total.  Thank you all.
19             We are in recess at this point.
20             (Recess taken at 11:48 a.m.)
21                       IN OPEN COURT
22                        1:30 p.m.
23             THE COURT:  All right.  Mr. Heist.
24             MR. HEIST:  Thank you, your Honor.  Your
25   Honor, before I begin, would it be possible for me to
```

1   possibly go five or ten minutes overtime?  I'd be happy

2   for Ball to have similar time.  I'm concerned I'm not

3   going to be able to finish.

4           THE COURT:  I'll give you that extra time,

5   not to exceed ten minutes.  I'll give Mr. Luken the

6   same.

7           MR. HEIST:  I'd like to reserve five minutes

8   total for rebuttal but I think I can finish in the time

9   now.

10          THE COURT:  Do what you can do, sir.

11          MR. HEIST:  Thank you.

12          THE COURT:  Don't rush.  It's too important.

13          MR. HEIST:  So I'd like to next turn to the

14  "second point" and "second location" term group.  The

15  term "second point" forming a lowermost end of the wall

16  is already construed by the Court in claim 14 of the

17  '826 patent.  The Court said it was the second point

18  that marks the lowest end of the can end wall.  That's

19  the construction that Crown believes should be adopted

20  again here.

21          Now, Ball would like to change that

22  construction and say that it is the point where the can

23  end wall is angularly offset from the reinforcing bead.

24  But Ball has really already lost this issue, not once

25  but twice.  Now it was argued slightly differently but

1    it's the same point.

2              They argued in the last case that they

3    needed to know where the wall stops and the bead starts.

4    Where they said they couldn't apply the claim.

5              Your Honor's opinion said Defendant -- in

6    the *Markman* order from the last case, said Defendant

7    argues that the annular reinforcing bead is or must be

8    clearly distinct from the wall and directly connecting

9    to the wall at a clear, distinct second point forming a

10   lowermost end of the wall.  That was Ball's argument at

11   the time.  The Court said no, I'm going to decline to

12   adopt that construction given that a claim is not to be

13   narrowly construed in order to conform to an embodiment.

14             So then when it came time for summary

15   judgment, they argued the same thing again.  Without

16   knowing where the wall stops and the bead starts, the

17   claim is indefinite.  They said each claim requires

18   locating these two points.  And during the *Markman*

19   process, the Court declined to adopt our more specific

20   definition and because of that, the claims are fatally

21   indefinite.  They moved for summary judgment that the

22   claims were invalid.  We cross-moved for summary

23   judgment that the claims were definite.  And they lost

24   and we won that issue.

25             Your Honor ruled that the Plaintiffs -- that

1    was Crown at that time, rather than the Defendant -- are

2    entitled to summary judgment on the question of whether

3    the pertinent claims are invalid for indefiniteness.

4    Now they're coming in and they're essentially making the

5    same argument.  We need to know where the wall stops and

6    the bead starts or we don't know how to apply the claim.

7    They say in their brief precisely locating the point at

8    which the wall meets the bead is essential to

9    determining if a can end infringes or a prior art can

10   end invalidates.  But this drawing that's on the screen

11   at slide 105 is their invalidity contention in this case

12   and similar to the invalidity contentions in the last

13   case.  There, they point to the prior art can end in the

14   Toyo patent, the Japanese '323 patent.  You can see from

15   the drawing that the bead is not angularly offset from

16   the wall, but they don't have any trouble applying the

17   claim there saying that there's the reinforcing bead on

18   the bottom right.  They point to it.  And they say

19   there's the second point.  So when they want to find the

20   second point and they want to find the reinforcing bead,

21   they can find it.

22          So to argue that we need to have this new

23   construction because otherwise the claim can't be

24   applied is belied by their own claim construction

25   positions in this case which were identical -- which are

1    identical to the ones that were asserted in the last

2    case.

3            They say:  Well, we have to impose this

4    angular offset requirement into the claims of the

5    patents in suit because the language appears in another

6    different patent from the same family, Crown's '041

7    patent.  Now, in their brief, at page 27, they say, the

8    reason why we can look to what the claims say in this

9    '041 patent is because it, quote, "claims and

10   describes," unquote, the same invention that is asserted

11   in this case.  But that violates the principle of the

12   *Modine* case and the other case we looked at this

13   morning, that different claims -- certainly in different

14   patents; even in the same patent -- presumptively define

15   different inventions.

16           The patent office in this case ruled that

17   the '826 patent claims were a different invention than

18   the '875 patent.  And the patent office never rejected

19   the '041 patent that came later because it claimed the

20   same invention as the invention claimed or described in

21   the '826 and '875 patents.  When the patent office

22   thinks that somebody's trying to get two patents on the

23   same invention, there's a rejection that the patent

24   office issues called double patenting.  There was never

25   a double patenting rejection in the '041 patent where

1    the government is saying you can't have the '041 patent

2    because it's already described in the '826 and '875

3    patent.  So the premise by which we look at the '041

4    patent because it's supposedly the same invention as the

5    patents in suit is false.

6            In addition, the term "angularly offset" in

7    the '041 patent is expressly included in hoc verba in

8    the claims of that patent themselves.  So it's right in

9    the claim.  The term "angularly offset" is not in the

10    claim of either of the two patents that are involved in

11    this suit.  And furthermore, the term "second point,"

12    "second location," or "transition" which give rise to

13    this issue and which Ball says mean angularly offset do

14    not appear in the '041 patent claims.  So the claims of

15    the two patents, the '041 on the one hand and the '826

16    and '875 patent on the other hand, use different

17    language.

18            Ball cites and relies upon *Microsoft versus*

19    *Multi-Tech*.  That case holds that where two patents in

20    the same family have a common claim term and where that

21    common claim term has been construed by the patentee one

22    way in one of the patents that that construction can be

23    imported into the other patents in the family.  But that

24    case doesn't apply here because the same claim terms are

25    not found in the '041 patent as are found in the '826

1    and '875 patent.

2          So, the *Albany Molecular versus Dr. Reddy*

3    case, 2010 U.S. District LEXIS 59236, District of New

4    Jersey draws that distinction.  It says:  "While the

5    prosecution history of one patent is relevant to an

6    understanding of the scope of a common claim term,

7    citing *Microsoft versus Multi-Tech*, no such common claim

8    term is present in this case.  The prosecution histories

9    at issue do not relate to a common claim term.

10          That's the situation that governs here.  The

11   *Albany* case is our situation.  The *Multi-Tech* case,

12   *Microsoft Multi-Tech* is a different situation.

13   Similarly, in *Liebel-Flarsheim versus Bedrad*, from this

14   district, 2005 U.S. District LEXIS 25733, the Southern

15   District of Ohio said:  "When multiple patents derive

16   from the same initial application, the prosecution

17   history regarding a claim limitation in any patent that

18   has issued applies with equal force to

19   subsequently-issued patents," -- but here's the crucial

20   language -- "that contain the same claim limitation."

21   These patents, the ones that are asserted, do not

22   contain the angularly-offset limitation.  It would be

23   error to read that limitation into claims that do not

24   have it.

25          Now, the second point, second location, and

1    second location on said wall that forms a transition

2    with said reinforcing bead, that appears in claims 1, 13

3    and 14 of the '826 patent, claims 32 and 45 of the '875

4    patent, and claim 14 of the '875 patent, respectively.

5    Crown's position is we don't need to construe those

6    terms any further because they're defined in the claim

7    itself.

