IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BALL METAL BEVERAGE CONTAINER CORP., | : | |
| Plaintiff, | : | |
| v. | : | |
| CROWN PACKAGING TECHNOLOGY, INC., | : | Case No. 3:12-cv-33 |
| and | | DISTRICT JUDGE WALTER H. RICE |
| CROWN CORK & SEAL USA, INC., | : | |
| Defendants. | : | |

DECISION CONSTRUING CLAIMS OF PATENTS IN SUIT;
CONFERENCE CALL TO BE SET IN SEPARATE ENTRY

On February 2, 2012, Plaintiff Ball Metal Beverage Container Corp. ("Ball"),

filed this declaratory judgment action under 28 U.S.C. §§ 2201 and 2202 against

Defendants Crown Packaging Technology, Inc., and Crown Cork & Seal, USA, Inc.

(collectively, "Crown"), seeking a declaration of non-infringement of two patents

held by Crown, as well as the patents' invalidity, under 35 U.S.C. §§ 102, 103

and 112.  Doc. #1.  Crown filed an Answer on April 17, 2012 (Doc. #12), and an

Amended Answer on July 25, 2012 (Doc. #16), asserting counterclaims of

infringement.  The Court has original jurisdiction over patent disputes pursuant to

28 U.S.C. §1338(a) and federal question jurisdiction pursuant to 28 U.S.C. 1331.

Pending before the Court are the parties' claim construction briefs, filed in accordance with S.D. Ohio Pat. R. 105.4.  The Court will first present a brief overview of the factual and procedural background of this case, before setting forth the legal standards applicable to claim construction.  The Court will then consider the parties' arguments while construing the individual claim terms presented in the Joint Claim Construction and Prehearing Statement (Doc. #18).

## I.      FACTUAL & PROCEDURAL BACKGROUND

The parties are competitors who manufacture and sell metal beverage can components.  Crown's two patents in question, U.S. Patent No. 6,848,875 ("the '875 Patent" or "Patent '875") and U.S. Patent No. 6,935,826 ("the '826 Patent" or "Patent '826"), describe a can end and process for securing the can end to the bodies of beer and soft drink cans by a "seaming" method.  The patents provide a significant savings over prior can ends in the industry with their novel shape and seaming process, which result in strongly secured can ends that use less metal and thinner can bodies.  The use of less metal results in significant savings over prior can designs and seaming methods.

### A.    The Parties' Previous Litigation

The '875 Patent and the '826 Patent were the subject of a previous patent infringement suit brought by Crown against Ball in this Court, filed on August 18, 2005.  *See Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc.*

2

*v. Ball Metal Beverage Container Corporation*, Case No. 3:05-cv-00281

(hereinafter, "*Crown v. Ball*").  In *Crown v. Ball*, Crown alleged that Ball's CDL+

can end and method of seaming the CDL+ can end infringed its patents.  The

Court originally granted summary judgment in Ball's favor, ruling that Crown's

patents were invalid for violating the written description requirement, and that the

patents were invalid as anticipated by a foreign patent.  *See* Case No. 3:05-cv-

00281 at Doc. #101.  On appeal, the Federal Circuit reversed and remanded,

finding the written description to be adequate and that a genuine issue of material

fact existed as to anticipation.  *Crown Packaging Tech., Inc. v. Ball Metal Beverage

Container Corp.*, 635 F.3d 1373, 1383-84 (Fed. Cir. 2011).

   After remand, the parties again filed for summary judgment, which the Court

granted in Ball's favor on the basis of non-infringement.  *See* Case No. 3:05-cv-

00281 at Doc. #123.  The Court found that Crown had disclaimed a broad

interpretation of "deformed" during the prosecution of its patents, a term that the

Court had construed as "to become substantially cylindrical," in reference to the

bending of the can ends during the seaming process that attached the can ends to

the can bodies.  Crown's patents required can ends to be bent between 30° and

60° during the seaming process, resulting in their being "deformed."  The Court

concluded that there was no genuine issue of material fact as to whether Ball's

CDL+ can end walls were bent more than 10°, the industry standard, and that

they could not, therefore, be "deformed" in a manner that could infringe Crown's

patents.  The Federal Circuit affirmed that conclusion after Crown's appeal.  *See*

3

*Crown Packaging Tech., Inc. v Ball Metal Beverage Corp.*, 492 F. App'x. 115 (Fed. Cir. 2012) (per curiam).

## B. The Present Case

On February 1, 2012, Ball brought this non-infringement action against Crown, requesting a declaratory judgment stating that two of its newer can ends do not infringe either of the Crown patents at issue in *Crown v. Ball*. Doc. #1 at 5-9. Ball also alleged that Crown's patents are invalid under 35 U.S.C. §§ 102, 103 and 112. *Id.* The Complaint states that, after the close of discovery in *Crown v. Ball*, but before the entry of the Court's summary judgment decision, Ball began to sell two other can ends: 1) the CDL-W can end, used for beer cans, and 2) the New CDL+, a modified version of the CDL+ can end that was the focus of Crown's allegation of infringement in *Crown v. Ball*. Doc. #1 at 4. Thus, the Court's ultimate conclusion that Ball had not infringed Crown's patents in *Crown v. Ball* applied only to the products Ball manufactured and sold prior to the introduction of its CDL-W and the New CDL+ can ends, as Ball's manufacture and sale of them occurred during the course of that litigation.[1] *Id.* at 5.

On April 17, 2012, Crown filed an Answer to Ball's Complaint, asserting two counterclaims that alleged that Ball's New CDL+ can ends infringed the '826 Patent and the '875 Patent. Doc. #12. Ball filed an Answer on May 11, 2012,

---

[1] As the *Crown v. Ball* case drew to a close, Crown filed a supplemental memorandum suggesting that Ball's new can ends also infringed its patents. *See* Case # 3:05-cv-281 at Doc. #121.

4

denying that its New CDL+ can ends infringed Crown's patents. Doc. #14. On July 25, 2012, Crown filed an Amended Answer and Counterclaims, further asserting that Ball's CDL-W can ends infringed the '826 Patent and the '875 Patent. Doc. #16. On August 13, 2012, Ball filed another Answer, denying that its CDL-W can ends infringed Crown's patents. Doc. #17.

In accordance with S.D. Ohio Pat. R. 105.4, the parties filed Claim Construction Briefs on March 15, 2013, and, on April 19, 2013, the parties filed Response Briefs. Doc. #22, Doc. #23, Doc. #28, Doc. #29. On October 22, 2013, the Court held a *Markman* hearing, during which the parties presented oral arguments on the construction of the disputed claim terms. Doc. #39. On December 20, 2013, the Court ordered the parties to file simultaneous memoranda, addressing the issue of whether issue preclusion applied to any of the currently disputed claim terms that the Court previously had construed in *Crown v. Ball*. Doc. #42; see also Doc. #53 at Case No. 3:05-cv-00281 (*Markman* Order in *Crown v. Ball*). The parties filed supplemental claim construction briefs on January 13, 2014, and responses thereto on January 23, 2014. Doc. #43, Doc. #44, Doc. #46, Doc. #37. All claim construction issues are, therefore, ripe for the Court's rulings, which are set forth below after a presentation of the relevant claims from the patents-in-suit and a discussion of the legal standards applicable to claim construction.

### C.    Relevant Claims of the '826 Patent

The following claims of the '826 Patent are relevant to the present patent

dispute and contain terms to be construed by the Court:

1.  A metal can end adapted to be joined to a can body for packaging
    beverages under pressure, said can end comprising;

    a peripheral cover hook adapted to be seamed onto a can body
        so as to form a joint therewith;

    a wall extending inwardly and downwardly from the cover
        hook; an outwardly concave annular reinforcing bead
        extending inwardly and downwardly from the wall;

    and a central panel supported by and extending inwardly from
        the reinforcing bead;

    wherein, prior to being joined to said can body:

    (i) the location at which said wall extends from said peripheral
        cover hook defines a first point,

    (ii) the location at which said reinforcing bead extends from said
        wall defines a second point, and

    (iii) a line extending between the first point and the second
        point is inclined to an axis perpendicular to the exterior of
        the central panel at an angle of between 30° and 60°.

2.  The can end of claim 1, wherein a base of the concave reinforcing
    bead is arcuate in cross-section and has a cross-sectional radius of
    less than 0.75 mm.

3.  The can end of claim 1, wherein the base of the concave reinforcing
    bead is approximately semi-circular in cross section.

4.  The can end of claim 1, wherein the reinforcing bead comprises an
    outer wall that is inclined to said axis at an angle between -15° and
    +15°.

5.  The can end of claim 1, wherein the reinforcing bead has inner and
    outer walls, a lower portion of the outer wall spaced apart from a
    lower portion of the inner wall by less than 1.5 mm.

6

\* \* \*

9. The can end of claim 1, wherein the ratio of the diameter of the central panel to the diameter of the peripheral cover hook is 80% or less.

\* \* \*

13. A metal can end for use in packaging beverages under pressure and adapted to be joined to a can body by a seaming process so as to form a double seam therewith using a rotatable chuck comprising first and second circumferentially extending walls, said first and second chuck walls forming a juncture therebetween, said can end comprising;

a peripheral cover hook, said peripheral cover hook comprising a seaming panel adapted to be formed into a portion of said double seam during said seaming operation;

a central panel;

a wall extending inwardly and downwardly from said cover hook, a first portion of said wall extending from said cover hook to a first point on said wall, said first wall portion adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall, a second portion of said wall extending from said first point to a second point forming a lowermost end of said wall, a line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle of between 30° and 60°.