8              So if we take a look at claim 14 and 13 of

9    the '826 patent, the patent refers to the second point

10   as the point that forms the lowermost end of the wall,

11   which is what the Court ruled in its prior construction

12   of the claims in the last case.  Similarly, in claim 32

13   and dependent claim 45, the "second location" is defined

14   as a second location on the can end wall being the

15   lowermost point on the wall.

16             And finally, in claim 14 of the '875 patent,

17   the "second location" is defined in the claim itself as

18   the point that forms a transition with the reinforcing

19   bead.  So, our position is that these claim terms do not

20   need further construction because it's clear what is

21   meant by the terms when they're read in the context of

22   the claim itself.

23             Turning to "transition therebetween."  This

24   is a term that the Court construed in the last case, a

25   place between them at which one changes to the other.

1   That's the construction Crown suggests the Court should

2   adopt again.  Ball again would read that limitation --

3   read into that limitation the idea of angular offset

4   from the annular reinforcing bead.

5           Nothing in the term "transition," if you

6   start from the words of the claim, would connote an

7   angular offset.  Again, this issue was raised below.

8   There Ball argued -- when I say below, in the last case.

9   There Ball argued, just as they do here, we need to know

10  where the wall stops and the bead starts or we can't

11  apply the claim.  There, they said:  Defendant -- in

12  contrast your Honor wrote that the Court must construe

13  "transition" to mean a sharp, distinct, definable

14  non-gradual borderline that appears as a sharp point in

15  cross-section.  They argued -- similarly, Defendant

16  argues that its proposed construction must be adopted

17  because claim 50 does not meaningfully explain where the

18  wall of the can stops -- can end stops and the

19  reinforcing bead begins.  It's essentially the same

20  argument that Ball is making today.

21          In that case, the Court rejected their

22  argument and said given that Plaintiff's construction,

23  Crown's construction is consistent with the plain

24  meaning of the word "transition" and the drawings of the

25  patent, the Court will adopt the same.  So, when Ball

1   says they want to stay true to the Court's prior opinion

2   this is a case where they're straying from the Court's

3   prior opinion.

4           And again in the last case, they said that

5   the Toyo claim anticipated claim 50, Japanese patent

6   '323.  They said it had a transition, even though Toyo

7   didn't show an angular offset with a reinforcing bead.

8   In the prior case, they said:  We don't need to

9   know whether -- even if there's no angular offset

10  between the wall and the bead, we sure know how to find

11  where the transition is.

12          The Court found that Toyo anticipated claim

13  50, and that would imply to me that the term "angular

14  offset" was not required because Toyo didn't show an

15  angular offset.  Crown then appealed that ruling and the

16  federal circuit reversed the anticipation ruling but

17  with no discussion of Ball's then secret angular offset

18  limitation which they're espousing here.

19          Even today in their claim construction -- or

20  pardon me -- their claim application to the prior art

21  infringement contentions, looking at slide 117, they

22  continue to allege that claim 50 is anticipated by Toyo.

23  They have no trouble pointing to the transition and no

24  trouble pointing to the reinforcing bead.  And so they

25  can apply this claim when they want to.  It's they don't

1    like the way the claim is otherwise applied when it's

2    applied for purposes of infringement.  But what's sauce

3    for the goose is sauce for the gander.

4              Turning to the portion of the "wall" term

5    group.  These are terms 13, 14, and 15, again taking the

6    numbering from Ball's brief.  Again, Crown's view is

7    these terms don't require construction because the

8    meaning of the term is, they're self-defined, these

9    terms are self-defined in the claims themselves.

10             Now, in the last case, the Court construed

11   one of those terms in claim 50.  The Court construed the

12   entire phrase.  The phrase that was construed was:  Bend

13   a portion of said can end wall upwardly around said

14   juncture of said chuck walls.  The Court construed that

15   language and used the term "portion of said can end

16   wall," which is what Ball's trying to read here or have

17   construed here.  The Court used the same term in its

18   construction as is found in the claim.  So the Court

19   read that entire phrase such that this portion of the

20   can end wall was self-defining because it used the term

21   "portion of said can end wall" in the construction

22   itself.  So, that demonstrates that this claim didn't

23   require construction before and it doesn't require, in

24   our view, construction now.

25             The real reason is because the meaning of

1    that portion of said can end wall is right in the claim.

2    A portion of said can end wall is a part of the can end

3    wall that is bent upwardly around the juncture of said

4    chuck walls at a first location on the can end wall.

5    That comes from claim 50 of the '875 patent.

6              Similarly, in claims 14 of the '826 patent

7    and claims 14 and 32/45 of the '875 patent, the term

8    "first wall portion or a portion of said first wall

9    portion" are defined, self-defined in the claim itself.

10   If we look at claim 14 of the '826 patent, we see that

11   the first wall portion is a part of the can end wall

12   that is, quote, "adapted to be formed during said

13   seaming operation so as to be bent upwardly around said

14   juncture."  And in claim 14 of the '875 patent, it's a

15   part of the can end wall that, quote, "after seaming is

16   substantially cylindrical."  So the claims are defining

17   in the words of the claim what is meant.

18             Finally, in claim 32, from which claim 45

19   depends, that's in the '875 patent, a portion of said

20   first wall portion is a part of the first part of the

21   can end wall.  That is to use the words of the claim,

22   pressed against the chuck first wall and bent upward

23   through an angle of at least 16 degrees.  So, again, the

24   construction comes from the language of the claim

25   itself.

1        Now, Ball comes along now and their position

2   is, we have to define this portion of the wall as the

3   straight upper portion that is not substantially

4   cylindrical, paren, i.e., is inclined at an angle of at

5   least 20 degrees before seaming.

6        We take issue with that for a number of

7   reasons.  First, let's focus on the straight upper

8   portion.

9        Now, the Court ruled that there was a

10  disclaimer.  It ruled that the upper portion of the can

11  end wall had to be bent upwardly more than ten degrees

12  during seaming.  We thought we knew how to measure that

13  angle and we measured it in the last case and the Court

14  ruled ultimately that the way our expert measured it was

15  different from the way it had been mentioned in the file

16  wrapper.  So the Court ruled that we had to look at the

17  straight portion of the can end wall to determine

18  whether it was bent upwardly ten degrees.  That would

19  ultimately resolve the first case.  But the Court didn't

20  rule that the entire can end wall had to be straight.

21        It doesn't have to be straight.  We know

22  that the can end wall needn't be flat.  It doesn't have

23  to be flat.  We know that from the *Anheuser Busch versus*

24  *Crown* case where the federal circuit refused to read the

25  can end wall as being an entirely flat or straight

1    surface.  We know that the straight part has to be bent

2    upwardly more than ten degrees.  Your Honor has ruled

3    that in the last case.  But that doesn't mean that the

4    entire wall needs to be straight.

5            In fact, if we look to figure 4 of the

6    patent, we see -- and we looked at this drawing

7    earlier -- we see that the can end wall at the top has a

8    little curved portion, a radiused portion, as it's

9    referred to in some of the claims of the '875 patent.

10   So while the wall that -- the straight part has to be

11   bent upwardly ten degrees doesn't mean the wall itself

12   must be straight or flat.  It would be error to read

13   that into the claims.  That's the very error that caused

14   the reversal in the *Anheuser Busch versus Crown* case.

15           A construction that excludes the preferred

16   embodiment is rarely, if ever, correct.  That's from the

17   *Rexnord* case *versus Laitram* and a construction that

18   would preclude the claim from reading on figure 4 of the

19   patent which shows a flat chuck wall with a curved

20   portion would not be correct.