14. The end according to claim 13, further comprising an annular reinforcing bead connected to said wall at said second point, said annular reinforcing bead connecting said wall to said central panel.

**D. Relevant Claims of the '875 Patent**

The following claims of the '875 Patent are relevant to the present patent dispute and contain terms to be construed by the Court:

\* \* \*

13. The method according to claim 1, wherein said chuck second wall is inclined with respect to an axial centerline of said chuck that substantially matches said inclination of said can end wall, and wherein said rotation of said can end during said first seaming operation is aided by driving contact between said second wall of said chuck and said inclined wall of said can end.

14. A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having

(i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation,

(ii) an annular reinforcing bead, and

(iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall comprising first and second wall portions, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location to a second location on said wall that forms a transition with said reinforcing bead, whereby said first and second locations form end points of said second wall portion, and wherein a straight line extending between said first and second locations on

8

said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising a first circumferentially extending wall, said chuck first wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, said first location on said wall after said seaming operation forming the transition from said substantially cylindrical wall portion to said second wall portion, said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation.

15. The method according to claim 14, wherein during said seaming operation at least a portion of said can end wall first portion is reformed by bending upward by an angle of at least about 16°.

16. The method according to claim 14, wherein said line between said first and second locations on said wall of said can end is inclined between about 30° and about 50° with respect to an axial centerline of said can end prior to performing said seaming operation.

* * *

18. The method according to claim 14, wherein said line between said first and second locations on said second wall of said can end is inclined between about 40° and about 45° with respect to an axial centerline of said can end.

* * *

24. The method according to claim 14, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall not being substantially cylindrical whereby said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall.

25. The method according to claim 24, wherein the step of performing said seaming operation further comprises bending said first wall portion of said can end upwardly around said chuck wall juncture so as to permanently deform said first wall portion.

* * *

28. The method according to claim 14, wherein said line between the first and second locations on said second wall remains inclined between about 30° and about 50° after seaming.

29. The method according to claim 14, wherein said line between the first and second locations on said second wall remains inclined between about 40° and about 45° after seaming.

* * *

32. A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having

(i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation and

(ii) a circumferentially extending wall comprising first and second portion, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location on said

10

wall to a second location on said wall, whereby said first and second locations form end points of said second wall portion, said second wall location being the lowermost point of said wall, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising a first circumferentially extending wall, said first chuck wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°, said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.

* * *

45. The method according to claim 32, wherein the can end includes a reinforcing bead extending radially inward from said lowermost point of said second portion of the wall.

* * *

50. A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having

11

(i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation,

(ii) an annular reinforcing bead, and

(iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall and said reinforcing bead forming a transition therebetween;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation.

* * *

52. The method according to claim 50, wherein said line extending from said first location to said transition is inclined between about 30° and about 50° with respect to said axial centerline of said can end both before and after performing said seaming operation.

* * *

54. The method according to claim 50, wherein said line extending from said first location to said transition is inclined between about 40° and about 45° with respect to said axial centerline of said can end both

12

before and after performing said seaming operation.

\* \* \*

58. The method according to claim 50, wherein said first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

59. The method according to claim 50, wherein said first wall of said chuck is substantially cylindrical.

## II.    <u>APPLICABLE LAW – CLAIM CONSTRUCTION</u>

Although the ultimate issue of patent infringement is a question of fact, the preliminary construction of the scope and meaning of disputed claim terms is a question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 385-88 (1996). The first step of claim construction requires an examination of "the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Words of the claim are presumed to carry their ordinary and customary meaning. *Id.*; *see also Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) (describing the "heavy presumption in favor of the ordinary meaning of claim language"). The Federal Circuit has emphasized that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application," as "patents are addressed to [such persons] and intended to be read by others of skill in the pertinent art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir.

13

2005) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) and *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002)). Thus, "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

When claim terms are easily understood, even by a layperson, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. However, "the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent," due to the technical subject matter of the patent or the patentee's idiosyncratic use of terminology. *Id.* In such cases, the meaning of the claim language must be construed by examining sources that include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova*, 381 F.3d at 1116). The Federal Circuit prioritizes the use of intrinsic evidence in claim construction. *Vitronics*, 90 F.3d at 1582 ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history," which comprises "the most significant source of the legally operative meaning of disputed claim language"). When consulting the intrinsic evidence, "the claims themselves provide substantial guidance as to the meaning of particular

14

claim terms." *Phillips*, 415 F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582). A court may compare the use of both disputed and undisputed claim terms to construe a disputed term's meaning to a person of skill in the art. *Id.* "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

Another canon of construction, claim differentiation, derives from the comparison of claim terms: "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* (citing *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). Under the doctrine of claim differentiation, there is a general presumption that "each claim in a patent has a different scope." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F. 3d 1182, 1187 (Fed. Cir. 1998)). There are "two considerations [that] generally govern this claim construction tool when applied to two independent claims: (1) claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous; and (2) claim differentiation 'cannot broaden claims beyond their correct scope.'"

In addition to the claim terms, there is the specification, which "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." *Vitronics*, 90 F.3d at

1582.  Thus, "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.*; *see also Phillips*, 415 F.3d at 1315 (observing that both the Federal Circuit "and its predecessors have long emphasized the importance of the specification in claim construction").  For example, examining the specification "may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack[s] sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  The specification is particularly relevant when the patentee acts as his or her own lexicographer, in which case "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  *Id.* at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  There is also the possibility that "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)).

Similarly, the intrinsic evidence of the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of

16

prosecution, making the claim scope narrower than it would otherwise be."

*Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83)). "Thus, the

prosecution history (or file wrapper) limits the interpretation of claims so as to

exclude any interpretation that may have been disclaimed or disavowed during

prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am.*

*Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). However, because the

prosecution history reflects the "negotiation" between the patentee and the patent

examiner that precedes the grant, the Federal Circuit has cautioned that the

prosecution history "often lacks the clarity of the specification and thus is less

useful for claim construction purposes." *Id.*

Although subordinate to intrinsic evidence, the Federal Circuit has "also

authorized district courts to rely on extrinsic evidence, which 'consists of all

evidence external to the patent and prosecution history, including expert and

inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at

1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.

Cir. 1995)). "This evidence may be helpful to explain scientific principles, the

meaning of technical terms, and terms of art that appear in the patent and

prosecution history. Extrinsic evidence may demonstrate the state of the prior art

at the time of the invention." *Markman*, 52 F.3d at 980.

17

III.     **CONSTRUCTION OF CLAIMS**

As mentioned in the recitation of the procedural history of this case, *supra*, Section I.A., the parties previously litigated an infringement case in this Court that required construction of a number of patent terms that the parties have again asked the Court to construe. As a preliminary matter, the Court will address the issue of issue preclusion and its application to construction of claims in this case.

"Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742 (2001)).  The Federal Circuit is "generally guided by regional circuit precedent" on issue preclusion, but applies its "own precedent to those aspects of such a determination that involve substantive issues of patent law." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013).  The Sixth Circuit has held that issue preclusion applies when: "(1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue." *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005).

18

Considering the foregoing factors in the particular circumstances of this case, it is clear that issue preclusion would only apply to a disputed issue of claim construction that "was necessary and essential to the judgment on the merits in the prior litigation" between Ball and Crown. *Id.* This requires revisiting the ultimate issue that led the Court to grant summary judgment in Ball's favor in *Crown v. Ball*, where it reasoned as follows:

> Initially, Ball argues that the CDL + can end does not infringe upon Plaintiffs' can ends, because Plaintiffs' can end is not "deformed," as that term is used in Claim 13 of the '826 patent and Claim 50 of the '875 patent. This argument raises the question of claim construction and whether Plaintiffs disclaimed a broad reading of "deformed" during the prosecution of the patents-in-suit. During claim construction, this Court noted that, through the prosecution of the '826 and '875 patents, the Plaintiffs had disclaimed a broad interpretation of "deformed," in order to overcome prior art. The Court interpreted "deformed" to mean "to become substantially cylindrical." In reaching that conclusion, the Court rejected Plaintiffs' proposed construction of the term, as meaning "to have its shape altered." In rejecting that proposed construction, the Court noted that the Plaintiffs had disclaimed such during the prosecution of the '826 and '875 patents.
> . . .
>
> In sum, Plaintiffs do not dispute that they disclaimed a broad interpretation to the word the word "deformed," as used in the '826 and '875 patents, during the prosecution of those patents. Indeed, Plaintiffs do not dispute that conventional thinking in the can industry is that a can end should be bent no more than 10° and have stated that their can end walls must be bent 30° to 60°. The Court has concluded that the evidence fails to raise a genuine issue of material fact as to whether the CDL + can end walls are bent more than 10° during the seaming process and that, therefore, they are not "deformed." As a consequence, CDL + cans do not infringe on those claimed by Crown in the '826 and '875 patents.

*Crown v. Ball*., Case No. 3:05-cv-00281, Doc. #123 at 11-14 (citations omitted).

The foregoing analysis makes it clear that the only issue of claim construction that was necessary and essential to the final judgment in *Ball v. Crown* concerned the construction of "deformed" as "to become substantially cylindrical," as the term "deformed" was used in Claim 13 of the '826 Patent and Claim 50 of the '875 Patent.  In the construction of claims set forth below, the Court construes a phrase from Claim 13 of the '826 patent that contains "deformed," but specifically adheres to its prior construction of same. *Infra*, Section III.A.2.  Although this is the only term to be construed that, based on principles of issue preclusion, cannot be revisited by the Court, the claim construction below largely incorporates the Court's prior construction of patent terms from *Crown v. Ball*. As discussed in more detail below, there are some enlargements of the Court's prior constructions, but no wholesale revisions.