21           The second problem we have with Ball's

22   construction is they say:  Well, the portion that's bent

23   upwardly, the portion of the can end wall that's bent

24   upwardly must not be substantially cylindrical.  We

25   don't take issue with that.  What we do take issue with

1    is that, quote, "corollary," unquote, that Mr. Luken

2    spoke about because Ball's construction says:  In order

3    to be not substantially cylindrical, the wall portion

4    must be inclined at an angle of at least 20 degrees

5    before seaming.  Nothing in the language of these

6    phrases, "portion of said can end wall," "first wall

7    portion," or "portion of said first wall portion" states

8    or implies that the wall before seaming must be inclined

9    at an angle of at least about 20 degrees.

10            Now, Ball says in their brief that the

11    reason why they say the wall must be 20 degrees before

12    seaming, the upper part of the wall, is because of the

13    disclaimer that your Honor found and as to which you

14    were affirmed by the federal circuit.  They say:  As

15    required by the disclaimer, the upper portion of a can

16    end wall must be inclined at an angle of 20 degrees or

17    more in order to be bent more than ten degrees and

18    become substantially cylindrical during seaming.

19            So we've shown here a chuck.  Shown in

20    yellow on slide 132.  And the chuck has a four-degree

21    angle, plus four degrees.  And the wall has a 20-degree

22    angle before seaming.  So if the wall is bent upwardly

23    against the chuck, it's deflected 16 degrees from plus

24    20 to plus four.  So if the requirement of the claim is

25    that the can end wall must be bent upwardly more than

1       ten degrees, it would seem, at first glance, that this

2       wall would satisfy that claim limitation.  It's bent

3       upwardly more than ten degrees.

4               But Ball says no, it's not.  It's not

5       because there is something called springback.  If the

6       wall is bent upwardly and is bent against the chuck, and

7       then the rolls are removed, metal has some memory to it

8       and it springs back a little bit.  And so they say well,

9       if it's bent upwardly, starts at 20 and it's bent up to

10      four, it springs back five, and so instead of going from

11      20 to four and to flex 16 degrees, it bends from 20 to

12      four and then springs back five.  So it's really only

13      deflected 11 degrees.  So they're making a factual

14      assumption that your Honor's disclaimer ruling required

15      springback and required that that springback be

16      considered.  They're also assuming that the

17      springback -- they're making a factual assumption that

18      the springback must be five degrees.

19              Finally, they're making the assumption that

20      the wall of the chuck must be plus four degrees.  All of

21      those factual assumptions they're asking to be buried

22      into this claim construction, and we submit all of them

23      would lead to error, and all of them are fact issues

24      that need to be resolved at some point but certainly not

25      in the context of a *Markman* hearing.  So let's consider

1    each of those assumptions and why they're unfounded.

2           They assume there must be springback, but

3    the Court's prior construction order said nothing about

4    the wall having to start at 20 degrees and it said

5    nothing whatever about springback.  Your Honor found

6    that Mr. Higham's declaration in the patent office

7    demonstrated that Plaintiffs disclaimed that the upper

8    wall portion of the can end wall was altered by bending

9    no more than about ten degrees.  That was the ruling.

10          So if we go back and look at Mr. Higham's

11   declaration upon which the disclaimer was found, we see

12   that Mr. Higham didn't say anything about 20 degrees.

13   He didn't say anything about springback.  All he said

14   was that the can end was bent more than ten degrees

15   during seaming.  So he was talking about -- in his

16   statement to the patent office, he was saying in the

17   prior art, the wall angle started at around 14 and was

18   bent to around four, for a deflection of about ten

19   degrees.  And he wasn't referring to what happened after

20   seaming, after the metal relaxed.  He was talking about

21   what happened during seaming.  You can see that from his

22   declaration.  Paragraph 5, Exhibit 6 to Ball's brief.

23          If you look at the claim language of the

24   various claims at issue, you'll see that what's being

25   referred to in the claim is what happens during seaming,

1  not what happens after seaming.  If we look at the '826

2  patent claim 13, it uses the word "deformed during said

3  seaming operation."  It's not talking about deformation

4  after the metal relaxes and the rolls are pulled away.

5         In the '875 patent, claim 32 and 50, we're

6  talking about what happens in the seaming operation as

7  the operation is being performed, not what condition

8  does the metal have after the seaming is complete.

9         Now if, and this is a big if.  If the

10  Court's disclaimer was taking springback into account,

11  then the disclaimer would not have been ten degrees as

12  the Court found it was.  If we're looking at the

13  deflection, the net deflection of the can end wall, it

14  starts at, say, 14, it's bent upwardly four degrees and

15  then it's bent back -- then it springs back five

16  degrees.  If that's what the Court was talking about,

17  then the net deflection of the wall would have been 14

18  to nine and the disclaimer would have been five degrees,

19  not ten degrees.

20         So it's very clear from the Court's ruling,

21  which was affirmed on appeal, that what is being

22  referred to here does not take into account springback.

23  That's consistent with the language of the claim that's

24  talking about what happens during seaming.

25         Next, they say:  Well, if we take springback

1    into account, we've got to assume it's five degrees

2    because Mr. Fields had a declaration in the patent

3    office in which he talked about a five-degree

4    springback.  But he wasn't talking about the invention.

5    He wasn't talking about the accused product.  The amount

6    by which the metal springs back after seaming is

7    dependent upon the geometry of the end, the stiffness of

8    the metal, none of which have a universal applicability

9    such that we could say that springback must be five

10   degrees.

11          Lastly, Ball assumes that the chuck must

12   have a plus four-degree angle but the specification

13   specifically says that the substantially cylindrical

14   surface of the chuck may be inclined at an angle between

15   plus four degrees and minus four degrees.  So let's see

16   what that means.

17          Let's look at slide 141.  If we look at a

18   chuck with a plus four-degree angle and we start out

19   with a 20-degree wall and even if we take springback

20   into account, there's a net deflection of 11 degrees

21   which would suggest that such a wall is within the scope

22   of the claim.

23          But let us suppose that instead of a plus

24   four-degree wall the chuck had a zero-degree wall which

25   is contemplated by the patent explicitly.  If the chuck

1    has a zero-degree wall and the wall of the can end

2    starts at 16 degrees, there's again -- even if we take a

3    five-degree springback into account -- that wall still

4    deflected 11 degrees, which is within the scope of the

5    claim.

6           And lastly, if the chuck has a minus

7    four-degree wall, which again is explicitly contemplated

8    by the patent and even if we assume there's five degrees

9    of springback which has nothing whatever to do with the

10   disclaimer -- you could start with a 12-degree wall,

11   bend it to minus four and let it spring back five

12   degrees and it would still be deflected 11 degrees,

13   which again is within the scope of the claim.  So the

14   wall doesn't have to be 20 degrees before seaming in

15   order to satisfy the claim.  What happens is the wall

16   not be substantially cylindrical before seaming, that it

17   be substantially cylindrical after seaming, and that it

18   be deflected during seaming by more than ten degrees.

19   So reading this 20-degree limitation into the claim is

20   error and is not required by the disclaimer that your

21   Honor found in the last case.

22          I'm going to turn over the last couple terms

23   to my partner, Mr. Murphy.

24          THE COURT:  All right, sir.  Mr. Murphy.

25          MR. MURPHY:  Thank you, your Honor.  For the

 1   last group of terms from terms 16 to 23, a lot of the

 2   arguments are repetitive from what we've already seen

 3   and a lot of the law that's relied upon is repetitive

 4   from what we've already seen.  So I'm not going to dwell

 5   very long on some of the issues.  I'll try to highlight

 6   anything that's new.

 7            All right.  Starting out with the Second

 8   Portion group.  There's two terms here.  One is "second

 9   portion of said wall."  One is "second wall portion."