After a brief discussion setting forth the terms to which the parties have agreed, the Court will turn to its construction of the disputed claim terms.

**A.    Claim Terms Undisputed by the Parties**

The parties agreed on the construction of six terms, as presented in their Joint Claim Construction and Prehearing Statement. Doc. #18.  Each of the stipulated constructions will be discussed in turn.  As will be seen, the Court will adopt some, but not all, of the parties' agreed constructions.

### 1. "Rotatable chuck"

The parties have agreed to the following construction of the term "rotatable chuck," as it is used in claim 13 of Patent '826 and claims 14, 32, 45, 50, 58, and 59 of Patent '875: "rotatable attachment to a seamer used to hold the can end, and against which the double seam is formed." Doc. #18 at 1. The Court previously adopted this construction when it construed claim 13 of Patent '826 in *Crown v. Ball*. Case No. 3:05-cv-00281, Doc. #53 at 11-13. That construction is consistent with the use of "rotatable chuck" in the claims at issue in the present case, as claims 14 and 32 of Patent '875 describe seaming methods that employ a rotatable attachment. The Court will, therefore, adopt its previous construction of "rotatable chuck" as "rotatable attachment to a seamer used to hold the can end, and against which the double seam is formed."

As a point of clarification, there are multiple instances in which the claims refer to the rotatable chuck, or parts of it, as simply "chuck" or "said chuck." For example, Claims 58 and 59 of Patent '875 also refer to the rotatable chuck when stating only "chuck" or "said chuck." Thus, the foregoing construction of "rotatable chuck" applies to those terms as well.

### 2. "Deformed during said seaming operation so as to be bent upwardly around said juncture [of said chuck walls]"

Claim 13 of Patent '826 describes the constituent parts of the can end, including the following description that pertains to the can end wall: "a first portion

21

of said wall extending from said cover hook to a first point on said wall, said first wall portion adapted to be *deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls* at said first point on said wall." According to the parties, the foregoing italicized phrase should be construed as: "bent upwardly around the juncture of the chuck and against the first chuck wall to become substantially cylindrical, with the first wall portion being bent by more than 10°." Doc. #18 at 1-2.

In *Crown v Ball*, the Court analyzed the phrases "to be deformed" and "bent upwardly around said juncture of said chuck walls" separately. It construed "to be deformed" as "to become substantially cylindrical." Case No. 3:05-cv-00281, Doc. #53 at 29. The Court further construed the phrase "bent upwardly around said juncture of said chuck walls" to mean "turned upwardly around the juncture of the walls of the chuck and against the first chuck wall." *Id.* at 31. The parties' proposed construction eschews the previously constructed phrase "turned upwardly" for "bent upwardly," reverting to the language of the original claim. Such a proposal construes nothing. Thus, the Court will reject the parties' construction to the extent that it uses "bent upwardly," which merely repeats the language of the claim, and will adopt its own previous construction of "turned upwardly." However, the second part of the parties' proposed construction is consistent with the Court's prior construction, which was based on Crown's disclaimer that the first wall portion was bent by 10° or less during patent prosecution. *Id.* at 21-29.

22

Furthermore, the Court finds that the parties' proposed construction "around the juncture of the chuck and against the first chuck wall," to be confusing, because it omits the word "walls." For some reason, the parties propose construing the phrase "juncture of the chuck walls" as "juncture of the chuck." Given that the word "juncture" suggests a place where things meet, replacing "chuck walls" with "chuck" leads one to ask: the juncture of the chuck and what? Thus, the Court cannot accept a construction that omits "walls," as that word illustrates that the juncture is on the chuck itself, where two of its walls meet. The Court will, therefore, adopt a construction that uses the word "walls," and will construe the phrase "deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls" in claim 13 of Patent '826 as "turned upwardly around the juncture of the chuck walls and against the first chuck wall to become substantially cylindrical, with the first wall portion being bent by more than 10°."

### 3. "Bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall"

Claim 50 of Patent '875 defines a method of forming a double seam between a can body and a can end. Step (e) requires that the seaming operation, in part, "bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall," for which the parties propose the following construction: "bend the portion of said can end wall upwardly around the juncture of the chuck and against the first chuck wall to become substantially

23

cylindrical, with the portion of said can end wall being bent by more than 10°."

Doc. #18 at 2.  The following quotation places the phrase in its context in the

claim, with the phrase to be construed in italics:

> A method of forming a double seam between a can body and a can end . . . comprising the steps of . . . e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and to *bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall* . . . .

In *Crown v Ball*, the Court construed this phrase together with the phrase

that immediately precedes it, "to deform said seaming panel of said cover hook,"

as "to deform said seaming panel of said cover hook to become substantially

cylindrical and to turn a portion of said can end wall upwardly around the juncture

of the walls of the chuck and against the first chuck wall."  Case No. 3:05-cv-

00281, Doc. #53 at 42.  Once again, Court does not find the omission of "walls"

in the proposed construction helpful in any way, as it obscures the location of the

"juncture."  Otherwise, the Court finds the proposed construction in accord with

its previous construction, as well the parties' stipulation that the phrase specifies a

minimum 10° threshold to which the portion must be bent.

Accordingly, the Court will construe the language in Claim 50 of Patent '875

"to bend a portion of said can end wall upwardly around said juncture of said

chuck walls at a first location on said can end wall," as the following: "to turn a

portion of said can end wall upwardly around the juncture of the walls of the chuck

24

and against the first chuck wall, with the portion of said can end wall being bent by more than 10°."

### 4. "Seaming panel"

Claim 13 of Patent '826 and Claims 14, 32, and 50 of Patent '875 contain the term "seaming panel," which the parties propose construing as "curved innermost portion of the peripheral cover hook." Claim 13 of Patent '826 uses the term "seaming panel" to describe the "peripheral cover hook" as follows: "said peripheral cover hook comprising a seaming panel adapted to be formed into a portion of said double seam during said seaming operation . . . ." Claims 14, 32, and 50 of Patent '875 also use the phrase "seaming panel" to describe the "peripheral cover hook" of the can end, with the only difference being that they describe "a seaming panel to be formed" instead of "a seaming panel adapted to be formed." There is no appreciable difference between the phrases "to be formed" and "adapted to be formed," and the parties have not pointed out one that would preclude a uniform construction of "seaming panel" in those claims.

Claims 14, 32, and 50 of Patent '875 also employ "seaming panel" to define the point at which the "circumferentially extending wall" begins on the can end. Claim 50 describes part of the can end as having "a circumferentially extending wall extending from said seaming panel to said reinforcing bead," and also employs "seaming panel" when describing its deformation during the seaming process. Claims 14 and 32 more specifically locate the "seaming panel" as the place where

25

the "first wall portion" of the "circumferentially extending wall" begins, as both claims describe the "said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel."

As used in these claims, there is no reason not to adopt a uniform construction of "seaming panel." The parties propose "curved innermost portion of the peripheral cover hook." It is clear from the language of Claim 13 of the '826 Patent that the "seaming panel" is at least one portion of the "peripheral cover hook," as the claim describes it as "*comprising a seaming panel* . . . ." It is an accepted canon of patent construction that "comprising" means "including, but not limited to." *CIAS, Inc., v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). Thus, although Claim 13 only describes one portion of the "peripheral cover hook," it is consistent with the open-ended meaning associated with "comprising" to state, as the parties propose, that it is a "portion" of the "peripheral cover hook." The Court also finds the use of the adjective "curved" consistent with the fact that it is a portion of the "peripheral cover hook," as well as the written description of Patent '826, which references a "peripheral curl" and the "curl of the can end."

Accordingly, the Court adopts the parties' proposed construction of "seaming panel," as the term is used in Claim 13 of Patent '826 and Claims 14, 32, and 50 of Patent '875, to mean the "curved innermost portion of the peripheral cover hook."

26

### 5. *"Annular reinforcing bead"*

The parties propose construing "annular reinforcing bead" as the "outwardly concave, generally 'U' shaped, ring-like stiffening channel."  Doc. #23 at 19 n.4.[2] The term "annular reinforcing bead" appears in Claims 1 and 14 of Patent '826, and Claims 1, 14, 40, 44, and 50 of Patent '875.  The proposed construction would also apply to the term "reinforcing bead" in Claim 45 of Patent '875.  The proposed construction is identical to the Court's previous construction of "annular reinforcing bead" in Claim 14 of Patent '826 in *Crown v. Ball*.  Case No. 3:05-cv-00281, Doc. #53 at 52-53.

The Court accepts the parties proposed construction, and will construe "annular reinforcing bead" as it is used in Claims 1 and 14 of Patent '826, and Claims 1, 14, 40, 44, and 50 of Patent '875, as "outwardly concave, generally 'U' shaped, ring-like stiffening channel."

### 6. *"Juncture therebetween"*

The parties propose construing "juncture therebetween," as used in Claim 13 of Patent '826 and Claims 24, 25 and 50 of Patent '875 as "definable edge between the walls of the chuck (which is a point in cross-section)."  Doc. #23 at 19 n.4.  The construction is essentially the same as the Court's previous

---

[2] The parties did not list "annular reinforcing bead" or "juncture therebetween" as terms upon which they agreed in their Joint Claim Construction and Prehearing Statement, but informed the Court in their claim construction briefs that they had later agreed to an identical construction of these terms.  Doc. #23 at 19 n.4.

construction, with the addition of the clarifying term "of the chuck." *See* Case No. 3:05-cv-00281, Doc #53 at 16-18. The Court approves of this clarifying addition, and adopts the proposed construction of "juncture therebetween" as "definable edge between the walls of the chuck (which is a point in cross-section)."