10            When Mr. Luken discussed these terms, he

11   said the problem is that with Crown's construction is

12   that they're not specific enough.  It's not enough to

13   clarify that the wall we're talking about is the can end

14   wall because these constructions offered by Crown invite

15   the jury to go all over the place.  But Crown submits

16   that that's not the case because when you read these

17   claim terms in the context of the claims themselves, you

18   see that the claim terms are defined by the claims

19   themselves.

20            So for example, in claim 14, the "second

21   portion of said wall" is defined as -- it's defined as

22   the second part of the can end wall that is extending

23   from the first point to a second point.

24            Very similarly, here in claim 14 of the '875

25   patent, the "second wall portion" is defined as the part

1    that's extending from the first wall portion at the

2    first wall location to a second location on said wall

3    that forms a transition with the reinforcing bead.

4         And again, this same similar claim term in

5    claim 32/45 of the '875 patent is defined by the claim

6    itself as the part that extends from the first wall

7    portion at the first wall location on the wall to a

8    second location on the wall.

9         Now, Ball offers these claim constructions

10   for these terms.  They say what we have to do is we have

11   to add -- that it's the part of the wall engaged by the

12   frustoconical drive surface of the chuck.

13        We know that these constructions are wrong

14   because when we look at the claim itself we see that the

15   claim does not require any kind of engagement with the

16   chuck.  It certainly doesn't require that the chuck be

17   frustoconical.

18        In particular, if you look at the '875

19   patent, claim 32 you see that in the claim language, it

20   says bring the chuck into engagement with the can end.

21   It doesn't say bring the chuck into engagement with the

22   wall.  It doesn't say that the chuck has to be

23   frustoconical.

24        If you look at one of the unasserted

25   dependent claims in claim 42, you can see in the

1    underlying language that it does -- the claim does talk

2    about the chuck wall juncture being brought into

3    engagement with the can end wall.  It's not just the can

4    end.  The can end wall.  This is an unasserted dependent

5    claim.

6              Similarly, in a different unasserted

7    dependent claim, you have the limitation that the wall

8    is substantially frustoconical.  The point is that when

9    there are dependent claims that have the limitations

10   that are being purportedly read into an independent

11   claim, you know that's a problem.  The federal circuit

12   law on this area, it's called the Doctrine of Claim

13   Differentiation.  We cite the *Nazomi* case as an example.

14             Now, turning away from the wall and turning

15   back to the chuck, the next group of terms have to do

16   with the first and second circumferentially extending

17   walls of the chuck.

18             Now, here there's one claim term that was

19   previously construed by the Court.  That's the first and

20   second circumferentially extending walls of the chuck

21   and then there's the first wall and second wall, sort of

22   versions of those terms.

23             Crown contends that construction of these

24   terms is not necessary.  Now, we understand that the

25   Court's construction in the first case was that it means

 1    first and second encircling distinct, discrete and
 2    discernibly separate side surfaces of the chuck.  Crown
 3    continues to urge its original position sort of by way
 4    of preserving its original position which is necessary
 5    but nonetheless we appreciate that that was the original
 6    construction.
 7              Now, Ball was not satisfied with the
 8    original construction either.  They've offered a new
 9    construction.  Here, the easiest place to see it is in
10    term 18 where it says:  First and second
11    circumferentially extending walls of the chuck.  And
12    Ball inserts the additional limitations basically that
13    the first wall has a substantially cylindrical surface
14    and the second wall has to have a frustoconical drive
15    surface and the slope of the frustoconical drive surface
16    has to be substantially equal to that of the can end
17    wall.  Then the other two terms just have the two parts
18    of that construction, accordingly.
19              So let's take a look at this.  In the
20    previous case when it came time for claim construction,
21    Ball urged the construction that there have to be these
22    two distinct, discrete, discernibly separate side
23    surfaces and that the Court accepted.  But they also
24    said on top of that, that the surfaces have to have
25    decidedly different geometrics and angles which are flat

1    in cross-section.  Now, notice that they didn't ask for

2    substantially cylindrical and they didn't ask for

3    frustoconical drive surfaces.

4            The Court decided to give Ball the first

5    part of this construction and not the second.  Now, Ball

6    has returned and said:  Well, let's ask for a different

7    second part of this construction.  But for exactly the

8    same reasoning that the Court decided not to give Ball

9    the latter part of this construction the first time,

10   they should once again not do that.

11           Just as in the previous example, an

12   examination of the dependent claims supports this

13   reasoning of Crown's.  You can see that claims 59 and 60

14   provide the specific limits that the first wall be

15   substantially cylindrical and that the second chuck wall

16   be substantially frustoconical.  It would be error to

17   incorporate those limitations of the dependent claims

18   into the independent claim, again under the doctrine of

19   claim differentiation.

20           Now, when it comes to '875 patents claims 14

21   and 32 in the first circumferentially extending wall,

22   there's a slightly different problem.  If you take this

23   claim construction that's being offered, substantially

24   cylindrical, and you insert it into those claims, what

25   you find out is that those claims already had a

1  requirement of that wall being substantially cylindrical

2  and so you get a redundancy.

3        And you might wonder:  Why would Ball offer

4  redundant claim construction?  It's not so much that

5  this claim construction needs to say "substantially

6  cylindrical" twice.  It's really just symptomatic of an

7  attempt to graft wholesale the limitations of the

8  specification into all of the claims which sometimes

9  results in this type of duplication.

10        Finally, the second circumferentially

11  extending wall of the chuck which isn't exactly as

12  printed in claim 50, but the second portion of the wall

13  is there.  There, you have exactly the same issues with

14  the frustoconical drive surface and the slope

15  substantially equal that you had with term 18 which I

16  already discussed.

17        Again, federal circuit case law says that

18  you're not supposed to read these limitations from the

19  specification into the claims.

20        Now, the last three claim terms Ball

21  addressed together.  They're called the deforming claim

22  terms.  I'm going to take one at a time, if briefly.

23        The first is "adapted to be joined."  Crown

24  offers a pretty simple claim construction for this.

25  "Adapted" just means designed or configured to.  It

means sort of capable.  This is a relatively common term
in patent parlance, especially for claims on objects,
things, products, machines because sometimes you want to
describe, you want to claim a capability of that thing.
There's lots of different ways that claim could be met
in practical purpose.  There's quite a bit of federal
circuit and District Court case law explaining that
"adapted to" is the sort of standard claim language, and
it means configured to.

          But what Ball has done is said we should
take this "adapted to be joined" language and we should
use it as a way to insert a variety of other
limitations.  Let's take a look at some of these.

          First of all, let's go back to the claim
language.  For example, claim 13, here you see how
"adapted to be joined" is used in the claim.  It says a
metal can end for use in packaging beverages under
pressure and adapted to be joined to a can body by a
seaming process.  The question is the can end has to be
designed in a certain way that makes it susceptible to
being joined.  Now, does it have to be -- in order for
it to susceptible to being joined in accordance with
this aspect of the claim, does it have to have a
straight upper portion, does it have to have a 20-degree
angle before seaming, does it have to be substantially

1    cylindrical after seaming and so on?  No, that's not

2    what the claim says.  It shouldn't be read into the

3    claim.

4           The can end claim is a claim on an end,

5    especially when it comes to claim 1 of the '826 patent.

6    That claim on a can end does not incorporate the method

7    of seaming into the claim.  And it's certainly fair

8    enough to say that the Court's disclaimer order,

9    disclaimer ruling should be incorporated into the method

10   claims that talk about deforming the can and so on, but

11   claim 1 of the '826 patent, as is laid out in Crown's

12   briefing, is really a bit of a different ball of wax.

13   It is a product claim that doesn't incorporate the

14   method.