## IV.    CONSTRUCTION OF DISPUTED CLAIM TERMS

The parties could not agree on a number of terms in the claims of the '826 Patent and the '875 Patent. The Court will set forth its construction of the disputed claim terms, after considering the parties' proposed constructions and arguments.[3]

### A.    Can End Wall Terms

Ball identifies three examples of what it calls the Can End Wall Terms: the term "wall extending inwardly and downwardly" in Claims 1 and 13/14 of Patent '826; the term "circumferentially extending wall" in Claims 14, 32/45 and 50 of Patent '875; and the term "circumferentially extending wall extending from said seaming panel to said reinforcing bead" in Claims 14 and 50 of Patent '875. According to Ball, the same construction should apply to all of these terms

---

[3] Crown originally included the following terms in its list of disputed patent terms that it wished the Court to construe: "second portion of said wall" in Claim 13/14 of Patent '826 and "second wall portion" in Claims 14 and 32/45 of Patent '875. Joint Claim Construction and Prehearing Statement, Doc. #18 at 3. However, in Crown's Claim Construction Brief, it argued that the foregoing terms should not be construed by the Court. Doc. #22 at 38-40. The Court, therefore, considers Crown to have withdrawn its request to have the foregoing terms construed, and will not construe such.

because, as used in the claims, they "all refer to the same structure– the can end wall– and should be construed to mean the same thing." Doc. #23 at 22. Ball's proposed construction of all of the foregoing terms is a "single surface encircling the center of the can end, which is engaged by a chuck during seaming, extending from the cover hook to the annular reinforcing bead." *Id*.

Crown proposes construing these terms individually. It proposes construing the term "wall extending inwardly and downwardly" in Claims 1 and 13/14 of Patent '826 as "can end wall extending inwardly and downwardly;" the term "circumferentially extending wall" in Claims 14, 32, and 50 of Patent '875 as "can end wall encircling the center of the can end"; and the term "circumferentially extending wall extending from said seaming panel to said reinforcing bead" in Claims 14 and 50 of Patent '875 as "a can end wall encircling the center of the can end extending from the seaming panel to the reinforcing bead."

The Court previously construed some of Ball's "Can End Wall Terms" together. For example, the Court's previous constructions of Claim 13 of Patent '826 and Claim 50 of Patent '875 clarified that the wall to which the terms referred was the can end wall. *See* Case No. 3:05-cv-00281, Doc. #53 at 19-20, 38 (construing "a wall extending inwardly and downwardly," as used in Claim 13 of Patent '826, as "a can end wall extending inwardly and downwardly," and "a circumferentially extending wall extending from said seaming panel to said reinforcing bead" in Claim 50 of Patent '875 as "a can end wall which is a single surface encircling the center of the can and extending from the seaming panel to

29

the reinforcing bead").  Ball correctly points out that all of the currently disputed terms that it groups together as the Can End Wall terms refer to the can end wall. The Court will, therefore, again construe each term's use of the word "wall" as "can end wall."

In its previous construction, the Court also stated that the term "single surface" would apply to the use of "can end wall" in Claim 13 of Patent '826, as well as in Claim 50 of Patent '875.  *Id.* at 20.  That construction resulted from the Court's partial adoption of Ball's proposed construction of can end wall as a "single distinct surface."  The Court reasoned that "single surface" would help the jury to differentiate the single can end wall from the multiple chuck walls.  *Id.* at 36. However, the Court rejected the suggestion of "distinct" because Ball failed to explain what the can end wall was distinct from.  *Id.* at 37.

Crown's current proposed constructions would eliminate the "single surface" construction that the Court previously adopted.  According to Crown, "limiting the 'can end wall' to a 'single surface' is unnecessary."  Doc. #22 at 19.  The Court disagrees.  The use of the word "wall" is endemic within the claims, and at times certain claims employ the word "wall" without specifying whether the usage refers to the single-surfaced can end walls or the multiple-surfaced chuck walls.  Any construction that demarcates the two meanings will assist the jury.  Crown has not identified a flaw in this reasoning or articulated another reason to discard the construction of "can end wall" as a "single surface," other than characterizing the construction as "unnecessary."  The Court rejects that characterization and

30

maintains its previous construction of "can end wall" as a "single surface" in Claim 13 of Patent '826 and Claim 50 of Patent '875. Furthermore, to the extent that Ball proposes applying the construction "single surface" to the other claim terms in dispute that refer to the "can end wall," namely, Claim 1 of Patent '826 and Claims 14 and 32/45 of Patent '875, the Court adopts the proposed construction. Again, this will help distinguish references of the can end walls in those claims from those of the chuck walls, which have more than one surface.

Other than the generally applicable construction in each of the disputed claims of wall as "can end wall" with "a single surface," however, the Court believes that the blanket construction that Ball proposes, "single surface encircling the center of the can end, which is engaged by a chuck during seaming, extending from the cover hook to the annual reinforcing bead," simply paints with too wide a brush. As a general principle of claim construction, a patent's consistent use of a particular term allows it to be construed consistently throughout the claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims"). However, Claims 1 and 13 of Patent '826 are product claims, whereas the claims of Patent '875 are method claims. The Federal Circuit has cautioned that courts must "take care to avoid reading process limitations into an apparatus claim, because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim." *Baldwin Graphic Systems,*

*Inc. v. Siebert, Inc.*, 512 F.3d 1338 (Fed. Circ. 2008) (internal citations omitted). "Despite their similarities, these claims are directed toward different classes of patentable subject material under 35 U.S.C. § 101." *Id.* The foregoing principle counsels against applying the process-based construction "which is engaged by a chuck during seaming" to the term "wall extending inwardly and downwardly" in the product claims of Patent '826. Furthermore, the proposed construction, particularly when read with the "single surface" construction, might suggest that the entirety of the can end wall is "engaged by a chuck." This is belied by the fact that Claim 13 (of Patent '826) states that the "first wall portion" of the can end wall is "adapted to be deformed during [the] seaming operation" and is "bent upwardly around [the] juncture of [the] chuck walls." Thus, *some* portion of the can end wall must *not* be engaged by the chuck, to allow for a only portion of the can end wall to be bent upwardly. For these reasons, the Court rejects "engaged by the chuck during seaming," when applied to the can end wall in its entirety, as Ball proposes, in both the product and the method claims in dispute.

Ball also proposes applying the construction of "extending from the cover hook to the annular reinforcing bead" to "wall extending inwardly and downwardly" in Claims 1 and 13/14 of Patent '826, "circumferentially extending wall" in Claims 14, 32/45 and 50 of Patent '875, and the term "circumferentially extending wall extending from said seaming panel to said reinforcing bead" in Claims 14 and 50 of Patent '875. The only explanation that Ball provides for its proposed construction is that it "substitutes 'cover hook' for 'seaming panel,' so

that the proposed construction can be applied consistently to all of the disputed claim terms."[4]  Doc. #23 at 45.  However, Ball fails to explain why any of the other elements of the proposed construction should be applied.  With regards to Claim 1 of Patent '826, the proposed construction is superfluous.  In a list of the can end's constituent parts, the claim describes "a wall extending inwardly and downwardly from the cover hook," and then, immediately afterwards, "an outwardly concave annular reinforcing bead extending inwardly and downwardly from the wall."  Ball's proposed construction of wall would merely repeat a description that already exists within the claim.  Furthermore, Claim 13 of Patent '826 makes no mention of the annual reinforcing bead until dependent Claim 14, which "further" describes the can end as "comprising an annual reinforcing bead connected to said wall . . . ."  It would be inappropriate to import that "further" limitation into the claim before it.  *Phillips*, 415 F.3d at 1314.  In light of Ball's failure to provide any reason to apply its proposed construction of "extending from the cover hook to the annular reinforcing bead" to the claim terms in dispute, the Court will decline to do so.

---

[4] In its brief, there is an asterisk after "cover hook," and Ball asserts in the note below that this "Court used 'seaming panel' instead of 'cover hook'" in its *Markman* Order of the parties' previous litigation.  *Id*.  However, the Court only employed the exact language of the claim being construed, Claim 50 of Patent '875, after rejecting Ball's proposed construction, whereby Ball might have argued for any use of "cover hook."  Case No. 3:05-cv-00281, Doc. #53 at 38.  Furthermore, Ball's proposed construction suggested "cover hook" instead of "seaming panel."  *Id*.  Because the Court's ultimate construction defaulted to the exact language of the claim ("extending from said seaming panel to said reinforcing bead"), the Court did not use one term "instead of" any other term.

With the exception of its proposal that the Court eschew its previous construction of "single surface," which the Court has rejected, Crown's proposals largely track the Court's previous constructions in *Ball v. Crown*. In that case, the Court construed "a circumferentially extending wall" in Claim 50 of Patent '875 as "a can end wall encircling the center of the can end," based on Crown's proposal to adopt a dictionary definition of "circumferentially." No. 3:05-cv-00281, Doc. #53 at 36-38. Here, Crown proposes applying thi + s construction to claims 14 and 32/45 of Patent '875 as well. Given that those claims also use "circumferentially extending wall," the Court will adopt that construction for the aforementioned claims. Ball criticizes Crown's failure to propose this construction for all of its Can End Wall Terms. However, the term "circumferentially" does not appear in Claims 1 of Patent '826, and in Claim 13 of that patent, it is used in reference to the chuck walls. Thus, the Court will not apply that construction to the disputed terms of Patent '826, but will construe "a circumferentially extending wall" in the disputed claims of Patent '875 as "a can end wall encircling the center of the can end."