15          When you go back and you examine the

16   prosecution history, again it's laid out in the

17   briefing, I think the resulting -- the result of that

18   analysis is that the nexus between that claim and the

19   supposed disclaimer doesn't reach the high bar of the

20   *Omega* case in the federal circuit and other similar

21   cases that say what it takes to have a disclaimer.

22          Even above and beyond the disclaimer,

23   there's nothing in the "adapted to be joined" language

24   that makes it reasonable to incorporate a straight upper

25   portion in the 20-degree angle and the substantially

1    cylindrical after seaming and so on.

2            Term 22 is a deforming claim limitation.

3    Here, the claim constructions are fairly long.  But

4    really we can skip through everything and just focus on

5    this one difference between Ball's and Crown's

6    construction.  It's laid out here.  I've highlighted in

7    pink the important difference.

8            Ball wants to add this additional limitation

9    that in this deforming step there has to be bent

10   upwardly around the juncture of the chuck and against

11   the first chuck wall.  The reason we know this

12   additional limitation is not called for and doesn't work

13   in this claim is that the claim doesn't even require a

14   chuck wall with a junction.  So how can you have bending

15   around the juncture of the chuck wall if it's not even

16   in the claim?  Instead, the claim simply provides

17   rotatable chuck comprising this first circumferentially

18   extending wall, and that first wall is substantially

19   cylindrical.  But it doesn't provide for the juncture.

20   So how can you add on an additional limitation of

21   something happening around that juncture?

22           Finally, this claim term which I think, as

23   Mr. Luken pointed out, limits the bending to 16 degrees

24   which is different and -- different in scope than the

25   Court's disclaimer.  Once again, the two parties'

1    constructions are very similar except again the one

2    exception is the same which is that Ball wants to add

3    this bending around the juncture of the chuck.  The flaw

4    here is exactly the same as in the last case which is

5    that claim 32 doesn't require a chuck with a juncture.

6    If there's no chuck with a juncture in the claim, how

7    can there be bending around that non-existent juncture?

8            This is just a good time to remind the Court

9    that the federal circuit case law is that when you have

10   these claims of slightly different scope and using kind

11   of similar terms, there's a presumption that the

12   different scope is intended.  There's a reason that

13   these claims have a different scope.  That leads me to

14   my conclusion that the problem throughout Ball's claim

15   construction position is it kind of starts from a flawed

16   premise.  Ball's premise here is that all the claims are

17   directed to a single uniform invention.  There's one

18   invention.  What that is it's the preferred embodiment.

19   Crown's premise is that the claims mean what they say.

20   Each one of these claims was crafted to mean something

21   specific.  The words mean what they say.

22           The approach that Ball took is at first you

23   look at the drawings and the specification.  It's pretty

24   clear from reading the briefing and watching the

25   presentation that that's what they start with; the

1   drawings and the specification.  They kind of devise an

2   ideal claim from their point of view that incorporates

3   all possible limitations.  Once you've done that, find a

4   place to put each of those limitations in each asserted

5   claim so that way all the claims are the same and

6   they're all limited to the preferred embodiment, but

7   that methodology is not allowed under federal circuit

8   law.

9           One of the reasons Ball says it's necessary

10  to do it this way is that we have to clarify the

11  situation for the jury, but their methodology actually

12  sews confusion.  Number 1, it inserts duplicative and

13  redundant limitations within a claim.

14          Number 2, it renders whole claims completely

15  redundant by violating claim differentiation principles.

16          And number 3, it creates claims that have

17  simply impossible-to-follow grammar.

18          And number 4, it adds these long complex

19  phrases in place of the short terms that are

20  self-defined within the claims.  None of that is going

21  to help the jury in addition to running contrary to

22  federal circuit law.  Thank you.

23          THE COURT:  Thank you, Mr. Murphy.  Give me

24  one moment.

25          Crown has utilized its hour and 40 minutes.

1    Mr. Luken, you have, if you wish, some 27 minutes left.

2          MR. LUKEN:  Judge, I appreciate the

3    additional time.  I've been warned in the sternest terms

4    by both Mr. Lorentz and Miss Rodman that I should not

5    use 27 minutes here.  While I frequently ignore what Mr.

6    Lorentz tells me, I try to do what Miss Rodman tells me.

7    So I'm going to do my best to leave a little bit of time

8    in the bank, although I confess, sometimes I get carried

9    away.

10          THE COURT:  All right.

11          MR. LUKEN:  There were, I think, about a

12   hundred and 70 pages on the PowerPoint that I'm

13   responding to.  I'm certainly not going to touch

14   everything there.  Our briefs go into much of the

15   detail.

16          I'm not sure if your Honor is going to

17   accept any post-argument briefing.  Last time I think we

18   did two rounds.  We certainly don't need two rounds, but

19   maybe one short one and a couple weeks might be useful.

20   That's obviously your call.

21          First point, in the briefing last time, we

22   and I were chastised by Crown for putting up the accused

23   end and for talking about things other than claim

24   construction.  So I'm not going to respond to most of

25   the first ten to 12 minutes of Mr. Heist's presentation,

1    which were a fairly one-sided and incomplete story of

2    the history of how we got here going back to dealings

3    with other can makers and things like that.  Suffice it

4    to say that none of that has anything at all to do with

5    claim construction.

6                There was also a suggestion, I heard words

7    like "didn't reveal" and things like that.  The part of

8    the record I would like to set straight, which is

9    entirely consistent with what your Honor, Mr. Heist and

10   I discussed by phone on the first case on an afternoon

11   in November, I believe it was 2011 when they filed that

12   motion.  I advised the Court -- I learned a little more

13   about it; we were moving rather quickly then -- I

14   advised the Court that there had been a change in how my

15   client made the end.  It was in the tooling that stamps

16   these things out.  There was not a redesign of the end

17   to try to make the angle go from well within ten degrees

18   to outside of ten degrees.  We may be naive, but we're

19   not that naive.  There was an attempt to make this end

20   more consistently to improve productivity, to improve so

21   that the downtime of changing out tools wouldn't be as

22   much so that one end to the next matched more perfectly,

23   and this part of the can end wall is not something

24   that's in the Ball specification.  It's something that

25   became important because of your Honor's ruling and the

1    file history in the case.  But it is not one of the

2    angles that in the specification it was called out.

3            When Crown filed that, your Honor will

4    remember that I specifically acknowledged that there had

5    been a change, and I said, specifically in one regard.

6    And I was talking about this one.

7            Mr. Heist may think his case gets better.

8    All three of us discussed:  What do we do about that?  I

9    proposed -- discovery in that case has gone on with the

10    original end, and I proposed that your Honor rules on

11    the original end.  Then depending on your Honor or if

12    the case ended if Crown wants to -- if they want to

13    accuse us of infringing on the modified end, your Honor

14    could either include that in the existing case, throw

15    open discovery, or could rule and then later a second

16    case, if necessary, could address it.  That was my

17    proposal:  Rule on the existing case.  Rule on the

18    existing end that has already been the subject of

19    discovery and briefing.

20            Your Honor -- we were on the phone so you

21    didn't turn to Mr. Heist.  Your Honor said:  Mr. Heist,

22    is that acceptable?  Mr. Heist said yes.  That's how we

23    got here today.