Thus, to summarize its construction of the Can End Wall Terms: the Court construes "wall extending inwardly and downwardly" in Claims 1 and 13/14 of Patent '826 as "a can end wall which is a single surface;" "circumferentially extending wall" in claims 14, 32/45 and 50 of Patent '875 as "a can end wall which is a single surface encircling the center of the can end;" and "circumferentially extending wall extending from said seaming panel to said

34

reinforcing bead" in Claims 14 and 50 of Patent '875 as "a can end wall which is a single surface encircling the center of the can end extending from said seaming panel to said reinforcing bead."

### 1. "First point" and "first location"

Ball believes that Claim 1 and Claim 13 of Patent '826 use the term "first point" to refer to different points on the can end wall, and each usage should, therefore, be construed separately. Doc. #23 at 25. Ball reads "first point" in Claim 1 of Patent '826 as a reference to "the point at which the peripheral cover hook terminates and the wall begins." *Id.* at 27. Ball would construe Claim 1's use of "first point" as the "innermost point (in cross-section) on the end at which the cover hook terminates."

Ball sees the use of "first point" in Claim 13 of Patent '826 as a reference to "the location on the wall at which the juncture engages the can end wall and deforms it during seaming." Ball believes this use of "first point" in Claim 13 of Patent '826 refers to the same place as the term "first location" in Claims 14, 24, 32/45, 50, 52 and 54 of Patent '875 (including "first and second locations" as stated in that patent's Claims 18, 28, and 29), and, therefore, both terms should be construed identically. Ball proposes the following construction for "first point" in Claim 13 of Patent '826 and "first location" in the Patent '875 claims: "point (in cross-section) on the can end wall where the juncture of the two chuck walls

35

engages the can end wall and bends it upwardly around the juncture and deforms it during the seaming process."

Ball presents the following argument to support this construction. First, it notes that although the Court declined to construe "first point" in Claim 13 of Patent '826 in the previous litigation, the Court observed in the *Markman* Order that "it is apparent that the first point is where the can end wall is bent upwardly at the juncture of the two chuck walls. In other words, the first point is where the can end wall is deformed during the seaming process." *Id.* (quoting Case No. 3:05-cv-00281, Doc. #53 at 20-21). According to Ball, "the claim language of the [Patent '875] claims is similar," and therefore, the Court's observation is "equally applicable" to the use of "first location" in those claims. To demonstrate this similarity, Ball points to the following language in Patent '875: "first location on said wall after said seaming operation forming the transition from said substantially cylindrical wall portion to said second wall portion" in Claim 14; "said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion" in Claim 32/45; and "bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall" in claim 50. Ball argues that "[a]ll of these claims require the 'first location' to be the point on the wall at which the wall is deformed during the seaming process, similar to the 'first point' in claims 13/14 of the '826 Patent," and they should all, therefore, be construed as it proposes.

36

Conversely, Crown argues that use of "first point" in Claim 1 of Patent '826 requires no construction because the language of the claim provides a definition. Doc. #22 at 26. Furthermore, Crown argues that Ball's proposed construction, when appended to the existing definition of "first point" in the claim, would "sow confusion" because it would read as follows: "the location at which said wall extends from said peripheral cover hook defines a[n] innermost point (in cross-section) on the end at which the cover hook terminates." *Id.* at 27. Crown also argues that "first point" as used in Claim 13 of Patent '826 does not require construction either, because its location is also defined by the claim language surrounding it. *Id.* Furthermore, Crown criticizes Ball's proposed construction as an attempt to impose limitations onto the term that are unsupported by the claim, such as the requirement that the chuck wall "engage" the can end. *Id.* at 28. Crown also points out that Ball's proposed construction in the parties' previous litigation did not seek to impose these limitations on the claim term that it now proposes. *Id.* at 28-29. Crown levels the same criticisms at Ball's proposed construction of "first location" in Patent '875, and also points out that the Court declined to construe the term in the previous case, despite Ball's request. *Id.* at 29.

Initially, it must be stressed that the Claim 1 of Patent '826 explicitly defines "first point." This is clearly a case where "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d 1303, 1314. When describing the invention, Claim 1 states in part that, on the can end:

37

> . . . prior to being joined to [the] can body: (i) the location at which said wall extends from said peripheral cover hook defines a first point, (ii) the location at which said reinforcing bead extends from said wall defines a second point, and (iii) a line extending between the first point and the second point is inclined to an axis perpendicular to the exterior of the central panel at an angle of between 30° and 60°.

(underlining added for emphasis).

Based on the underlined definition above, the Court agrees with Ball's observation that the "first point" is the point at which the peripheral cover hook terminates and the wall begins.  There is no indication that the peripheral cover hook and the can end wall overlap.  Rather, as the claim states, the "wall extends *from* [the] peripheral cover hook" at that point.  Thus, the Court agrees with Ball that a useful construction would state that the peripheral cover hook terminates at the first point.  A portion of the final part of Ball's proposed construction somewhat clarifies that termination: the "innermost point (in cross-section) on the end at which the cover hook terminates."

However, the first part of the proposed construction, which refers to an "innermost point (in cross-section) on the end," must be rejected for two reasons.  First, the use of "innermost point . . . on the end at which the cover hook terminates" is not clear, as it suggests that there may be more than one point in question, or even more than one point at which the cover hook terminates.  This is not so, as the peripheral cover hook terminates at the "first point."  Second, the reference to the "cross-section" is otherwise foreign to Claim 1.  Dependent claims 2 and 3 further define the can end by reference to its "cross-section," but Claim 1

38

does not rely on that terminology to define the can end.  A limitation present in a dependent claim should not be read into an independent one.  *Phillips*, 415 F.3d at 1314.  Construing "first point" with a reference to the cross-section would import that particular reference, reserved otherwise to the dependent claims, into the independent claim.  For these reasons, the Court will not adopt the entirety of Ball's proposed construction.  However, the Court will incorporate a reference to the termination of the peripheral cover hook, and will, therefore construe "first point" in Claim 1 of Patent '826 as "the location at which the can end wall extends from the termination of the peripheral cover hook."

Additionally, it is clear, as Ball asserts, that Claim 13 of Patent '826 also uses the term "first point" in reference to a different point on the can end wall than Claim 1.  Whereas Claim 1 *defined* a "first point" where the can end wall extends from the peripheral cover hook, Claim 13 describes the can end wall, in part, as having:

> a first portion of said wall extending from said cover hook to a first point on said wall, said first wall portion adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall . . . .

(underlining added for emphasis).

Thus, in Claim 13, "first point" marks 1) the *extent* of the "first portion" of the can end wall extending from the peripheral cover hook, and 2) the place where the "first wall portion" is "bent upwardly around" the juncture of the chuck walls.  Because the defined term "first point" in Claim 1 marks the location where the

peripheral cover hook ends and the wall *begins*, as opposed to Claim 13, where it demarcates the *extent* of the first portion of the wall, a person skilled in the art would undoubtedly recognize that "first point" has two distinct meanings in these claims. The Court, therefore, agrees with Ball that it cannot forgo construing "first point" in Claim 13, as it did in the prior litigation, where Claim 1 was not at issue. According to Ball, however, the Court's construction of "first point" in Claim 13 should also extend to the term "first location," as that term is used in a number of claims in Patent '875. Ball argues for such a blanket construction because "[a]ll of these claims require the 'first location' to be the point on the wall at which the wall is deformed during the seaming process, similar to the 'first point' in claims 13/14 of the '826 Patent." Ball only quotes three of the nine examples of the use of "first location" in Patent '875 to demonstrate this purported similarity: one of its two uses in Claim 14, one of its two uses in Claim 32, and one of its two uses in Claim 50. The Court finds Ball's demonstration of "similarity" insufficient. Without an unambiguous clarification of the total identity of the meanings in all of the claim terms to which Ball proposes applying a blanket construction, the Court does not believe that the same construction should apply to two terms in two different patents across such an array of claims.

Furthermore, Ball's proposed construction, "point (in cross-section) on the can end wall where the juncture of the two chuck walls engages the can end wall and bends it upwardly around the juncture and deforms it during the seaming process," would, like its proposed construction of Claim 1, invoke the "cross-

section" perspective in a claim that otherwise makes no reference to such a perspective.  The proposed construction must also be rejected because it would inappropriately import the process described in the claims of Patent '875 into the "first point" of Claim 13 in the '826 Patent.  Claim 13 itself makes no reference to the "engagement" of the can end wall by the juncture of the chuck walls.  Claim 13 states that the "first point" is where the "first wall portion . . . [is] bent upwardly around [the] juncture of [the] chuck walls," but is silent as to the details of that process.   Ball's proposed construction essentially rephrases a dependent process claim, Claim 24 of Patent '875, as a construction of an independent claim: "wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall."

Finally, "first point" and "first location" are not terms of art, but generally understood terms that depend on the immediate context of the sentence or phrase they are within for meaning.  It is for that reason, for example, that "first point" in Claim 1 refers to a different location on the can end wall than "first point" in Claim 13.  In short, the Court believes that it would be unduly restrictive to construe "first point" and "first location," as used across a variety of claims, according to a single construction.