24            When your Honor ruled in our favor, I don't

25    think I was out of line to assume that we were about to

1    get accused -- with the modified end, the inadvertently

2    modified end -- of infringing because, as your Honor

3    notes, from the beginning of my presentation that they

4    just didn't send the same four claims after us this

5    time.  They've got 25.  The fact that we filed the DJ to

6    keep that dispute in front of your Honor, who is

7    familiar, probably more familiar than you would ever

8    want to be with these issues, but is familiar with these

9    issues, I think was entirely appropriate.  The

10   suggestion that there was anything improper about what

11   went on then, it's just wrong.  If I'm taking that

12   suggestion and it wasn't intended, I apologize.

13            With respect to the claim construction, Mr.

14   Heist may not be far off when he said we're ships

15   passing in the night on some issues, but I don't think

16   our position -- I know our position is not the

17   caricature that Mr. Heist outlined.  We are not trying

18   to take every limitation that's anywhere in the

19   specification and fit it into the claim construction

20   somewhere.  Far from it.  Your Honor can read the

21   specification here and find that there's lots of things,

22   there are many angles -- and Mr. Heist pulled one of

23   them out today.  There are many angles in here.  There

24   are many pieces of structure in here.  There are many

25   examples that we are not calling on.

1           The bedrock principle that you did not hear

2    refuted this morning in the Crown presentation -- I

3    agree *Phillips* says look at the claims.  *Phillips* also

4    says look at the specification.  And the cases since

5    *Phillips* make it abundantly clear you cannot claim more

6    than you invented.

7           While I understand that we cannot limit them

8    to the preferred embodiment, your Honor has been down

9    this road before, in finding a disclaimer, in finding

10   that the can end wall has a single surface.  Whereas the

11   chuck walls have two walls with two distinct and

12   discernibly different surfaces.  Crown's difficulty is

13   they only disclosed one invention.  They can talk about

14   multiple embodiments and preferred embodiments all they

15   want, but their inventions require these elements that

16   your Honor has already construed the claims to include.

17          What we're doing here, while we are asking

18   for more clarity in certain areas, we are not, by any

19   means, pulling a wholesale importation of the entire

20   specification.  That's a red herring that is being

21   refuted.

22          With respect to the claim language itself,

23   and I will again not go back in and put all of those

24   little charts -- we're going to hand up a copy of our

25   PowerPoint at the end.  I assume Crown is too.  But

1      remember in those charts where we took every group of

2      terms and we put the word side by side by side by side.

3              Mr. Heist basically said because one of them

4      says first point and the other says first location

5      you've got to construe them differently because they use

6      different words.  That may be a cheap example of it, but

7      frequently when those words are saying synonyms but

8      using different language, Mr. Heist wants you to give

9      the jury different claim constructions for them.  You

10     did not hear any suggestion that they're pointing to

11     different parts of the can end.  The can end wall is the

12     can end wall, whether we're in claim 50 of the '875 or

13     we're in claim 13 and 14 of the '826.  The chuck is the

14     chuck all the way through.  And that's what our claim

15     constructions are asking you to do.

16              It's curious that having accused us of

17     wholesale importation of limitations from the

18     specification, Crown exercised a fairly recent example

19     of that in order to try to change your Honor's

20     disclaimer ruling.  I'm speaking specifically of the

21     upper can end wall and the cover hook.

22              If we could -- just so I can place this, if

23     you could put up, say, maybe number 39 -- or I'm sorry

24     80.  Actually, 62 would be better.  I am going to use up

25     all my time just because I can't figure out which slide

1   I want to look at.  Okay.  Can we go full screen?  All

2   right.

3            Your Honor, remember that what we're

4   talking about here is where the upper can end wall ends,

5   where the cover hook begins and thus where that first

6   point is in claim '826 and what are you measuring when

7   you decide whether there's been ten degrees of bending?

8   The upper can end wall, which you've already decided in

9   the summary judgment motion.

10           We put that first point at the same place

11  that -- the upper can end wall, the boundary of the

12  upper can end wall shown here is the first point.  The

13  upper of the two dots.  That's the top of the can end

14  wall.

15           Mr. Higham in the summary judgment briefing

16  tried to do exactly what Mr. Heist did this morning for

17  exactly the same reason.  He pulled -- I'm told I

18  can't -- I'm going to walk over here because the pointer

19  doesn't work on the TV screens.  He went and started to

20  go into the curved portion over here, which is clearly

21  the cover hook.  Your Honor said no.  The upper can end

22  wall that we're talking about here for the disclaimer,

23  that we're talking about here from the file history is

24  the straight upper portion of the can end.  Mr. Heist

25  went on and on today about whether the entire can end

1    has to be straight.  I'll come back to that.  We're

2    talking about the upper portion of the can end and where

3    it abuts the can end wall.  The border, if it's

4    curved -- where it abuts the cover hook.  If you're

5    curved, you're in the cover hook.  If you're straight,

6    you're in the can end wall.

7              What Mr. Heist is trying to do is precisely

8    what Mr. Higham did, which is he needed to get us above

9    13 degrees, as your Honor will recall.  So he moved it

10   out here to get it to 23.  He just took this point and

11   slid it.  He pivoted our angle.  He got it to a higher

12   point.  He didn't just do that randomly.  He went to the

13   same part of the specification that Mr. Heist quoted

14   today.  He went to the chart that's on the bottom of

15   columns two and three that gives some examples of

16   experimentation that Crown did.  There's a spot there

17   that says seaming panel, says chuck wall radius, which I

18   would suggest to your Honor precisely is the radius in

19   the cover hook next to the can end wall.  He took that

20   radius and -- he didn't give it all to the cover hook.

21   He didn't give it all to the can end wall.  He just

22   split it arbitrarily right down the middle.  So he took

23   the radius that Mr. Heist was showing you this morning,

24   which is right here, it's the first curved part of what

25   should indisputably be the cover hook.  Mr. Heist

1    eventually said he doesn't really have a problem with

2    the cover hook having the word "curved" in its

3    construction.  He objected to it in both briefs.  But I

4    guess the fact that that's exactly what he asked for,

5    what Crown asked for and what the District Court in

6    Delaware gave them, brought it around and that is the

7    curved end.  The cover hook is curved.

8                Mr. Heist told you that this radius which is

9    called r1 or r2 in an obscure part of the specification

10   and has a name and a chart that has the word seaming

11   panel and -- or seaming panel and chuck wall in the name

12   so he stitches that together, and he's going to overrule

13   your decision in the summary judgment decision and say

14   that Mr. Higham really can take the can end wall and

15   catch -- take part of the cover hook and move it into

16   the can end wall.  That's not right.

17               Your Honor, the very argument that Mr. Heist

18   advanced today using his r1 from the fine print at the

19   bottom of column 3 of the patent and imposing that on

20   figure 4 is exactly what Mr. Higham tried to do in the

21   summary judgment briefing and exactly what your Honor

22   rejected.  That, your Honor, is importing limitations

23   from the specification to change the natural language

24   and to change the ruling that your Honor did before.

25               This is important not only because that

1  first point in claim 1 of the '826 is at a different

2  place than the first point in all the other claims

3  which, as an aside, is reason enough to be more specific

4  in your construction of the first point on the other

5  claims than you were last time. The last time the only

6  first point that was in play was the lower one here of

7  the two. Because claim 1 of the '826 was not an

8  asserted claim.

9         Now, you have first point, the same words in

10  two different places. It is inviting the jury to be

11  confused and it is inviting the experts to go off on a

12  frolic that is inappropriate. All you have to do is say

13  what you knew was the case in the first case but didn't

14  feel that you needed to clarify included in the claim

15  construction so the "first point" language doesn't

16  confuse anybody.