This conclusion still leaves the issue of the construction of "first point" in Claim 13.  For the reasons just set forth, the Court will not adopt Ball's proposed construction.  Crown proposes no construction.  The Court therefore finds it

41

necessary to provide a construction that eliminates any confusion with the use of "first point" in Claim 1. Thus, the Court will construe "first point" in Claim 13 of Patent '826 as "a point on the can end wall where the first portion of the can end wall terminates, where the first wall portion is bent upwardly around the juncture of the chuck walls, and distinct from the 'first point' in Claim 1."

### 2. "Second Point," "Second Location"

Ball also proposes a single construction for the following terms: "second point" in Claims 1 and 13/14 of Patent '826; "second point forming a lowermost end of said wall" in Claim 13/14 of Patent '826; "second location" in claims 16, 18, 28, 29, and 32/45 of Patent '875; "second location on said wall that forms a transition with said reinforcing bead" in Claim 14 of Patent '875; and "transition therebetween" in Claims 50, 52, 54 of Patent '875. Ball proposes the following construction for all of the foregoing terms: "point (in cross-section) on the end where the can end wall is angularly offset from the annular reinforcing bead."

In support of its proposed construction, Ball makes several arguments. Preliminarily, Ball points out that the Court previously construed two of these terms in the parties' prior patent dispute: "second point forming a lowermost end of said wall" in Claims 13/14 of Patent '826, which was construed as "a second point that marks the lowest end of said can end wall"; and "transition therebetween" (as used the phrase "(iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall and said

42

reinforcing bead forming a transition therebetween") in Claim 50 of the '875 Patent, which was construed as "a place between them at which one changes to the other." According to Ball, all of the currently disputed terms, including the two previously construed terms, refer to the "same point at which the can end wall meets the annular reinforcing bead, and they should be construed similarly." Ball points to a disclaimer that Crown made during the prosecution of U.S. Patent No. 8,328,041 ("Patent '041"), which Ball claims "shares substantially the same specification and figures," to support its proposed construction. During that prosecution, Crown amended its claims in Patent '041 to "recite a can end with a reinforcing bead that has an outer wall that is angularly offset from the chuck wall." Doc. #23-10 at 4; Office Action Reply of 12/22/11. According to Ball, this is identical to the "second point," "second location," or "transition therebetween" that are currently in dispute, and should, therefore, inform the Court's current construction.

Crown rejects Ball's proposed construction, arguing that the terms in question require no further construction, and the term "annular reinforcing bead" should not be imported into claims where it otherwise does not appear. Doc. #22 at 29-30. Crown also argues that the "angularly offset" limitation from Patent '041 should not be read onto Patent '826 or Patent '875 because it appears nowhere in their claims, and was never argued during their prosecution to distinguish them from prior art.

43

Ball's argument for construing all of the disputed terms in question relies on the premise that they all refer to the identical point on the can end.  But there are genuine distinctions between the functions of Patent '826's "second point" and Patent '875's "second location."  For example, Claim 1 of Patent '826 describes "a line extending between the first point and the second point [that] is inclined to an axis perpendicular to the exterior of the central panel at an angle of between 30° and 60°."  Claim 14 also employs "second point" to plot an "angle of between 30° and 60°."  Patent '875, on the other hand, describes "a straight line extending between said first and second locations on said wall [that] is inclined between about 20° and about 60° with respect to an axial centerline of said can end."  Thus, the two patents allow for a 10° difference between the angles created with Patent '826's "second point" and Patent '875's "second location."  A uniform construction of these distinct terms would risk obscuring this significant distinction.

The Court also declines Ball's proposal to construe the terms in question based on disclaimers that Crown made in a later patent.  In *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1332-33 (Fed. Cir. 1999), an accused infringer argued that statements made nine months after the issuance of the patent-in-suit, during the prosecution of a subsequent patent, bound the plaintiff and should be considered as extrinsic evidence in support of its proposed construction of an ambiguous claim term.  The Federal Circuit rejected that argument, and stated that in order for the plaintiff "to be bound by the statement

44

made to the PTO in connection with a later prosecution of a different patent, the
statement would have to be one that the examiner relied upon in allowing the
claims *in the patent at issue*." *Id.* at 1333 (citing *Mannesmann Demag Corp. v.
Engineered Metal Prods. Co.*, 793 F.2d 1279, 1284–85 (Fed.Cir.1986)) (emphasis
added).  Here, Ball has not demonstrated that the examiner of the '826 or '875
Patent ever relied on a statement from Crown that the annular reinforcing bead has
to be "angularly offset" from the can end wall.

For these reasons, the Court will examine the disputed terms of each patent
separately.  First, the Court believes that Patent '826 uses the term "second point"
consistently in Claim 1 and 13.  Both claims use the term "second point" in order
to plot a hypothetical line that exists at a 30° to 60° angle to an axis that is
perpendicular to the central panel.  This consistent usage of an identical term
supports extending the Court's previous construction of "second point" in Claim
13 to Claim 1 as well.  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342
(Fed. Cir. 2001) (stating the general rule that "a claim term should be construed
consistently with its appearance in other places in the same claim or in other
claims of the same patent").  Accordingly, the Court will instruct the jury that
"second point" in Claim 1 and Claim 13 both refer to "a second point that marks
the lowest end of said can wall."

Second, the Court previously construed "transition therebetween," in the
phrase "a circumferentially extending wall extending from said seaming panel to
said reinforcing bead, said wall and said reinforcing bead forming a transition

45

therebetween," in Claim 50 of Patent '875, as "a place between them at which one changes to another." The Court adopts its previous construction of this phrase.

Third, the Court must construe the term "second location" as it is used in Patent '875. The claims themselves provide the best guidance as to the meaning of "second location." *See Phillips*, 415 F.3d 1303, 1314 (stating that "the claims themselves provide substantial guidance as to the meaning of particular claim terms" and "the context in which a term is used in the asserted claim can be highly instructive"). Claim 14 states that the "second location . . . forms a transition with [the] reinforcing bead," and Claim 32 describes it as "the lowermost point of [the can end] wall." Based on the plain meaning of the term in context, the Court will instruct the jury that the "second location" in claims 14, 16, 18, 28, 29, and 32/45 of Patent '875 is the "lowermost portion of the can end wall, where the second portion of the can end wall ends, that forms a transition with the reinforcing bead."

### 3. Can End Wall First Portion Terms

Ball argues for a uniform construction of the following terms: "a portion of said can end wall" in Claim 50 of Patent '875; "first wall portion" and "first portion of said wall" in Claims 13/14 of Patent '826; "a portion of said first wall portion" in Claims 14/15 of Patent '875; and "a portion of said first portion of said can end wall" in Claims 32/45 of Patent '875. Ball's proposed construction for all of these

terms is "the straight upper portion of the can end wall that is not substantially cylindrical (i.e., is inclined at an angle of at least 20°) before seaming."

In support of this uniform construction, Ball argues that Claims 13/14 of Patent '826 and Claim 50 of Patent '875 both require a seaming operation that involves the "straight upper portion of the can end wall." Doc. #23 at 34. Even though Claim 14 and Claims 32/45 of Patent '875 refer to a "radiused portion" of the can end wall, Ball believes that their other reference to a "portion of said first wall portion" must refer to the "straight upper portion of the can end wall" that is substantially deformed during seaming. According to Ball, all of these claim terms must be construed identically as the "straight upper portion of the can end wall" to prevent Crown from "utiliz[ing] the radiused portion (which actually belongs to the cover hook) when measuring the amount that an accused can end wall is bent during seaming." *Id.* at 35. Ball believes that Crown's previous attempt to avoid summary judgment involved utilizing such a measurement, and that the Court should adopt Ball's proposed construction to prevent it from doing so again. *Id.* at 34-35.

Crown argues against Ball's proposed construction, which it believes is not a construction at all, but an attempt to read the specification into the claims. Doc. #22 at 27-30. According to Crown, Ball is attempting to read the specification into the claims by specifying an angle inclination of at least 20° and by requiring the upper portion of the can end wall to be straight. In fact, Crown argues, such a construction would be contradicted by the specification, and cites to a specific

47

embodiment that demonstrates an upper wall portion that is partially straight and partially curved.  Crown also argues that Ball's construction improperly equates "not substantially cylindrical" with being "inclined at an angle of at least 20°." Ball's argument for a uniform construction of all of these terms relies on the underlying premise that the upper portion of the can end wall is straight.  Ball never, however, explains the basis for this premise, while acknowledging that several claims, such as Claim 14 and Claims 32/45 of Patent '875, refer to a "radiused portion" of the upper can end wall.   Ball even asserts that the radiused portion "actually belongs to the cover hook" in the same paragraph that it admits that Claims 14 and 32/45 of Patent '875 require that the "first wall portion" include a "radiused portion."  Doc. #23 at 45.

An examination of the claim language reveals no requirement that any of the upper wall portions be construed as "straight."  Claim 13 of Patent '826 describes "a first portion of said wall extending from said cover hook to a first point on said wall" that is "adapted to be deformed during said seaming operation," with no requirement that the first portion be straight.  To be sure, some part of the can end wall must be straight, for the purpose of determining the angle that is perpendicular to the central panel.  But the claim contemplates this, by specifying that "a line between [the] first and second points" determines the angle, and that line must, by definition, be below the "first wall portion."  Thus, there is no requirement that the can end wall have a "straight upper portion."  Claim 50 of Patent '875 also plots a straight line, but does so from its "first location" to the

48

wall's "transition" with the "reinforcing bead," well below the part above the "first location" that is bent upwardly during seaming. Again, there is no requirement that the upper part of the can end wall, above the "first location," be construed as a "straight upper portion."