17         More importantly, this is important, where

18  the top of the can end wall is and where its border

19  where the cover hook is important because the disclaimer

20  that you found in the first case, that applies to their

21  invention. Not to one claim, not to another claim. And

22  throughout the presentation this morning, Crown was very

23  careful. They agreed to a very limited version of the

24  disclaimer, ten degrees of bending, and they agreed

25  exactly on the claims that were at issue last time, but

1    they did not admit that that's part of the new claims

2    that they've added this time and they especially argued

3    very hard about claim 1 of the '826.  But the argument

4    that they used there is the same argument that was wrong

5    in the first case and it's wrong here.

6            They point out that the '826 is an end and

7    the '875 is a method of seaming.  But as your Honor has

8    already held in doing the claim constructions and

9    analyzing the disclaimer, the '826 is an end that is

10   made to be seamed in a particular way and the '875 is a

11   method of seaming that uses a particular can end.  The

12   invention is the same.  They are the mirror of each

13   other.

14           So the disclaimer that your Honor found in

15   the first case applies to all of the claims.  And if

16   there was any claim that that is abundantly clear, it is

17   claim 1 of the '826.  Because as I said very hurriedly

18   at the end of my presentation this morning, claim 1 of

19   the '826 was the independent claim at issue when the

20   patent examiner during the '826 prosecution said, a can

21   end that has a large angled wall is not patentable.  And

22   Crown came back with its arguments and with the Higham

23   declaration that your Honor relied upon.  They were in

24   direct response to the rejection of claim 1.

25           The way they overcame that rejection is they

1   said it's not just a can end with a big angle. It's a

2   can end with a big angle that is seamed in a very new,

3   unique and particular way that is part of our invention.

4   That new, unique and particular way is the bending of

5   the upper part upwardly around the junction of this new

6   radically different chuck with its top wall that's

7   substantially cylindrical and its bottom wall that is

8   frustoconical and does the driving. You don't just

9   squeeze the end like in the prior art and move it a

10  little bit. You start with something that's a lot

11  bigger. You drive it down here. You've got that edge

12  that your Honor found, the juncture that's an edge

13  pressing right in there, like a fulcrum. You take this

14  thing and you bend it upwardly around. In the process,

15  it has to bend by more than ten degrees. It has to

16  become substantially cylindrical. The federal circuit

17  affirmed you on the first. Crown's never disagreed with

18  you on the "becoming substantially cylindrical." That

19  disclaimer unequivocally applies everywhere.

20          We have suggested, your Honor, in the

21  briefing that the place to, the way to apply it is

22  through the "adapted to be seamed" language that is at

23  the very beginning of claim 1 of the '826. If your

24  Honor doesn't want to attach it to that language, you

25  can simply reflect that the disclaimer applies but the

1    disclaimer applies.  By adding new claims that weren't

2    in the case last time when your Honor found the

3    disclaimer, Crown does not get to avoid the -- when your

4    Honor found the disclaimer, Crown does not get to avoid

5    the disclaimer, particularly as to the very claims when

6    it made the statement.

7            Now, the upper wall portion, I think I've

8    covered this because we were talking about the first and

9    second points, the definition of where that first point

10   is, the definition of where the can end wall ends, the

11   definition of where the cover hook begins is what we've

12   been talking about here, that borderline between the

13   two.  One is curved.  The other is a single surface that

14   should pervade your Honor's construction of all three of

15   them.

16           Nicole, could I have, say, 67?

17           Your Honor, I'm now going to turn quickly to

18   the second point terms and to the angular offset

19   language that we've proposed.

20           I'm back -- I may have hurried through this

21   a little bit.  This slide in red shows precisely where

22   that second point/second location is on the invention.

23   Let me just step back.

24           You can look in their briefs and they point

25   at exactly the same place.  The structure above that is

1    unequivocally the can end wall.  It's that single

2    surface.  Mr. Higham says it doesn't have to be straight

3    because in a different case involving a different patent

4    with different claims, the '634, which that patent was

5    prosecuted before anybody had heard of the Japanese

6    reference that's the subject of the invalidity briefing

7    in this case that your Honor found actually anticipated

8    these claims.  Maybe the federal circuit overruled that.

9    But where your Honor found that it had everything, I

10   think it's a very short step under 103 that it renders

11   it obvious.  But in any event, that patent has never

12   seen the light of day since that case because that

13   patent is clearly invalid in light of the JP 323

14   reference that has been before your court and before

15   your Honor and will be.

16            More importantly, that's a non-precedential

17   decision that your Honor's not bound by.  We weren't a

18   party to it, your Honor.  So while Mr. Heist says that

19   you can have a can end that isn't precisely straight, I

20   don't think your Honor has to get into that today.  But

21   there's no question that your Honor's held that it's a

22   single surface.  So it sure doesn't have the two

23   distinct walls that the chuck has.  That much is clear

24   and undisputed even though they told you that they

25   reserve the right to go upstairs and try to get you

1   reversed on that.  They don't seem to be fighting it

2   very hard today.

3            So we've got a single surface on the can end

4   wall.  We've got right below it -- I'm going over here

5   since my pointer won't work on the TV.  We've got a

6   single surface on the can end wall which is this, which

7   is a clear single surface.  We've got this thing right

8   below it is the reinforcing bead, which in the agreed

9   construction is generally U-shaped.  The only embodiment

10  shown, the invention has a border between them.  That

11  border, because this is defined by one geometry, single

12  surface, and the reinforcing bead below it is defined --

13  I'm hoping I'm not messing up the TV screen.  I'll quit

14  tapping and just point.

15           And the surface below it, the reinforcing

16  bead, has a different geometry.  There has to be

17  something that marks the difference.  And the problem we

18  had in the first case, again without my corner I'm a

19  little helpless, Mr. Higham was putting his reinforcing

20  bead, his second point, his second location, the border

21  between the can end wall and the reinforcing bead up

22  here, up here, up here.  He was taking part of this

23  single surface and slicing it in the middle and

24  arbitrarily giving part of it to the reinforcing bead.

25  When I pushed him on that in the deposition, he actually

1    said yeah, there's an infinite number of points here

2    that it could be.

3           The reason he could come up with an infinite

4    number of points, here, here, here, here, here, here,

5    any of which could be a reinforcing bead.  He did have a

6    way of breaking a tie.  We went to a computer model and

7    I was going to run it through the computer model and

8    estimate strength.  You're not going to ask a jury to do

9    that.  That's not a logical way of dividing -- of

10   distinguishing between two adjoining geometric shapes.

11   There's certainly nothing that Crown has advanced here

12   that would support that.

13          To prevent that kind of mischief, to prevent

14   that kind of opportunistic moving of things, to give the

15   jury some clarity, what your Honor needs to do, we

16   submit, and strongly request, is simply to say something

17   in the definition, in the construction either to say

18   where the can end wall ends or where the reinforcing

19   bead begins.  So there's multiple places in the claim

20   construction you can put it.  We put it on the second

21   point terms because that's the border that says angular

22   offset.

23          I agree, I recognize that Mr. Heist has

24   said:  Hey, when we used the word "angular offset" in

25   that other patent, we were describing a claim.  I

1    understand that.  That's why this morning I said if your

2    Honor has another word for angular offset, I'm not

3    saying that that exact phrase is the only word you could

4    use.  I said kink.  I said change in direction.

5    Remember it was from at least 20 degrees to 15 degrees.

6    So it's a noticeable change in direction.  We went with

7    the term "angular offset" because it's a phrase that

8    Crown used to describe that structure.  They're not

9    bound because they used it in that case.  They're bound

10   because it's in their invention.  There must be a border

11   there.