Furthermore, as mentioned, Claims 14 and 32 of Patent '875 both recite that the "first wall portion" comprises a "radiused portion extending from [the] seaming panel." As an adjective describing "an edge or surface," radiused is defined as "rounded-off; curved." Oxford English Dictionary (3d Ed. 2008). Ball's proposed construction of the upper portion of the can end wall as "straight" directly conflicts with the claim language's description of the first wall portion having a "radiused portion." In short, there is no support for Ball's proposed construction of "a straight upper portion of the can end wall" in two of the claims, and it conflicts with the plain meaning of two other claims. Because the remainder of Ball's proposed construction only modifies the fictitious "straight upper portion," by specifying that it be "not substantially cylindrical (i.e., is inclined at an angle of at least 20°) before seaming," it must be rejected in its entirety.

As a final point, the Court believes that each of the claims in question describes the disputed claim terms with sufficient specificity, within the relevant context of each claim, that no further construction is necessary. Claim 13 of Patent '826 defines the "first wall portion" as "extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel." The parties have not indicated any source of ambiguity in

49

that language that would befuddle a person skilled in the art. The same observation applies to "a portion of said first wall portion" as used in Claims 14 and 15 of Patent '875. Claim 14 describes the method step of a "seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical," and Claim 15 further adds a limitation that "during said seaming operation at least a portion of said can end wall first portion is deformed by bending upward by an angle of at least about 16°." Finally, the "portion of said can end wall" in Claim 50 of Patent '875 is part of a larger phrase that the parties have stipulated to a construction of, modified by the Court, and set forth *infra* in Section III.A.2: "to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall," construed as "to turn a portion of said can end wall upwardly around the juncture of the walls of the chuck and against the first chuck wall, with the portion of said can end wall being bent by more than 10°." The words and phrases that surround each of the claims in question provide sufficient guidance as to the meaning and scope, and the Court does not discern a genuine dispute over their meaning in the parties' arguments, beyond what has been addressed. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy"). Accordingly, the Court will not construe "a portion of said can end

50

wall" in Claim 50 of Patent '875; "first wall portion" and "first portion of said wall" in Claims 13/14 of Patent '826; "a portion of said first wall portion" in Claims 14/15 of Patent '875; and "a portion of said first portion of said can end wall" in Claims 32/45 of Patent '875.

### 4. Bending/deforming terms

The parties had agreed upon two constructions of terms relating to the bending or deforming of the upper portion of the can end wall, which the Court slightly modified, as set forth above in Section III.A.2-3. The parties present several other terms related to the bending/deforming process, which the Court addresses individually below.

### a. "adapted to be joined" in Claim 1 and Claim 13 of Patent '826

The parties dispute "adapted to be joined," as used in two claims of Patent '826. Claim 1 describes "[a] metal can end <u>adapted to be joined</u> to a can body for packaging beverages under pressure . . . ." Claim 13 describes "[a] metal can end for use in packaging beverages under pressure and <u>adapted to be joined</u> to a can body by a seaming process so as to form a double seam therewith . . . ."

Ball proposes the following construction of "adapted to be joined": "having a can end wall with a first straight upper portion that is not substantially cylindrical (i.e., is not inclined at an angle of at least 20°) before being seamed, such that the first straight upper portion becomes substantially cylindrical and is bent by more

than 10° when seamed." In support of this construction, Ball repeats the same argument that it made for the construction of the various terms relating to the upper portion of the can end wall, stating that "it is imperative" that they be construed "so that the radiused portion is not included in the upper portion of the can end wall, which is measured to determine if it is bent by more than 10° to become substantially cylindrical during seaming." Doc. #23 at 42.

Crown proposes construing "adapted to be joined" as "designed or configured to be joined." Crown cites several cases in support of its construction and argues that "adapted to be joined" is a commonly used term in patent claims that is often given this construction. Doc. #22 at 41. Crown characterizes Ball's proposed construction as "a wholesale alteration of the claim language" that is unsupported by the phrase in question. *Id.* at 42. Finally, Crown argues that the parties' agreed construction of Claim 13 already requires that the first wall portion be bent by more than 10°. *Id.* Thus, Crown argues, there is no reason to repeat that requirement in a definition of "adapted to," or to impose it on Claim 1, which makes no mention of the seaming method. *Id.*

The Court agrees with Crown. Even if the Court had not previously rejected Ball's argument that no upper can end wall portion could possibly include a radiused portion (which, as discussed, is contrary to the plain language of the claims), the Court would still have to reject Ball's proposed construction because it connects in no meaningful way to the phrase "adapted to be joined," much less explains or construes it.

52

Crown's argument in support of its proposed construction, "designed or configured to be joined," relies on *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012). In *Aspex Eyewear*, the Federal Circuit upheld the district court's construction of "adapted to" in the claim "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame" as "made to," such that the phrase meant "that the arms and the pair of magnetic members [we]re made to extend across the top of the respective side portions of the primary frame." *Id.* at 1348. The court noted that "the phrase 'adapted to' is sometimes used in claim drafting to carry the broader meaning" of "suitable for," and "sometimes to carry a narrower meaning" such as "made to" or "configured to." *Id.* at 1349. The court upheld the narrower construction of "made to" or "configured to," because, in the context of the claim, "the phrase 'adapted to' is most naturally understood to mean that the arms and magnetic members are designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose." *Id.*

Here, too, the claims reference a specified objective that supports a construction of "adapted to" as "designed or configured." Claim 1 describes "[a] metal can end <u>adapted to be joined</u> to a can body for packaging beverages under pressure . . . ." Claim 13 describes "[a] metal can end for use in packaging beverages under pressure and <u>adapted to be joined</u> to a can body by a seaming process so as to form a double seam therewith . . . ." Both claims reference the specified objective of joining the can end to the can body. As such, it is obvious

53

that the invention was designed for that purpose.  Accordingly, the Court will adopt Crown's proposed construction of "adapted to be joined" in Claims 1 and 13 of Patent '826, and construe that phrase as "designed or configured to be joined."

> b. *"deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical" in Claim 14 of Patent '875; and "said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°" in Claims 32/45 of Patent '875*

The parties have proposed competing constructions for terms in Claim 14 and Claims 32/45 of Patent '875.  The proposed constructions apply to the following underlined text of Claim 14:

> e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said seaming operation <u>deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical</u>, said first location on said wall after said seaming operation forming the transition from said substantially cylindrical wall portion to said second wall portion, said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation.

Ball proposes construing the underlined phrase as "bending the first wall portion such that the portion of said first wall portion is bent upwardly around the juncture of the chuck and against the first chuck wall to become substantially cylindrical, with the portion of said first wall being bent by more than 10°." Crown's proposed construction is "deforming the first wall portion so that at least

54

a part of the first wall portion is substantially cylindrical after seaming, with the part of the first wall portion that is substantially cylindrical after seaming having been bent by more than 10° during seaming."

The parties have also proposed constructions for the following underlined text of Claim 32:

> e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, <u>said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°</u>, said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.

Ball proposes construing the underlined text above as "the portion of the first wall portion is bent upwardly around the juncture of the chuck through an angle of at least 16° to become substantially cylindrical." Crown's proposed construction is "at least a part of the first wall portion is pressed against the first wall of the chuck so that it is bent upward through an angle of at least about 16°."

In support of its proposed constructions, Ball argues that Claims 14 and 32 must be construed so that their mention of a "radiused portion" of the "first wall portion" not be included in the "portion of the said first wall portion" that is deformed during seaming, asserting that the "portion of the said first wall portion" only includes a straight portion of the can end wall. Doc. #23 at 42. Ball also

argues that Crown's proposed constructions are ambiguous because they "only require that any 'part' of the 'first wall portion' . . . be 'deformed' during seaming." Doc. #23 at 42.

Crown argues that Ball's constructions, by stating that the wall be "bent upwardly around the juncture of the chuck," improperly import the requirement that the chuck walls form a juncture into the claims. Doc. #22 at 42-44. Crown also argues that Ball's construction of Claim 32 unnecessarily specifies that the first wall portion become substantially cylindrical, because this fact can be inferred from the fact that the claim requires the first wall portion to be pressed against a substantially cylindrical chuck wall. *Id.*

As an initial matter, in spite of Ball's insistence that any construction require that the portion of the first wall portion that is deformed during seaming be restricted to a straight portion of the can end wall, its constructions do not do so. Moreover, as stated previously, there is no basis for reading such a limitation into the language of the claims, particularly when both Claim 14 and Claim 32 state that the first wall portion is comprised of "a radiused portion" extending from the seaming panel.

Furthermore, the Court agrees with Crown's observation that Ball's proposed constructions, insofar as they specify that the portion of the first wall portion is "bent upwardly around the juncture of the chuck," impose a foreign limitation onto the scope of Claim 14 and Claim 32. There is a presumption that each claim in a patent has a different scope. *Versa Corp. v. Ag-Bag- Int'l, Ltd.*,

56

392 F.3d 1325, 1330 (Fed Cir. 2004).  Claim 14 and Claim 32 are independent claims that recite methods that include "bringing [the] chuck into engagement with [the] can end," and the chuck in question is described only as "rotatable," with "a first circumferentially extending wall" that is "substantially cylindrical."  Claim 32 further describes a seaming operation in which the "first portion of said can end wall [is] pressed against said chuck first wall," but there is no requirement that the juncture of the chuck's wall be involved in the operation the claim described.