12            Your Honor can make this case so much more

13   clean if your Honor construes this the way the invention

14   is and the way Crown presented it all the way through so

15   that the experts can't come up with many, many, many,

16   many of these that give you many, many, many lines with

17   many, many, many, many angles when we have to say is the

18   angle greater to, equal to or less than what's in the

19   claim so you can only have one angle instead of an

20   infinite number of them.

21            Finally, on the two chuck walls.  I don't

22   hear Crown other than preserving appeal rights

23   substantively seriously telling you that the chuck

24   wall -- the chuck doesn't have two distinct and

25   discernibly side surfaces.  That much I think is --

1    while they were reserving the right to fall back on

2    appeal purposes to what they said in the first *Markman*,

3    I don't think they're seriously advancing a reason why

4    you shouldn't do that again.  The most -- we then differ

5    on how you describe the two chuck walls, the two walls

6    of the chuck when they are individually called out.

7    I'll stand with what I said this morning on the upper

8    one being substantially cylindrical.

9              The bottom one does need clarification.

10   That is the frustoconical drive surface.  I suppose you

11   could put that in the can end language.  Your Honor

12   unequivocally found in this case that this invention,

13   not one embodiment, this invention requires the bottom

14   of the chuck to drive a can end wall.  Crown appealed

15   and the federal circuit said that it was a step too far

16   to say that there must be a negative limitation.  Thou

17   shalt not also drive in the reinforcing bead.

18             So if we drive in both places, we can still

19   be covered.  It doesn't negate that the invention drives

20   on the can end wall.  It's not just in the

21   specification.  That's the magic of their seaming method

22   that they sold to the patent office to get this patent

23   issued.

24             So again, your Honor, we would put it in the

25   description of the lower wall of the chuck.  It could

1   also be in the description of the lower wall of the can

2   end.  In fact I think we put it in both places to be

3   clear.  But there has to be driving there.

4          Finally, your Honor, I apologize I'm doing

5   my second finally.  The 20-degree angle.  Mr. Heist went

6   on at great length with springback and arguments from

7   our appellate brief.  While I stand by what's in the

8   brief on that and the mathematical example does work

9   out, the 20 degrees does not come from the springback.

10  The 20 degrees comes because your Honor found that the

11  disclaimer said at least ten degrees of bending in the

12  process of moving and it must become substantially

13  cylindrical, which raises the question of:  What does it

14  need to become substantially cylindrical?

15         That means it wasn't in the first place.

16  The line of demarcation here is 20 degrees.  There's

17  nothing in the patent or in any file history that even

18  remotely suggests that they ever had anything covered by

19  the patent that was less than 20 degrees, and the

20  specification repeatedly describes the can end wall of

21  the prior art as being 20 degrees or less.

22         So in order to implement the disclaimer that

23  you already found specifically to become a substantially

24  cylindrical part that Crown has never taken issue, even

25  on appeal, the 20 degrees is the way to do that.  It

1    flows directly from the consistent description of the

2    invention.  There's no way they should be able to claim

3    an upper can end wall that's in the prior art range and

4    still say that it's becoming substantially cylindrical

5    as their disclaimer.  With that, thank you, judge.

6              THE COURT:  Thank you, Mr. Luken.  Thank you

7    Mr. Heist, Mr. Murphy, for your courtesies.

8              I'm assuming that you will either now or at

9    some point need a transcript, is that correct, Mr.

10   Luken?

11             MR. LUKEN:  I think so, judge, yes.

12             THE COURT:  Mr. Heist?

13             MR. HEIST:  Yes, your Honor.

14             THE COURT:  While I am in a position of

15   finding it hard to conceive what more you can write that

16   you haven't already written or said, I would be remiss

17   if I didn't give you at least the opportunity to tell me

18   whether you wish any post-argument briefing.  Mr. Luken.

19             MR. LUKEN:  Your Honor, as I said briefly

20   before, I think last time your Honor allowed two rounds.

21   As Mr. Heist pointed out, that may have been a little

22   bit, a lot.  I would suggest something relatively soon

23   so it doesn't hold up your Honor's decision.  Maybe 10

24   days, two weeks after a transcript.  The briefing so far

25   was 40 in the opening and 30 in the response.  I would

 1   propose something like 20 or 25 pages, something that's

 2   shorter than what we've already done.  So basically we

 3   can look at -- we're going to get each other's

 4   PowerPoints.  We can take a look at those and if there's

 5   a here, there, there, that we need to correct, that was

 6   hard to do on the fly, it can be fairly tight, fairly

 7   quick.  That's what I would propose.

 8            THE COURT:  Mr. Heist, your thoughts.

 9            MR. HEIST:  Your Honor, I'd be happy to rest

10   on the existing briefing.  If Mr. Luken wants to file a

11   brief, maybe we'd respond to it.  I don't feel that we

12   need to say anything further than we already have.  In

13   our view actually, market procedure in the last case was

14   sufficient.  We don't think we should even be here

15   today.

16            THE COURT:  All right, sir.  Mr. Luken.

17            MR. LUKEN:  Your Honor, I polled our group.

18   If your Honor -- judging from your comment about you're

19   not really sure what we can say, I think we're both

20   going to give you our PowerPoints.  We're also okay

21   resting on it if your Honor doesn't desire anything

22   further which it sounds like you don't.

23            THE COURT:  I'm not saying I don't desire

24   anything further.  I was simply indicating some question

25   as to what more could be said.  But again, this is not

1    my case.  This is counsel's case.  Mr. Luken.

2            MR. LUKEN:  Your Honor, I may have been a

3    little flip in the way I characterized it.

4            THE COURT:  I don't feel that.

5            MR. LUKEN:  We are comfortable leaving it as

6    it is.

7            THE COURT:  Why don't we do this then.  I

8    will ask our court reporter to generate a transcript as

9    quickly as she can.  In the scheduling order I filed

10   yesterday, I talked about a decision by December 23rd.

11   I will do my very, very best to meet that.  If I can't,

12   I'll simply extend dates by the amount of time I've gone

13   past that date.

14           Mr. Luken, anything further?

15           MR. LUKEN:  That answered the question I was

16   about to ask, judge, because you put a certain date or

17   so many days afterwards, so that clarifies it.

18           THE COURT:  Fair enough.  Mr. Heist,

19   anything?

20           MR. HEIST:  Nothing, your Honor, I guess we

21   would like to hand up our PowerPoint if you would like

22   to receive it.

23           THE COURT:  Absolutely.  I think that would

24   be extremely helpful.  May I suggest that if there is

25   nothing further that we adjourn and I'll let you give

1   that to Cindy.  To the extent it's necessary, why don't

2   I simply admit this as a Plaintiff's Exhibit 1 and a

3   Defendant's Exhibit 1.

4           Mr. Heist, anything further?

5           MR. HEIST:  Nothing from us, your Honor,

6   thank you.

7           THE COURT:  Mr. Luken?

8           MR. LUKEN:  Nothing, judge.

9           THE COURT:  Again, thank you for the quality

10  of your presentations and your courtesies.  We are in

11  recess.

12          (Proceedings concluded at 2:43 p.m.)

13                  - - -

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      C-E-R-T-I-F-I-C-A-T-E

3              I, Debra Lynn Futrell, Notary Public in and

4    for the State of Ohio at large,

5              Do Hereby Certify that the foregoing pages

6    are a true and correct transcription of my stenographic

7    notes taken of the proceedings held in the

8    afore-captioned matter, to the best of my ability.

9

10

11         S/Debra Lynn Futrell
           _____
12         Debra Lynn Futrell, RMR-CRR
           Notary Public, State of Ohio
13         My Commission Expires 12-27-13

14

15

16

17

18

19

20

21

22

23

24

25