In contrast, Claim 1 and Claim 50 each provide specific descriptions of processes that involve the juncture of the chuck walls.  For example, Claim 1 describes a method that includes the "said rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end." Claim 50, which reads almost exactly like Ball's proposed construction, describes the "bend[ing] [of] portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall." Claim 24, which is a dependent claim to Claim 14, does describe "bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall."  This observation further bolsters the argument against reading the limitation Ball proposes onto Claim 14, because "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (citing *Liebel–Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 910 (Fed.Cir.2004)). For the foregoing reasons, the Court will not adopt a construction of Claim 14 or Claim 32 that incorporates a requirement that the first wall portion be "bent upwardly around the juncture of the chuck."

Crown also argues against Ball's proposed reference, in Claim 32, that a portion of the first wall portion "become substantially cylindrical." Crown states that its objection is "one of form, not substance," because the substantially cylindrical result may be inferred from other language of the claim. Doc. #22 at 44. Given that "[t]he purpose of claim construction is to determine the meaning and scope of the patent claims that the plaintiff alleges have been infringed," a construction that clearly states what is otherwise inferred seems preferable. *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1381 (Fed Cir. 2009) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed.Cir.2008)). Furthermore, Crown has stipulated to constructions that employ the exact same phrase to describe the first wall portion. Thus, the Court will adopt the language that Ball proposes and construe Claim 32 as requiring the portion of the first wall portion in question "to become substantially cylindrical."

### 5. *"First and second circumferentially extending walls of the chuck"*

Both Claim 13 of Patent '826 and Claim 50 of Patent '875 use the phrase "first and second circumferentially extending walls [of the chuck]" to describe the rotatable chuck used in the seaming process. In the following quotations, the

phrase is underlined. Claim 13 describes "[a] metal can end for use in packaging beverages under pressure and adapted to be joined to a can body by a seaming process so as to form a double seam therewith using a rotatable chuck comprising first and second circumferentially extending walls, said first and second chuck walls forming a juncture therebetween." Claim 50 describes the method of seaming, two steps of which include "c) providing a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween" and "d) bringing said chuck into engagement with said can end."

Crown's proposed construction of "first and second circumferentially extending walls [of the chuck]" is simply "first and second walls encircling the chuck." Doc. #22 at 23. Ball proposes "first and second encircling distinct, discrete, and discernibly separate side surfaces of the chuck, the first wall being a substantially cylindrical surface and the second wall bring a frustoconical drive surface with a slope substantially equal to that of the can end wall."[5] Doc. #23 at 38.

---

[5] Ball also proposes applying these constructions to "first circumferentially extending wall" in Claims 14, 20, 24, 24, 32/45. 50, 58, 89, including "first chuck wall" as stated in Claim 50, of the '875 Patent, and "second circumferentially extending wall" in Claim 50, including "second chuck wall" as stated in Claim 24 of the '875 Patent. Ball did not include the aforementioned terms in the list of patent terms that it was required to submit under S.D. Ohio Patent R. 105.2(d)(iii), notifying the Court of the terms it considered most significant to the resolution of the case. The Court will not, therefore, consider its arguments for construction of those terms separately from those for "first and second circumferentially extending walls [of the chuck]." However, the Court

In *Crown v. Ball*, the Court construed "first and second circumferentially extending walls" as "first and second encircling distinct, discrete and discernibly separate side surfaces of the chuck."  Thus, Crown's proposed construction, "first and second walls encircling the chuck," would delete much of the Court's previous construction.  As it argued in the previous case, Crown believes that the "distinct, discrete and discernibly separate" language is "unnecessary."  Doc. #22 at 24.  The Court declines Crown's invitation to delete the phrase "distinct, discrete and discernibly separate" from its construction of "first and second circumferentially extending walls."  As explained in the Court's previous *Markman* ruling, "[it] is not possible to have a first and a second wall, without there being two distinct, discrete and discernibly separate side surfaces."  Case No. 3:05-cv-281, Doc. #53 at 15.  Crown has not improved upon its argument in the previous case against "distinct, discrete and discernibly separate," and the Court accordingly rejects the suggestion to omit that language and adopt a bare-bones construction of the "first and second circumferentially extending walls [of the chuck]."

On the other hand, Ball's proposal would have the opposite effect.  Ball proposes a construction that specifies that the first chuck wall is "substantially cylindrical" and the second chuck wall is a "frustoconical drive surface encircling the chuck with a slope substantially equal to that of the can end wall."  According

---

notes that the same analysis and conclusion set forth above for "first and second circumferentially extending walls [of the chuck]" would apply to the use of "first circumferentially extending wall" and "second circumferentially extending wall."

to Ball, both of its "proposed constructions are supported by the specification, which requires the use of a chuck . . . with . . . 'a frustoconical drive surface' and a 'substantically cylindrical surface portion.'" Doc. #23 at 39. Ball appropriately references the written specification in support of its construction, due to the primary role that the written specification plays in claim construction. *See Phillips*, 415 F.3d 1303, 1315-1317 (Fed. Cir. 2005) (describing role of the specification in claim construction and stating that "[t]his court and its predecessors have long emphasized the importance of the specification in claim construction"). However, *Phillips* also recognizes "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim . . . " *Id.* at 1323. For this reason, the Court will not apply the additional limitations proposed by Ball to its previous construction of "first and second circumferentially extending walls."

Claim 50, in particular, deserves to be shielded from the limitations that Ball proposes. The proposition that limitations from the written specification should not be imposed on the claims carries additional force when the limitations in question appear only in claims that are dependent to the independent claims to be construed. This is because, notwithstanding the appearance of such terminology in the specification, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315 (citing *Liebel-Florsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). Here, the limitations in question only appear

in two dependent claims.  Dependent claim 59 recites:  "The method according to Claim 50, wherein said first wall of said chuck is substantially cylindrical."  Similarly, dependent Claim 60 recites: "The method according to claim 59, wherein said second chuck wall being substantially frustoconical."  Furthermore, each of these dependent claims consists only of the limitation in question.  A person skilled in the art would not read these limitations onto the independent claim. Due to their precise separation from the independent claim into individual dependent claims that contain no other recitation, a person skilled in the art would presume that they do not apply to the independent claim.  Accordingly, the Court rejects Ball's proposed construction, and will not append it to its previous construction of "first and second circumferentially extending walls."  With its previous construction as a model, the Court will construe "first and second circumferentially extending walls [of the chuck]" in Claim 13 of Patent '826 and Claim 50 of Patent '875 as "first and second encircling distinct, discrete and discernibly separate side surfaces of the chuck."

## V.    **CONCLUSION**

After consideration of the parties' arguments and the law applicable to claim construction, the Court construes the terms identified by the parties in their Joint Claim Construction and Prehearing Statement (Doc. #18) as follows:

1. "rotatable chuck," as it is used in Claim 13 of Patent '826 and Claims 14, 32, 45, 50, 58, and 59 of Patent '875 is construed as "rotatable attachment to a seamer used to hold the can end, and against which the double seam is formed"

2. "deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls," in Claim 13 of Patent '826, is construed as "turned upwardly around the juncture of the chuck walls and against the first chuck wall to become substantially cylindrical, with the first wall portion being bent by more than 10°"

3. "to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall," in Claim 50 of Patent '875, is construed as "to turn a portion of said can end wall upwardly around the juncture of the walls of the chuck and against the first chuck wall, with the portion of said can end wall being bent by more than 10°"

4. "seaming panel," as the term is used in Claim 13 of Patent '826 and Claims 14, 32, and 50 of Patent '875, is construed as the "curved innermost portion of the peripheral cover hook."

5.  "annular reinforcing bead" as it is used in Claims 1 and 14 of Patent '826, and Claims 1, 14, 40, 44, and 50 of Patent '875, is construed as "outwardly concave, generally 'U' shaped, ring-like stiffening channel."

6.  "juncture therebetween," as used in Claim 13 of Patent '826 and Claims 24,25 and 50 of Patent '875, is construed as "definable edge between the walls of the chuck (which is a point in cross-section)"

7.  "wall extending inwardly and downwardly" in Claims 1 and 13/14 of Patent '826 is construed as "a can end wall which is a single surface"

8.  "circumferentially extending wall" in Claims 14, 32/45 and 50 of Patent '875 is construed as "a can end wall which is a single surface encircling the center of the can end"

9.  "circumferentially extending wall extending from said seaming panel to said reinforcing bead" in Claims 14 and 50 of Patent '875 is construed as "a can end wall which is a single surface encircling the center of the can end extending from said seaming panel to said reinforcing bead"

10. "first point" in Claim 1 of Patent '826 is construed as "the location at which the can end wall extends from the termination of the peripheral cover hook"

64

11. "first point" in Claim 13 of Patent '826 is construed as "a point on the can end wall where the first portion of the can end wall terminates, where the first wall portion is bent upwardly around the juncture of the chuck walls, and distinct from the 'first point' in Claim 1"

12. "adapted to be joined" in Claims 1 and 13 of Patent '826 is construed as "designed or configured to be joined"

13. "said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°" in Claims 32/45 of Patent '875 is construed as to require the first portion of the can end wall "to become substantially cylindrical"

14. "first and second circumferentially extending walls [of the chuck]" in Claim 13 of Patent '826 and Claim 50 of Patent '875 is construed as "first and second encircling distinct, discrete and discernibly separate side surfaces of the chuck"

A further scheduling conference, setting forth at that date and other dates leading to the resolution of this litigation, will be set by separate entry.

65

Date: December 28, 2015                    s/ Walter H. Rice
                                           WALTER H. RICE
                                           UNITED STATES DISTRICT JUDGE